Affirmed by Supreme Court on May 15, 2000.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTY BRZONKALA,
<u>Plaintiff-Appellant,</u>

v.

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; ANTONIO J.
MORRISON; JAMES LANDALE CRAWFORD,
<u>Defendants-Appellees,</u>

and

CORNELL D. BROWN; WILLIAM E.
LANDSIDLE, in his capacity as
Comptroller of the Commonwealth,
<u>Defendants.</u>

LAW PROFESSORS; VIRGINIANS ALIGNED

AGAINST SEXUAL ASSAULT; THE ANTI-
DEFAMATION LEAGUE; CENTER FOR
WOMEN POLICY STUDIES; THE DC RAPE
CRISIS CENTER; EQUAL RIGHTS
ADVOCATES; THE GEORGETOWN
UNIVERSITY LAW CENTER SEX
DISCRIMINATION CLINIC; JEWISH WOMEN
INTERNATIONAL; THE NATIONAL
ALLIANCE OF SEXUAL ASSAULT
COALITIONS; THE NATIONAL COALITION
AGAINST DOMESTIC VIOLENCE; THE
NATIONAL COALITION AGAINST SEXUAL
ASSAULT; THE NATIONAL NETWORK TO
END DOMESTIC VIOLENCE; NATIONAL
ORGANIZATION FOR WOMEN;

No. 96-1814

NORTHWEST WOMEN'S LAW CENTER; THE
PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE, INCORPORATED;
VIRGINIA NATIONAL ORGANIZATION FOR
WOMEN; VIRGINIA NOW LEGAL
DEFENSE AND EDUCATION FUND,

INCORPORATED; WOMEN EMPLOYED;
WOMEN'S LAW PROJECT; WOMEN'S
LEGAL DEFENSE FUND; INDEPENDENT
WOMEN'S FORUM; WOMEN'S FREEDOM
NETWORK,
Amici Curiae.

UNITED STATES OF AMERICA,
Intervenor-Appellant,

and

CHRISTY BRZONKALA,
Plaintiff,

v.

ANTONIO J. MORRISON; JAMES LANDALE
CRAWFORD,
Defendants-Appellees,                                    No. 96-2316

and

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; CORNELL D. BROWN;
WILLIAM E. LANDSIDLE, in his capacity
as Comptroller of the Commonwealth,
Defendants.

LAW PROFESSORS; VIRGINIANS ALIGNED
AGAINST SEXUAL ASSAULT; THE ANTI-
DEFAMATION LEAGUE; CENTER FOR
WOMEN POLICY STUDIES;

2

THE DC RAPE CRISIS CENTER; EQUAL
RIGHTS ADVOCATES; THE GEORGETOWN
UNIVERSITY LAW CENTER SEX
DISCRIMINATION CLINIC; JEWISH WOMEN
INTERNATIONAL; THE NATIONAL
ALLIANCE OF SEXUAL ASSAULT
COALITIONS; THE NATIONAL COALITION
AGAINST DOMESTIC VIOLENCE; THE
NATIONAL COALITION AGAINST SEXUAL
ASSAULT; THE NATIONAL NETWORK TO
END DOMESTIC VIOLENCE; NATIONAL
ORGANIZATION FOR WOMEN; NORTHWEST

WOMEN'S LAW CENTER; THE
PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE, INCORPORATED;
VIRGINIA NATIONAL ORGANIZATION FOR
WOMEN; VIRGINIA NOW LEGAL
DEFENSE AND EDUCATION FUND,
INCORPORATED; WOMEN EMPLOYED;
WOMEN'S LAW PROJECT; WOMEN'S
LEGAL DEFENSE FUND; INDEPENDENT
WOMEN'S FORUM; WOMEN'S FREEDOM
NETWORK,
Amici Curiae.

No. 96-2316

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CA-95-1358-R)

Argued: March 3, 1998

Decided: March 5, 1999

Before WILKINSON, Chief Judge, and WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

3

Affirmed by published opinion. Judge Luttig wrote the opinion, in which Chief Judge Wilkinson and Judges Widener, Wilkins, Niemeyer, Hamilton, and Williams joined. Chief Judge Wilkinson wrote a concurring opinion. Judge Niemeyer wrote a concurring opinion. Judge Motz wrote a dissenting opinion, in which Judges Murnaghan, Ervin, and Michael joined.

_____

**COUNSEL**

**ARGUED:** Mark Bernard Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Julie Goldscheid, NOW LEGAL DEFENSE & EDUCATION FUND, New York, New York; Deborah L. Brake, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., for Appellants. William Henry Hurd, Senior Counsel to the Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia; Michael E. Rosman, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C., for Appellees. **ON BRIEF:** Frank W. Hunger, Assistant Attorney General, Robert P. Crouch, Jr., United States Attorney, Stephen W. Preston, Deputy Assistant Attorney General, Alisa B. Klein, Anne M. Lobell, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant United States; Martha F. Davis, NOW LEGAL DEFENSE & EDUCATION FUND, New York, New York; Neena K. Chaudry, Marcia D. Greenberger, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Eileen Wagner, Richmond, Virginia, for Appellant Brzonkala. Mark L. Earley, Attorney General of Virginia, William E. Thro, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia; Jerry D. Cain, Special Assistant Attorney General, Kay Heidbreder, Special Assistant Attorney General, VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY, Blacksburg, Virginia, for Appellee VPI. Hans F. Bader, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C.; W. David Paxton, M. Christina Floyd, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellee Morrison; Joseph Graham Painter, Jr., PAINTER, KRATMAN, SWINDELL & CRENSHAW, Blacksburg, Virginia, for Appellee Crawford. Sara D. Schotland, Amy W. Schulman, CLEARY, GOTTLIEB, STEEN & HAMILTON, Washington, D.C.,

4

for Amici Curiae Law Professors. Janice Redinger, VIRGINIANS ALIGNED AGAINST SEXUAL ASSAULT, Charlottesville, Virginia; Minna J. Kotkin, Sara Kay, Federal Litigation Program, BLS LEGAL SERVICES CORPORATION, Brooklyn, New York, for Amici Curiae Virginians Aligned, et al. E. Duncan Getchell, Jr., J. William Boland, Robert L. Hodges, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Amicus Curiae Independent Women's Forum. Michael D. Weiss, LAWSON, WEISS & DANZIGER, Houston, Texas, for Amicus Curiae Women's Freedom Network.

_____

## OPINION

LUTTIG, Circuit Judge:

We the People, distrustful of power, and believing that government limited and dispersed protects freedom best, provided that our federal government would be one of enumerated powers, and that all power unenumerated would be reserved to the several States and to ourselves. Thus, though the authority conferred upon the federal government be broad, it is an authority constrained by no less a power than that of the People themselves. "[T]hat these limits may not be mistaken, or forgotten, the constitution is written." Marbury v. Madison, 1 Cranch 137, 176 (1803). These simple truths of power bestowed and power withheld under the Constitution have never been more relevant than in this day, when accretion, if not actual accession, of power to the federal government seems not only unavoidable, but even expedient.

These foundational principles of our constitutional government dictate resolution of the matter before us. For we address here a congressional statute, Subtitle C of the Violence Against Women Act, 42 U.S.C. § 13981, that federally punishes noncommercial intrastate violence, but is defended under Congress' power "[t]o regulate commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, and that punishes private conduct, but is defended under Congress' power "to enforce, by appropriate legislation" the Fourteenth Amendment guarantee that "[n]o State shall. . . deny to any person within

5

its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, §§ 1, 5. Such a statute, we are constrained to conclude, simply cannot be reconciled with the principles of limited federal government upon which this Nation is founded. As even the United States and appellant Brzonkala appear resignedly to recognize, the Supreme Court's recent decisions in United States v. Lopez, 514 U.S. 549 (1995), and City of Boerne v. Flores, 117 S. Ct. 2157 (1997), which forcefully reaffirmed these most basic of constitutional principles, all but preordained as much. Enacted by the Congress assertedly in exercise of its powers both to regulate interstate commerce and to enforce the prohibitions of the Fourteenth Amendment, section 13981 was initially defended by appellants in the wake of United States v. Lopez primarily as a valid exercise, not of Congress' Commerce Clause power, but of Congress' power under Section 5 to enforce the Fourteenth Amendment's restrictions on the States -- notwithstanding the statute's regulation of conduct purely private. Confronted by the Supreme Court's intervening decision in City of Boerne v. Flores during this appeal, the appellants retreated to defend the statute primarily as an exercise, not of Congress' power under Section 5 of the Fourteenth Amendment, but of its power under the Commerce Clause -- notwithstanding the statute's regulation of conduct neither commercial nor interstate. And, finally, in the end, appellants are forced by these two plainly controlling decisions to defend the statute on little more than wistful assertions that United States v. Lopez is an aberration of no significance and that the established precedents upon which City of Boerne v. Flores rested -- United States v. Harris, 106 U.S. 629 (1883), and the Civil Rights Cases, 109 U.S. 3 (1883) -- should be disregarded as insufficiently "modern" to define any longer the reach of Congress' power under the Fourteenth Amendment.

Appreciating the precariousness in which appellants find themselves by virtue of the intervening decisions in Lopez and City of Boerne, but accepting these recent and binding authorities as the considered judgments of a Supreme Court that has incrementally, but jealously, enforced the structural limits on congressional power that inhere in Our Federalism, see Printz v. United States, 117 S. Ct. 2365, 2376-78 (1997); City of Boerne v. Flores , 117 S. Ct. 2157, 2162, 2168, 2172 (1997); Seminole Tribe v. Florida, 517 U.S. 44, 64-65 (1996); United States v. Lopez, 514 U.S. 549, 552-53, 556-57, 567-68 (1995); New York v. United States, 505 U.S. 144, 155-57 (1992), we

6

hold today that section 13981 exceeds Congress' power under both the Commerce Clause of Article I, Section 8, and the Enforcement Clause of Section 5 of the Fourteenth Amendment.

To otherwise hold would require not only that we, as the dissent would do, disclaim all responsibility to "determine whether the Congress has exceeded limits allowable in reason for the judgment which it has exercised," Polish Nat'l Alliance v. NLRB, 322 U.S. 643, 650 (1944), and embrace the view of federalism articulated by Justice Blackmun over passionate denouncements by the Chief Justice and Justice O'Connor in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528 (1984), but that we extend the reach of Section 5 of the Fourteenth Amendment beyond a point ever contemplated by the Supreme Court since that Amendment's ratification over a century and a quarter ago. These things we simply cannot do.

I.

In response to the problems of domestic violence, sexual assault, and other forms of violent crime against women, Congress enacted the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, §§ 40001-40703, 108 Stat. 1796, 1902-55. This legislation represents a multifaceted federal response to the problem of violence against women and includes a host of provisions, only one of which we address today.

VAWA's provisions are too numerous to discuss exhaustively here. Among its many provisions not at issue, VAWA provides extensive federal funding -- initially $1.6 billion, but subject to subsequent enhancement -- to the States to help them curtail violence against women through law enforcement efforts, 42 U.S.C.§ 3796gg, education and prevention programs, id. § 300w-10, and the maintenance of battered women's shelters, id. § 10402(a); it criminalizes interstate acts of domestic violence, 18 U.S.C. § 2261, as well as the interstate violation of protective orders against violence and harassment, id. § 2262; it imposes various sentencing enhancements for existing federal crimes motivated by gender animus, 28 U.S.C.§ 994, restitution to the victims of violent crime against women, 18 U.S.C. §§ 2248, 2259, 2264, and other remedial provisions governing those who commit violent crimes against women, see, e.g., id. § 2247 (repeat offend-

7

ers); id. § 2263 (pretrial release of defendants); it amends the Federal Rules of Evidence by adopting a rape shield provision to exclude from sexual assault trials evidence of a victim's prior sexual behavior, 28 U.S.C. § 2074; Fed. R. Evid. 412; and it mandates that all States give Full Faith and Credit to the protective orders of every other State, 18 U.S.C. § 2265.

In addition to these provisions, however, VAWA establishes, in the single section at issue before us today, a federal substantive right in "[a]ll persons within the United States . . . to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). See infra Part II. And, to enforce this substantive right, section 13981(c) creates a private cause of action against any "person . . . who commits a crime of violence motivated by gender," 42 U.S.C. § 13981(c), and allows any party injured by such a crime to obtain compensatory damages, punitive damages, and injunctive, declaratory, or other appropriate relief, id.

Plaintiff-appellant Christy Brzonkala brought the instant action under section 13981 in federal district court against defendants-appellees Antonio Morrison and James Crawford. As is relevant here, she alleged as follows.[1] Brzonkala was a student at Virginia Polytechnic Institute at the time of the incident at issue. Morrison and Crawford were students at Virginia Polytechnic Institute at the same time and were members of the school's football team. Brzonkala alleges that soon after she met Morrison and Crawford, the two defendants pinned her down on a bed in her dormitory and forcibly raped her. J.A. at 71-72. Afterwards, Morrison told Brzonkala,"You better not have any f***ing diseases." Id. at 72. And, subsequently, Morrison announced publicly in the dormitory's dining hall,"I like to get girls drunk and f*** the s*** out of them." Id. at 73. In her complaint, Brzonkala alleges, inter alia, that these acts by Morrison and Craw-

_____

[1] This statement of facts is drawn almost verbatim from the statement of facts set forth by the United States and adopted, for purposes of this appeal, by appellees Morrison and Crawford. Br. of Intervenor United States at 16-17; Br. of Appellees at 1 (adopting statement of facts set forth by the United States).

ford violated her right under 42 U.S.C. § 13981(b) to be free from gender-motivated crimes of violence.**2**

Morrison and Crawford moved to dismiss Brzonkala's claim on the grounds that the complaint failed to state a claim under section 13981 and that, even if the complaint did state such a claim, Congress was without constitutional authority to enact section 13981. The United States intervened to defend the constitutionality of section 13981 under the Commerce Clause and Section 5 of the Fourteenth Amendment -- the two sources of power expressly invoked by Congress in enacting section 13981. See 42 U.S.C. § 13981(a) (declaring statute adopted "[p]ursuant to the affirmative power of Congress to enact this part under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of the Constitution"). The government, joined by Brzonkala, defended section 13981 as an appropriate exercise of Congress' power to regulate interstate commerce on the ground that violence against women is a widespread social problem with ultimate effects on the national economy. They defended section 13981 as an exercise of Section 5 of the Fourteenth Amendment on the grounds that bias and discrimination against women in the state criminal justice systems often deny legal redress

_____

**2** Appellant Brzonkala also contends that the district court improperly dismissed her claims against Virginia Polytechnic Institute under Title IX of the Education Amendments of 1972, 20 U.S.C.§§ 1681-1688, in which she assertedly alleged both disparate treatment and hostile environment causes of action. We do not question the district court's conclusion that Brzonkala failed to state a claim alleging disparate treatment, and we thus affirm that holding and the reasoning upon which it was based. With respect to the hostile environment claim, the Supreme Court of the United States has recently agreed to decide whether student on student sexual harassment is actionable at all under Title IX. See Davis v. Monroe County Bd. of Educ., 120 F.3d 1390 (11th Cir. 1997), cert. granted, 66 U.S.L.W. 3387 (U.S. Sept. 29, 1998) (No. 97-843). Because the Court's decision in Davis will almost certainly prove informative of whether Brzonkala has sufficiently pled such a cause of action, if not determinative of that asserted cause of action as a matter of law, we vacate the district court's dismissal of the hostile environment cause of action and remand with instructions to the district court to hold this claim in abeyance pending the Supreme Court's disposition of Davis.

to the victims of gender-motivated crimes of violence and that such denials may violate the Equal Protection Clause.

In a thorough opinion, the district court concluded that Brzonkala stated a statutory claim against defendant Morrison, but held that Congress was without authority under the Constitution to enact section 13981. 935 F. Supp. 779 (W.D. Va. 1996). With respect to whether section 13981 could be justified under Congress' power "[t]o regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, the district court meticulously canvassed the reasoning of Lopez, the Supreme Court's recent decision that invalidated the Gun-Free School Zones Act of 1990 as an unconstitutional exercise of Congress' Commerce Clause power. 935 F. Supp. at 785-88. The district court concluded that section 13981, like the Gun-Free School Zones Act, regulated neither the channels of interstate commerce nor the instrumentalities of interstate commerce, and thus could be upheld, if at all, only as a regulation of an activity that "substantially affects" interstate commerce. Id. at 786. Applying Lopez's "substantially affects" test to section 13981, the district court concluded that, like the Gun-Free School Zones Act, section 13981 could not be sustained under the Commerce Clause both because it regulated noneconomic activity (private acts of gender-motivated violence) without any jurisdictional requirement limiting its application only to particular acts of violence that in fact affect interstate commerce and because the practical implications of concluding that gender-motivated violence was sufficiently related to interstate commerce to justify its regulation would be to grant Congress power to regulate virtually the whole of criminal and domestic relations law. Id . at 788-93. The district court reasoned that these failings rendered section 13981 materially indistinguishable from the Gun-Free School Zones Act invalidated in Lopez, and that the asserted differences between section 13981 and the Gun-Free School Zones Act -- that Congress made more extensive findings with respect to section 13981, that section 13981 imposes only civil and not criminal liability, and that there are arguably slightly "fewer steps of causation" in the chain from gender-motivated violence to an effect on interstate commerce -- were, essentially, superficial distinctions in light of the Supreme Court's controlling reasoning in Lopez. Id.

Turning to Section 5, the district court then concluded that section 13981 was not "appropriate legislation" "to enforce" the guarantee

10

that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §§ 1, 5. In this regard, the district court concluded, first, that section 13981, which regulates private acts of gender-motivated violence, could not be reconciled with controlling Supreme Court precedent holding that Congress may not regulate purely private conduct under Section 5. 935 F. Supp. at 793-94 (citing, among others, Civil Rights Cases, 109 U.S. 3 (1883)). Second, the district court reasoned that, even if Congress could regulate some private conduct under Section 5 as a means of remedying violations of the Equal Protection Clause by the States, section 13981 was nonetheless invalid because it was not a closely tailored means to that end:

> [Section 13981] is tailored to remedy conduct other than the conduct giving rise to the equal protection concern.[Section 13981] compensates victims for the violence directed against them because of their gender, not for the states' denial of equal protection. . . . The statute is overbroad: many women who do not suffer Fourteenth Amendment violations at the hands of the state system would still have a [section 13981] claim. A woman in a state with fair rape laws who is raped and whose rapist receives the maximum sentence may still have a [section 13981] claim. That woman may receive compensation via [section 13981] despite having suffered no denial of her equal protection rights. [Section 13981] is also too narrow: many women who suffer clear violations of their Fourteenth Amendment rights would not have a [section 13981] remedy, because the crime was not based on the woman's gender. These women would not receive any compensation despite the fact that the states clearly denied them equal protection of the laws.

Id. at 800. Finally, the district court concluded that section 13981 was not even aimed at remedying violations of the Equal Protection Clause by the States, primarily because it regulates the perpetrators of gender-motivated violence rather than the States themselves or those acting under color of state law. Accordingly, the district court concluded that "[n]o reasonable possibility exists that, in enacting [section 13981], Congress has enforced the Fourteenth Amendment mandate that `[n]o State shall . . . deny to any person within its juris-

11

diction the equal protection of the laws,'" id. at 801 (quoting U.S. Const. amend. XIV, § 1), and that "[n]o reasonable possibility exists that [section 13981] will remedy any legitimate Fourteenth Amendment concern." Id.

The government and Brzonkala appealed this decision, and, on December 23, 1997, a divided panel of this court reversed the judgment of the district court, holding that section 13981 was a legitimate exercise of Congress' power under the Commerce Clause. 132 F.3d 949 (4th Cir. 1997). By order dated February 2, 1998, the full court vacated the judgment and opinion of that panel, and, on March 3, 1998, we reheard the case en banc.

II.

As a threshold matter, we must determine whether Brzonkala has stated a claim under section 13981 sufficient to withstand appellees' motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. We hold that Brzonkala has properly stated a claim under section 13981 against appellee Morrison. We do not reach, because it is unnecessary to do so, the question of whether her complaint properly states a section 13981 claim against appellee Crawford.

Section 13981 provides a civil remedy to parties injured by "a crime of violence motivated by gender." 42 U.S.C.§ 13981(c). The statute defines the term "crime of violence" by reference to existing state and federal law. Id. § 13981(d)(2) (defining the term to include "an act or series of acts that would constitute a felony" "and that would come within the meaning of State or Federal offenses"). Such a crime is defined to be "motivated by gender" for the purposes of the statute when that crime is "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." Id. § 13981(d)(1); see also id. § 13981(e)(1) (no cause of action "for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender").

Crawford and Morrison concede that Brzonkala's complaint alleges that they have committed "crime[s] of violence" within the meaning of the statute. Cf. J.A. at 96-97 (complaint alleging that Mor-

12

rison and Crawford's conduct toward Brzonkala violated Virginia criminal law in several respects). They challenge, however, Brzonkala's allegation that they acted "because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1).

Brzonkala has explicitly alleged that the defendants-appellees' actions "were motivated wholly by discriminatory animus toward her gender and were not random acts of violence." J.A. at 24. As it relates to Morrison, this allegation of gender motivation is supported and corroborated by Brzonkala's allegation that Morrison stated publicly that he "like[d] to get girls drunk and f*** the s*** out of them." Id. at 20. Although these allegations do not necessarily compel the conclusion that Morrison acted from animus toward women as a class, and might not even be sufficient, without more, to defeat a motion either for summary judgment or for a directed verdict, we hold that they are sufficient to defeat Morrison's motion to dismiss.**3**

So concluding, we are faced directly, as appellants urge, with the question whether section 13981 represents a constitutional exercise of Congress' power under either the Commerce Clause of Article I, Section 8, or Section 5 of the Fourteenth Amendment.

III.

After the Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), but before the Court's decision two years ago in City of Boerne v. Flores, 117 S. Ct. 2157 (1997), the appellants defended section 13981 primarily as a valid exercise of Congress' enforcement authority under Section 5 of the Fourteenth Amendment. Since the decision in City of Boerne, the appellants have resorted to defending

_____

**3** It is much less clear whether Brzonkala has properly stated a section 13981 claim against appellee Crawford, as Crawford is not alleged to have made statements like Morrison's. By concluding that Brzonkala has stated a claim against Morrison, however, we are forced to confront the question of whether section 13981 exceeds the scope of Congress' constitutional powers. Our resolution of that question, which we discuss below at Parts III-IV, renders unnecessary any decision as to whether Brzonkala has also stated a claim against Crawford.

the section primarily as a valid exercise of Congress' power under the Commerce Clause. Therefore, we address ourselves first to this defense of the statute.

In United States v. Lopez, the Supreme Court held that Congress had exceeded its power to regulate interstate commerce in enacting the Gun-Free School Zones Act of 1990 ("GFSZA"), 18 U.S.C. § 922(q). In so holding, the Court reaffirmed that, although the Commerce Clause represents a broad grant of federal authority, that authority is not plenary, but subject to outer limits. See, e.g., Lopez, 514 U.S. at 556-57, 567-68. And although the Court reaffirmed that congressional power under the Commerce Clause is not limited solely to the regulation of interstate commerce per se , but extends to laws governing activities sufficiently related to interstate commerce to render their regulation necessary and proper to the regulation of interstate commerce, the Court also substantially clarified the scope and the limits of Congress' Article I, Section 8 power. Under the principles articulated by the Court in Lopez, it is evident that 42 U.S.C. § 13981, like the Gun-Free School Zones Act, does not regulate an activity sufficiently related to interstate commerce to fall even within the broad power of Congress under the Commerce Clause.

A.

In demarcating the limits of congressional power to regulate activities that do not themselves constitute interstate commerce, the Court in Lopez made clear that such power does not extend to the regulation of activities that merely have some relationship with or effect upon interstate commerce, but, rather, extends only, as is relevant here, to those activities "having a substantial relation to interstate commerce, . . . i.e., those activities that substantially affect interstate commerce." Lopez, 514 U.S. at 558-59 (emphases added); accord id. at 559 ("[O]ur case law has not been clear whether an activity must `affect' or `substantially affect' interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity `substantially affects' interstate commerce." (citations omitted)).**4**

_____

**4** As the Court reaffirmed in Lopez, Congress may, under the Commerce Clause, "regulate the use of the channels of interstate commerce"

14

Furthermore, the Court made explicit that whether an activity "substantially affects" interstate commerce such that it may be regulated under the Commerce Clause "is ultimately a judicial rather than a legislative question." Id. at 557 n.2 (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 273 (1964) (Black, J., concurring)). Thus, the Court not only reaffirmed that the limits of the Commerce Clause are judicially enforceable, see also id . at 557 ("[T]he power to regulate commerce, though broad indeed, has limits that [t]he Court has ample power to enforce." (internal quotation and citation omitted)); id. at 566 (referring to "judicially enforceable outer limits" of the Commerce Clause); id. at 580 (Kennedy, J., concurring) (discussing Court's "duty to recognize meaningful limits on the commerce power of Congress"), it also made clear, as its analysis confirms, that the "substantially affects" test does not contemplate a mere factual or empirical inquiry, but must be understood, in the final analysis, as a legal test, and the phrase "substantially affects interstate commerce" as one of legal art.

In clarifying the content of this legal test, the Court specifically identified two types of laws that it had upheld as regulations of activities that substantially affect interstate commerce: (1) "regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate

_____

and "regulate and protect the instrumentalities of interstate commerce, or persons and things in interstate commerce, even though the threat may come only from intrastate activities," in addition to regulating activities that substantially affect interstate commerce. Lopez, 514 U.S. at 558-59. It is both clear and undisputed by the parties that§ 13981, like the GFSZA,

> is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can it be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce.

Id. at 559. Thus, § 13981 can be sustained under the Commerce Clause only if it constitutes "a regulation of an activity that substantially affects interstate commerce." Id.

15

commerce," Lopez, 514 U.S. at 561 (majority), and (2) regulations that include a jurisdictional element to ensure,"through case-by-case inquiry," that each specific application of the regulation involves activity that in fact affects interstate commerce, id.

The Court also emphasized that, any dictum in its previous cases notwithstanding, see infra Part III.E, it had never extended the substantially affects test to uphold the regulation of a noneconomic activity in the absence of a jurisdictional element, see, e.g., id. at 560 ("Even Wickard, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not."); id. at 580 (Kennedy, J., concurring) ("[U]nlike the earlier cases to come before the Court here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus."). And it confirmed that it was unwilling to follow "[t]he broad language" in certain previous cases that had "suggested the possibility of additional expansion" of congressional authority under the Commerce Clause by extending that authority beyond the scope of its previous holdings, Lopez, 514 U.S. at 567 (majority) ("declin[ing] here to proceed any further"). Most importantly, the Court expressly held that because the Gun-Free School Zones Act "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce," id.,"it exceed[ed] the authority of Congress `[t]o regulate Commerce . . . among the several States . . .,'" id. at 551 (quoting U.S. Const. art. I, § 8, cl. 3) (ellipses in original). Accord id. at 567-68; cf. id. at 561 ("[GFSZA] is a criminal statute that by its terms has nothing to do with `commerce' or any sort of economic enterprise, however broadly one might define those terms. . . . It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." (emphasis added)).

That the Court's focus on the failure of the Gun-Free School Zones Act either to regulate economic activity or to include a jurisdictional element was intended to demarcate the outer limits-- or, at the very least, the presumptive outer limits, see infra Part III.C -- of congressional power under the substantially affects test is explicitly con-

16

firmed throughout the majority and concurring opinions. See, e.g., id. at 566 ("Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender `legal uncertainty.'") (emphasis added); id. at 573-74 (Kennedy, J., concurring) (listing certain prior cases as "examples of the exercise of federal power where commercial transactions were the subject of regulation" and noting that "[t]hese and like authorities are within the fair ambit of the Court's practical conception of commercial regulation and are not called in question by our decision today"). And such an understanding of the case follows inescapably, as well, from the enormous emphasis placed by the Court -- essentially ignored by both the appellants and the dissent -- on the "commercial concerns that are central to the Commerce Clause," id. at 583, and on the corresponding distinction between regulation of commercial or economic activities and regulation of noncommercial, noneconomic activities, see, e.g., id. at 627-28 (Breyer, J., dissenting) (recognizing the majority's "critical distinction between`commercial' and non-commercial `transaction[s]'"); id . at 608 (Souter, J., dissenting) (similar); cf. Hoffman v. Hunt, 126 F.3d 575, 586-87 (4th Cir. 1997) ("The [Lopez] Court repeatedly pointed to a distinction between the regulation of, on the one hand, those activities that are commercial or economic in nature -- or arise out of or are connected with a commercial transaction -- and, on the other hand, those activities that are not. In the two instances in which it stated the controlling analysis, the Court focused on the fact that possession of a gun in a school zone was neither itself an economic or commercial activity nor had any connection with such activity.").**5**

(Text continued on page 19)

_____

**5** Although appellants -- in six briefs -- confine their tepid acknowledgment of this distinction to a single sentence, see infra note 19 and accompanying text, it is impossible to ignore either the distinction drawn by the Court between regulations of economic and noneconomic activities or the critical importance of this distinction to the Court's analysis. See, e.g., Lopez, 514 U.S. at 559 (majority) ("[W]e have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected inter-

17

state commerce.") (emphasis added); id. at 560 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.") (emphasis added); id. at 561 ("[GFSZA] is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.") (emphasis added); id. at 565-66 ("We do not doubt that Congress has authority under the Commerce Clause to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process.") (emphasis added); id. at 567 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce.") (emphasis added); id. at 574 (Kennedy, J., concurring) ("Stare decisis operates with great force in counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature. . . . Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.") (emphases added); id. at 577 ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory.") (emphasis added); id. at 583 (GFSZA regulates "an activity beyond the realm of commerce in the ordinary and usual sense of that term.") (emphasis added); id. (GFSZA could not be sustained "[a]bsent a stronger connection or identification with commercial concerns that are central to the Commerce Clause") (emphasis added); id. at 595 (Thomas, J., concurring) (distinguishing regulation of "intrastate commerce that substantially affects interstate and foreign commerce" from regulation of "all activities that affect interstate commerce"); id. at 601 n.9 ("[C]ommercial character is not only a natural but an inevitable ground of Commerce Clause distinction.") (emphasis added; internal quotation marks and citation omitted).

This said, the dissent actually does completely ignore this distinction. In fact, so consciously does the dissent turn a blind eye to the Court's repeated distinction between regulations of economic and noneconomic activities that in its discursive treatment of Lopez the dissent does not as much as once -- not once -- cite to or quote even one of the score of references to this distinction in the Lopez opinions, except a single time

18

Accordingly, the dissent's assertion that the rule that Congress' power under the Commerce Clause is at least presumptively limited to regulating economic activities and promulgating regulations that include a jurisdictional element is an "unprecedented new rule of law," see infra at 184, is perplexing. For this is precisely the rule repeatedly articulated by the Supreme Court in Lopez, beginning with its holding in the very first paragraph of the opinion:

> The [GFSZA] neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. We hold that the Act exceeds the authority of Congress "[t]o regulate Commerce . . . among the several states . . . ." U.S. Const., Art. I, § 8, cl. 3.

Lopez, 514 U.S. at 551 (ellipses in original); compare infra at 185 (omitting second sentence and asserting that majority merely "contends" that this is the rule, while at the same time acknowledging that for this rule we rely upon quotation from Lopez ). Far from constituting a "new" rule of law, this rule of law is the law of the land.**6**

_____

inadvertently, see infra at 203 ("The representative effectiveness of state and federal governments would also be impaired if the Federal Government [were] to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities.'") (quoting Lopez, 514 U.S. at 577 (Kennedy, J., concurring)) (emphasis added). Only once (and then only in a quote from another case) does the dissent quote even the word "economic" from Lopez -- a word that appears repeatedly throughout the several opinions in that case.

Cases subsequent to Lopez, of course, reaffirm that congressional power under the substantially affects test is limited primarily to the regulation of economic or commercial activities. See , e.g., United States v. Robertson, 514 U.S. 669, 671 (1995) (per curiam) ("The `affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely intrastate commercial activities that nonetheless have substantial interstate effects.") (second emphasis added).

**6** Notwithstanding this seemingly unequivocal holding by the Court in Lopez, we do, nevertheless, proceed to address the possibility that Con-

19

B.

In contrast to the statutes that the Supreme Court has previously upheld as permissible regulations under the substantially affects test, see Lopez, 514 U.S. at 560; id. at 580 (Kennedy, J., concurring), but analogously to the Gun-Free School Zones Act, see id. at 551 (majority), section 13981 neither regulates an economic activity nor contains a jurisdictional element. Accordingly, it cannot be sustained on the authority of Lopez, nor any of the Court's previous Commerce Clause holdings, as a constitutional exercise of Congress' power to regulate interstate commerce.

1.

Appellants do not contend that section 13981 regulates economic activity. Nor could they. The statute does not regulate the manufacture, transport, or sale of goods, the provision of services, or any other sort of commercial transaction. Rather, it regulates violent crime motivated by gender animus. Not only is such conduct clearly not commercial, it is not even economic in any meaningful sense. While some violent crimes, such as robbery, may be economically motivated and thus at least arguably "economic" in a loose sense, section 13981 is not directed toward such crimes, but instead is expressly limited to "crime[s] of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1); accord id. § 13981(e)(1) ("Nothing in this section entitles a person to a cause of action . . . for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender . . . ."); see also S. Rep. No. 103-138, at 52 n.61 (1993) (listing "absence of any other apparent motive" among circumstantial indicia

_____

gress' power might well extend to regulating some noneconomic activities as well. See infra Part III.C. To the extent that we do consider such a possibility, that new rule would contemplate a congressional power under the Commerce Clause broader, rather than narrower, than that acknowledged by the Court in Lopez. Thus, in the end, the dissent's rhetorical ploy of charging us with creating a "new rule" rebounds upon itself with a vengeance.

20

of gender motivation). The statute thus explicitly excludes from its purview those violent crimes most likely to have an economic aspect -- crimes arising solely from economic motives-- and instead addresses violent crime arising from the irrational motive of gender animus, a type of crime relatively unlikely to have any economic character at all.

That section 13981 may, on occasion, reach activity that arises in part from economic motives does not transform it into a statute regulating economic activity. For Lopez made clear that the Gun-Free School Zones Act regulated activity having "nothing to do with `commerce' or any sort of economic enterprise, however broadly one might define those terms," Lopez, 514 U.S. at 561, even though a ban on guns in school zones would appear on its face to regulate activity considerably more likely to arise from economic motivation than is the narrowly circumscribed conduct regulated by section 13981, and even though, as the Supreme Court was doubtless aware, the defendant in Lopez itself admitted that his criminal conduct was economically motivated, see United States v. Lopez, 2 F.3d 1342, 1345 (5th Cir. 1993), aff'd, 514 U.S. 549 (1995) (defendant charged with violating the GFSZA by delivering a gun to a student admitted that he had been promised $40 for the delivery).

Not only is violent crime motivated by gender animus not itself even arguably commercial or economic, it also lacks a meaningful connection with any particular, identifiable economic enterprise or transaction. Cf. Hoffman, 126 F.3d at 587-88 (finding that the Freedom of Access to Clinic Entrances Act of 1994 regulated conduct -- protests -- that "is closely and directly connected with an economic activity" -- the operation of abortion clinics). Furthermore, unlike guns in school zones, violence arising from gender animus lacks even a meaningful connection with any specific activity that might arguably be considered economic or commercial in the loosest sense. Compare Lopez, 514 U.S. at 628-30 (Breyer, J., dissenting) (arguing that GFSZA regulated conduct closely connected with the operation of schools, an arguably commercial activity), with Lopez, 514 U.S. at 565 (majority) (rejecting Justice Breyer's characterization of schools as commercial).

Finally, section 13981 cannot be sustained as "an essential part of a larger regulation of economic activity, in which the regulatory

21

scheme could be undercut unless the intrastate activity were regulated." <u>Id</u>. at 561. Although section 13981 addresses private discrimination, and other laws address discrimination in clearly economic contexts, the federal patchwork of antidiscrimination laws can hardly be characterized as a single, interdependent regulatory scheme aimed at commercial or economic activity. While such an understanding of section 13981 might be suggested by certain language in the committee reports, <u>see</u>, <u>e.g.</u>, H.R. Conf. Rep. No. 103-711, at 385 (1994), <u>reprinted in</u> 1994 U.S. Code Cong. & Admin. News 1839, 1853 ("[C]urrent law provides a civil rights remedy for gender crimes committed in the workplace, but not for crimes of violence motivated by gender committed on the street or in the home."), section 13981 and Title VII -- the statute to which the report apparently refers -- cannot reasonably be said to constitute a unified statutory scheme. While the two statutes share a general concern with discrimination, they address different kinds of conduct that only occasionally overlap -- gender-motivated violence on the one hand, employer discrimination on the other. Rather than creating an integrated regulatory scheme, each statute is obviously written without regard for the concerns that animate the other. For example, section 13981 provides a remedy for gender-motivated violence in the workplace as well as on the street or at home, without regard for the victim's actual or potential employment status, and directly against the violent actor. Title VII, by contrast, provides a remedy only for gender discrimination that can be attributed to the fault of the employer, without regard to whether such discrimination takes the form of violent conduct, and it provides that remedy against the employer, who may or may not be the actual discriminator.

More importantly, even if the federal patchwork of antidiscrimination laws could be characterized as a single, interdependent regulatory scheme, section 13981 itself does not regulate even arguably economic activity. And it is clear from the context in which the <u>Lopez</u> Court observed that the Gun-Free School Zones Act was not "an essential part of a larger regulation of economic activity," <u>Lopez</u>, 514 U.S. at 561, that the Court did not intend by this statement to authorize the regulation of activity lacking any meaningful economic nexus pursuant to a comprehensive statutory scheme that also regulates economic activity. Rather, it is plain that the Court's language references its discussion of <u>Wickard</u> v. <u>Filburn</u> in the preceding paragraph, and

22

clarifies the constitutional basis of that decision. See id. at 560-61 (discussing Wickard v. Filburn, 317 U.S. 111 (1942)). As the Court explained, Wickard, which it characterized as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," id. at 560, upheld the application to homegrown wheat of a statute "designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices." Id . Although the wheat at issue was not produced for sale, and therefore its production "m[ight] not be regarded as commerce" in the strictest sense, Wickard, 317 U.S. at 125 (quoted in Lopez, 514 U.S. at 556), it was produced for human consumption, directly satisfying needs that would otherwise be filled by purchase or other commercial transaction, and was thus clearly economic in a general sense, see Lopez , 514 U.S. at 560 ("Even Wickard . . . involved economic activity in a way that the possession of a gun in a school zone does not."). The Court's characterization of Wickard as a case involving economic activity thus makes explicit the Supreme Court's relatively broad understanding of such activity. Id. at 561 (economic activity includes not just commercial transactions per se, but also "activities that arise out of or are connected with a commercial transaction"); see also id. at 573-74 (Kennedy, J., concurring) (discussing Court's "practical conception of commercial regulation"); id. at 574 (discussing "imprecision of content-based boundaries" and rejecting narrow"18th-century" understanding of commerce). And the Court's discussion reaffirms that when Congress enacts a general statutory framework regulating economic activity, its power is not limited to the regulation only of interstate economic activity, but extends to the regulation of purely intrastate economic activity as well. Cf . United States v. Robertson, 514 U.S. 669, 671 (1995) (per curiam) ("The `affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely intrastate commercial activities that nonetheless have substantial interstate effects.") (second emphasis added); Lopez, 514 U.S. at 559 ("[W]e have upheld a wide variety of intrastate economic activity where we have concluded that activity substantially affected interstate commerce." (emphases added)). But the decision does not, in such circumstances, authorize the regulation

23

of intrastate conduct falling outside even the Court's relatively gener-ous conception of economic activity.**7**

It follows, then, that section 13981, even more clearly than the Gun-Free School Zones Act struck down in <u>Lopez</u> , does not fall "within the fair ambit of the Court's practical conception of commer-cial regulation," <u>Lopez</u>, 514 U.S. at 573-74 (Kennedy, J., concurring), but is, rather, a "statute that by its terms has nothing to do with `com-merce' or any sort of economic enterprise, however broadly one might define those terms," <u>Lopez</u>, 514 U.S. at 561 (majority). To hold otherwise would divest the words `commerce' and`economic' of any real meaning. <u>Cf</u>. <u>id</u>. at 565 (rejecting definition of "commercial" activity broad enough to encompass the operation of schools as "lack-[ing] any real limits because, depending on the level of generality, any activity can be looked upon as commercial"). Accordingly, sec-tion 13981 cannot be sustained on the authority of cases such as <u>Wickard</u>, which have upheld "regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." <u>Id</u>. at 561.

2.

Similarly, and as appellants concede, section 13981 does not have an "express jurisdictional element which might limit its reach to a dis-crete set of [gender-motivated violent crimes] that additionally have

---

**7** The Court's reaffirmation of<u>Wickard</u> in <u>Lopez</u> also distinguishes the present case from <u>United States</u> v. <u>Leshuk</u>, 65 F.3d 1105 (4th Cir. 1995), in which we upheld the federal prohibition on the manufacture of mari-juana, even as applied to manufacture for personal use. Like the produc-tion of home-grown wheat, the manufacture of marijuana for personal use is an economic activity in a general sense. Further, such manufacture is prohibited pursuant to a comprehensive statutory scheme bearing on all aspects of the illegal-drug trade, which is assuredly both commercial and interstate. <u>Cf</u>. <u>id</u>. at 1112 ("In contrast to the firearm possession pro-hibited in the Gun Act, the intrastate drug activities regulated in the Drug Act are clearly tied to interstate commerce."). Thus, like the regulation of home-grown wheat, the prohibition of home-grown marijuana is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." <u>Lopez</u>, 514 U.S. at 561.

an explicit connection with or effect on interstate commerce." Id. at 562. Although the criminal statutes enacted by Congress as part of the Violence Against Women Act predicate liability on the crossing of state lines or the entering or leaving of Indian country, see 18 U.S.C. § 2261 (interstate domestic violence); id . § 2262 (interstate violation of a protective order), section 13981 includes no similar jurisdictional requirement, see 42 U.S.C. § 13981(b)-(c) (extending cause of action to "[a]ll persons within the United States" who are victims of gender-motivated crime). Nor does the statute include any language which could possibly be construed to constitute such a jurisdictional element. Cf. United States v. Bass , 404 U.S. 336, 349 (1971) (construing statute prohibiting felon from receiving, possessing, or transporting any firearm "in commerce or affecting commerce" to require additional nexus to interstate commerce); Pennsylvania Dep't of Corrections v. Yeskey, 118 S. Ct. 1952, 1956 (1998) (reasoning that unambiguous statute cannot be construed to avoid constitutional concerns). Accordingly, section 13981 cannot be sustained as a statute that contains a jurisdictional element "which would ensure, through case-by-case inquiry, that the [gender-motivated violent act] in question affects interstate commerce." Lopez, 514 U.S. at 561; cf. United States v. Cobb, 144 F.3d 319, 321-22 (4th Cir. 1998); United States v. Wells, 98 F.3d 808, 810-11 (4th Cir. 1996).

3.

Because section 13981 neither regulates an economic activity nor includes a jurisdictional element, it cannot be upheld on the authority of Lopez or any other Supreme Court holding demarcating the outer limits of Congress' power under the substantially affects test. See Lopez, 514 U.S. at 551 ("The Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. We hold that the Act exceeds the authority of Congress `[t]o regulate Commerce. . . among the several states . . . .'") (quoting U.S. Const. art. I,§ 8, cl. 3) (ellipses in original).

C.

Even if these two categories of permissible congressional regulations demarcate not the absolute, but only the presumptive outer lim-

25

its of congressional power under the substantially affects test, such that Congress may regulate noneconomic activities absent jurisdictional elements in at least some circumstances -- a proposition not only unsupported by Supreme Court holding, see Lopez, 514 U.S. at 560; id. at 580 (Kennedy, J., concurring), but seemingly eschewed by the Court in Lopez, see, e.g., Lopez, 514 U.S. at 551, 560, 567 -- we hold that the Commerce power does not extend so far as to support the regulation at issue in this case. A contrary holding would violate the "first principles" of a Constitution that establishes a federal government of enumerated powers, id. at 552, principles that the Lopez Court believed so important to its constitutional analysis that it both began and ended its opinion with a full discussion of them, id. at 553-58, 564-68, and that even the government is forced to concede lie at the heart of the Court's reasoning in Lopez, see Reply Br. of Intervenor United States at 14 ("The [Lopez] decision thus turned largely on the threat posed by the statute to principles of federalism."); Supp. Br. of Intervenor United States at 4 ("Federalism concerns were, of course, crucial in Lopez.").

Consistent with these principles, Lopez affirms that we must evaluate carefully the implications of our holdings upon our federal system of government and that we may not find an activity sufficiently related to interstate commerce to satisfy the substantially affects test in reliance upon arguments which, if accepted, would eliminate all limits on federal power and leave us "hard pressed to posit any activity by an individual that Congress is without power to regulate." Lopez, 514 U.S. at 564; see also id. at 567 (admonishing that courts are not to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States"). This is so especially when the regulated activity falls within an area of the law "where States historically have been sovereign," id. at 564, and countenance of the asserted federal power would blur"the boundaries between the spheres of federal and state authority" and obscure "political responsibility," id. at 577 (Kennedy, J. concurring).

Lopez, therefore, is emphatic that the scope of the interstate commerce power

> "must be considered in the light of our dual system of government and may not be extended so as to embrace effects

26

upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."

Lopez, 514 U.S. at 557 (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37 (1937)); see also id . at 567 (quoting A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 554 (1935) (Cardozo, J., concurring)) (noting that everything affects interstate commerce to some degree, but rejecting "view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce" (internal quotation marks omitted)); id. at 567-68 (refusing to rely on arguments that obliterate "distinction between what is truly national and what is truly local"); id. at 580 (Kennedy, J., concurring) ("In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far.").

We could perhaps reconcile with these "first principles" of federalism a holding that Congress may regulate, even in the absence of jurisdictional elements, noneconomic activities that are related to interstate commerce in a manner that is clear, relatively direct, and distinct from the type of relationship that can be hypothesized to exist between every significant activity and interstate commerce. See, e.g., United States v. Bird, 124 F.3d 667, 677 n.11 (5th Cir. 1997) ("[I]n determining whether the regulated intrastate activity substantially affects interstate commerce, `substantial' must be understood to have reference not only to a quantitative measure but also to qualitative ones; effects which are too indirect, remote, or attenuated -- or are seen only by piling `inference upon inference'-- are not substantial."); cf. Hoffman, 126 F.3d at 587 (holding that obstruction of abortion clinic entrances "is closely connected with, and has a direct and profound effect on, the interstate commercial market in reproductive health care services").

In this case, however, we can discern no such distinct nexus between violence motivated by gender animus and interstate commerce. Indeed, to sustain section 13981 as a constitutional exercise of

27

the Commerce power, not only would we have to hold that congressional power under the substantially affects test extends to the regulation of noneconomic activities in the absence of jurisdictional elements, but we would also have to conclude that violence motivated by gender animus substantially affects interstate commerce by relying on arguments that lack any principled limitations and would, if accepted, convert the power to regulate interstate commerce into a general police power.

Echoing the government's arguments in <u>Lopez</u>, the appellants argue that violence motivated by gender animus imposes medical and legal costs upon its victims; discourages those who fear such violence from traveling, working, or transacting business at times or in places that they consider unsafe (thereby deterring some interstate travel, employment, and transactions); and, as a result, inhibits the productivity of its actual or potential victims and decreases the supply and demand for interstate products. <u>See</u> Br. of Appellant Brzonkala at 37; <u>cf</u>. Supp. Br. of Appellant Brzonkala at 3 (noting effects of gender-motivated violence "on employment, health care, housing, criminal justice, interstate travel and consumer spending"). These arguments closely resemble, and are functionally equivalent to, the arguments advanced by the government in <u>Lopez</u>:

> The Government argues that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being.

<u>Lopez</u>, 514 U.S. at 563-64 (citations omitted). As in <u>Lopez</u>, appellants rely in essence on the costs of violent crime (including the deterrence

28

of interstate travel and other similar interstate activities) and on decreased national productivity (including reduced employment, production, and demand), both of which ultimately affect the national economy, and presumably interstate commerce as well. But as the arguments are the same, so also does the Supreme Court's categorical rejection in Lopez of such attenuated links to interstate commerce again control:

> We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of [the GFSZA], it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

Id. at 564 (citation omitted); see also id. at 600 (Thomas, J., concurring) ("When asked at oral argument if there were any limits to the Commerce Clause, the government was at a loss for words.").[8]

_____

[8] We reject Brzonkala's contention that the link here is more direct than in Lopez because section 13981 regulates actual violence rather than the possession of guns, which could, but would not necessarily, lead to violence. See Br. of Appellant Brzonkala at 38. As is apparent from their arguments, however, many of the economic effects of gender-motivated violence upon which the appellants rely arise, as in Lopez, not from actual violence, but rather from the fear of such violence. And, unlike in Lopez, in which the potential violence threatened education, a specific enterprise with clear links to the economy, see Lopez, 514 U.S. at 624 (Breyer, J., dissenting) ("[T]he immediacy of the connection between

29

It is unsurprising that appellants must resort to such arguments. Just as it is impossible to link violence motivated by gender animus with any particular, identifiable economic transaction or enterprise, see supra Part III.B.1, it is similarly impossible to link such violence with a particular interstate market or with any specific obstruction of interstate commerce. Cf. Hoffman, 126 F.3d at 587 (noting close and direct relationship between obstruction of abortion clinic entrances and the interstate commercial market in reproductive health care services); Leshuk, 65 F.3d at 1112 (noting relationship between the manufacture of marijuana and the interstate market in illegal drugs). Rather, to the extent violence motivated by gender animus affects interstate commerce, it does so only in the same way that any other significant problem does. Like violence in schools, violent crime generally, and many other less visible though still significant problems, violent crime motivated by gender animus undoubtedly imposes costs on, and decreases the productivity of, its victims. As with other such problems, to the extent violent crime motivated by gender animus is widespread, these costs and productivity losses in the aggregate will ultimately, though indirectly, affect the national economy. Cf., e.g., Carol Krucoff, Get Moving, Wash. Post, Aug. 12, 1997, Health Section, at 12 (quoting director of Center for Disease Control as predicting annual savings of $4 billion in medical costs if only one-fourth of sedentary people were to exercise); 140 Cong. Rec. S14211 (1994) (statement of Sen. Hatfield) (estimating annual cost of accidents, medical problems, and reduced productivity, due to insomnia at between $92.5 and $107.5 billion). And, presumably, any adverse

_____

education and the national economic well-being is documented by scholars and accepted by society at large in a way and to a degree that may not hold true for other social institutions. It must surely be the rare case, then, that a statute strikes at conduct that (when considered in the abstract) seems so removed from commerce, but which (practically speaking) has so significant an impact upon commerce."), gender-motivated violence affects no such specific enterprise. Thus, the manner in which any given act of gender-motivated violence affects the economy will depend on the specific circumstances of its victim. It is clear that here, as in Lopez, the relationship between the regulated conduct and interstate commerce is attenuated, and that any slight difference in the number of "steps" in the relationship is both artificial and insignificant.

30

effect on the national economy will eventually also affect interstate commerce.

However, though the Supreme Court has, in cases such as Wickard, relied on relatively sweeping and permissive reasoning of this kind -- including looking to the aggregate effects of entire classes of activities and indulging in attenuated chains of inferences -- to find that intrastate economic activity substantially affects interstate commerce, Lopez clearly forecloses either reliance upon such authority or application of such analysis to sustain congressional regulation of noneconomic activities such as the conduct reached by section 13981. Compare Lopez, 514 U.S. at 558 ("[W]here a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." (citation omitted; emphasis added)), with id. at 561 (explaining that, because GFSZA was "a criminal statute" having "nothing to do with `commerce' or any sort of economic enterprise," it could not "be sustained under [the Court's] cases upholding regulation of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." (emphasis added)); see also id. at 567 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." (emphases added)); id. at 563 (similar); id. at 567 (refusing to "pile inference upon inference" to find a substantial effect on interstate commerce); id. at 565 (rejecting, as excessively permissive, Justice Breyer's three-step analysis of the relationship between gun-related crime and interstate commerce). To extend such reasoning beyond the context of statutes regulating economic activities and uphold a statute regulating noneconomic activity merely because that activity, in the aggregate, has an attenuated, though real, effect on the economy, and therefore presumably on interstate commerce, would be effectively to remove all limits on federal authority, and to render unto Congress a police power impermissible under our Constitution. See, e.g. , id. at 564.**9**

_____

**9** Brzonkala selectively quotes from our opinion in Hoffman to support her argument that Congress may regulate violence motivated by gender animus, despite its noneconomic character, solely because of its ultimate

31

This case, in fact, draws into sharp relief the sweeping implications for our federal system of government that would follow were we, in reliance on such reasoning, to extend congressional power under the substantially affects test to the regulation of noneconomic conduct remote from interstate commerce. For here, not only could the logic of the arguments upon which the appellants must rely justify congressional regulation of any significant activity, but the regulation in support of which these arguments are marshaled also intrudes upon areas of the law "to which States lay claim by right of history and expertise." Id. at 583 (Kennedy, J., concurring). Thus, in this case, concerns of federalism, far from hypothetical, are immediate and concrete. First, although 42 U.S.C. § 13981(c) provides a civil remedy, the underlying conduct to which the remedy attaches is violent crime, see id. § 13981(d)(2), conduct that has traditionally been regulated by the States through their criminal codes and laws of intentional torts. Compare id. (defining "crime of violence" through incorporation of state and federal criminal law), with Lopez, 514 U.S. at 561 n.3 ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law. . . . When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction." (citations and internal quotation marks omitted; emphasis added)). Appellants contend that section 13981 neither duplicates state criminal laws nor overrides these or any other state laws, but merely provides a civil remedy for conduct that is already proscribed by the States. Therefore, they argue, the provision does not implicate

_____

economic effects, see Supp. Br. of Appellant Brzonkala at 4. That case, however, does not support her position. Compare id. (stating that this court has upheld regulation of an activity that "was `closely connected with, and ha[d] a direct and profound effect on, the interstate commercial market.'") (quoting Hoffman, 126 F.3d at 586-87), with Hoffman, 126 F.3d at 587 (explaining that regulated activity "is closely connected with, and has a direct and profound effect on, the interstate commercial market in reproductive health care services" (emphasis added)). It is plain that we did not uphold the statute in Hoffman because the regulated conduct affected the national economy, but rather because it directly affected a specific interstate market and was also "closely and directly connected with an economic activity." Id.

32

the sensitive balance between state and federal criminal authority.**10** Even were appellants' description of section 13981 wholly accurate, we would reject their conclusion. For when the federal government provides a remedy for violent crime in addition to that provided by the States, it both involves itself in the punishment of such crime and increases the total penalty for such crime beyond that provided by the laws of the States.**11** Moreover, this federal involvement will inescapably lead to changes in the allocation of state law enforcement and judicial resources, and even in substantive state law, by altering the underlying enforcement realities against which all such allocative and legislative decisions are made. Thus, it is clear that the balance between federal and state responsibility for the control of violent crime is implicated not only by federal criminal statutes, but also by

_____

**10** Appellants attempt to distinguish the GFSZA struck down in <u>Lopez</u> from section 13981 on the grounds that the former overrode state laws that would otherwise regulate guns in school zones. Appellants' characterization of the GFSZA, however, rests primarily on the misleading attribution to the Supreme Court of an opinion voiced only by President Bush, which the Court quotes in passing at the end of a lengthy footnote. <u>Compare</u> Br. of Intervenor United States at 31-32 ("<u>In the Court's view</u>, the Gun Free School Zones Act `inappropriately overr[ode] legitimate state firearms laws with a new and unnecessary Federal law.' 115 S. Ct. at 1631 n.3 (internal quotation marks and citation omitted).") (emphasis added)), Supp. Br. of Intervenor United States at 5 (same), Reply Br. of Intervenor United States at 14 (similar), <u>and id</u> . at 15 (similar), <u>with</u> <u>Lopez</u>, 514 U.S. at 561 n.3 ("[<u>S</u>] <u>ee also</u> Statement of President George Bush on Signing the Crime Control Act of 1990, 26 Weekly Comp. of Pres. Doc. 1944, 1945 (Nov. 29, 1990) (`Most egregiously, section [922(q)] inappropriately overrides legitimate state firearms laws with a new and unnecessary Federal law. . . .').") (emphasis added)). Furthermore, appellants' characterization of the GFSZA overlooks the actual character of that statute which, like section 13981, carefully preserved state laws by, <u>inter alia</u>, exempting from its prohibition possession of a gun licensed by a State or locality, 18 U.S.C. § 922(q)(2)(B)(ii), and preserving the rights of States and localities to establish gun-free school zones, <u>id</u>. § 922(q)(4); <u>see also id</u>. § 927 (expressing desire not to preempt state laws).

**11** In fact, section 13981 appears to have been specifically intended to enhance the penalty for the conduct that it regulates. <u>See</u> S. Rep. No. 103-138, at 50 (1993) ("Title III [section 13981] singles out for enhancement bias-inspired conduct . . . .").

any federal sanction for such crime, even in the form of civil remedy. See Chief Justice William H. Rehnquist, Welcoming Remarks: National Conference on State-Federal Judicial Relationships, 78 Va. L. Rev. 1657, 1660 (1992) (noting section 13981's"potential to create needless friction and duplication among the state and federal systems"); cf. Lopez, 514 U.S. at 582 (Kennedy, J., concurring) (approving argument that "injection of federal officials into local problems causes friction and diminishes accountability of state and local governments" (citation omitted)).

As its proclamation of a new, substantive right"to be free from crimes of violence motivated by gender" suggests, however, section 13981 does not merely provide a federal remedy for certain violent conduct defined by the States as felonious. 42 U.S.C. § 13981(b). Although the statute does provide a remedy for such conduct, it also provides a remedy for certain federally defined violent felonies, "whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States." Id. § 13981(d)(2)(A). That is, under the plain language of the statute, a plaintiff may sue for gender-motivated violent conduct that would, if it occurred within an area of special federal jurisdiction, constitute a felony under the relatively comprehensive criminal code adopted by Congress to govern such areas, see, e.g. , 18 U.S.C. §§ 1111, 1118 (murder); id. § 1112 (manslaughter); id. § 1113 (attempted murder and manslaughter); id. § 113 (assault); id. § 114 (maiming); id.§ 2241 (rape); id. § 1201 (kidnapping); id. § 81 (arson), even when the conduct occurs outside such a federal enclave, and even if the relevant federal law differs substantively from the law of the state in which the conduct occurs. Indeed, the apparent purpose of this provision is to create a minimum level of substantive protection-- tied to federal definitions of violent crimes and therefore subject to ready congressional calibration -- that is unaffected by individual variation among the criminal laws of the several States.

Further, to the extent that section 13981's remedy is limited to violent acts constituting felonies as defined by state law, the statute provides a remedy for such conduct, "whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," 42 U.S.C. § 13981(d)(2)(A); id. § 13981(e)(2) (same); cf. id. § 13981(d)(2)(B) (abrogating certain defenses that may exist under

34

state law), and in many instances in which such violence would not be actionable under state tort law, see id.§ 13981(c)-(d)(2)(B) (providing cause of action in cases in which a civil remedy may not exist under state law); 28 U.S.C. § 1658 (providing four-year statute of limitations which is considerably longer than the limitations periods for intentional torts in most States); cf. 42 U.S.C. § 1988(b) (successful section 13981 plaintiff may recover attorneys' fees).

Thus, not only does section 13981 provide a federal remedy for violent crime in addition to those remedies already provided by the laws of the States -- thereby increasing the total penalty for such crime -- it also provides such a remedy for violence that the States would leave unpunished, whether for reasons of state criminal-law policy, prosecutorial discretion, or state tort-law policy. And the statute deliberately disregards the limits of state criminal and civil law, purportedly in response to the States' failure properly to enforce their criminal and tort laws against gender-motivated violent criminals. See infra Parts III.D.2, IV. By responding to this alleged failure of the States not with a remedy against the States or their officers, as would a civil rights statute properly enacted pursuant to Section 5 of the Fourteenth Amendment, see infra Part IV.A, but instead with a remedy against the violent criminals themselves, Congress not only has encroached upon the States' ability to determine when and how violent crime will be punished, see Lopez, 514 U.S. at 581 (Kennedy, J., concurring) (noting States' abilities "as laboratories for experimentation to devise various solutions" for problems whose "best solution is far from clear"); id. at 583 (GFSZA impermissibly "forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and experience"), but in so doing has blurred the boundary between federal and state responsibility for the deterrence and punishment of such crime. Accordingly, the citizens of the States will not know which sovereign to hold accountable for any failure to address adequately gender-motivated crimes of violence. See Lopez, 514 U.S. at 576-77 (Kennedy, J., concurring) ("If . . . the Federal and State Governments are to control each other . . . and hold each other in check . . . citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function. Federalism serves to assign political responsibility, not to obscure it." (citation omitted)); cf. Printz v. United States, 117 S. Ct. 2365, 2377

35

(1997) (noting that the Constitution contemplates that "a State's government will represent and remain accountable to its own citizens"); New York v. United States, 505 U.S. 144, 168-69 (1992) ("Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation." (citation omitted)). Moreover, it is undisputed that a primary focus of section 13981 is domestic violence, a type of violence that, perhaps more than any other, has traditionally been regulated not by Congress, but by the several States. See, e.g., infra at 49-50 (discussing congressional findings on the extent and effects of domestic violence). Though such violence is not itself an object of family law -- an area of law that clearly rests at the heart of the traditional authority of the States, see Lopez, 514 U.S. at 564 -- issues of domestic violence frequently arise from the same facts that give rise to issues such as divorce and child custody, which lie at the very core of family law. Although section 13981 explicitly precludes the federal courts from exercising the supplemental jurisdiction that might otherwise extend to such matters, see 42 U.S.C. § 13981(e)(4), the fact that Congress found it necessary to include such a jurisdictional disclaimer confirms both the close factual proximity of the conduct regulated by section 13981 to the traditional objects of family law, cf. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966) (holding that supplemental jurisdiction extends to state law claims arising from the same "common nucleus of operative fact" as federal claims); 28 U.S.C. § 1367 (codifying this aspect of Gibbs), and the extent of section 13981's arrogation to the federal judiciary of jurisdiction over controversies that have always been resolved by the courts of the several States. In the words of the Chief Justice of the United States, section 13981 creates a "new private right of action so sweeping, that the legislation could involve the federal courts in a whole host of domestic relations disputes." Chi. Daily L. Bull., Jan. 2, 1992, at 2 (quoting from Chief Justice Rehnquist's 1991 report on the federal judiciary).**12**

_____

**12 See also** Chief Justice William H. Rehnquist, Remarks at the Annual Meeting of the American Law Institute (May 11, 1998) (listing the Violence Against Women Act as one of "the more notable examples" of "a series of laws passed by Congress that have expanded the jurisdiction of the federal courts" and that have raised the"prospect that our system will look more and more like the French government, where even the most

Section 13981 also sharply curtails the States' responsibility for regulating the relationships between family members by abrogating interspousal and intrafamily tort immunity, the marital rape exemption, and other defenses that may exist under state law by virtue of the relationship that exists between the violent actor and victim. See § 13981(d)(2)(B); cf. Br. of Intervenor United States at 12 (noting that, "as of 1990, seven states still did not include marital rape as a prosecutable offense, and an additional 26 states allowed prosecutions only under restricted circumstances"). Although Congress may well be correct in its judgment that such defenses represent regrettable public policy, the fact remains that these policy choices have traditionally been made not by Congress, but by the States. By entering into this most traditional area of state concern, Congress has not only substantially reduced the States' ability to calibrate the extent of judicial supervision of intrafamily violence, see Lopez, 514 U.S. at 581 (Kennedy, J., concurring), but has also substantially obscured the boundaries of political responsibility, freeing those States that would deny a remedy in such circumstances from accountability for the policy choices they have made, see id. at 576-77.

The sweeping intrusion of section 13981 into these areas of traditional state concern well illustrates the essentially limitless nature of congressional power that would follow if we were to accept, as sufficient to justify federal regulation under the Commerce Clause, the type of connection with interstate commerce on which appellants rely in this case. Under such an understanding, the only conceivable limit on congressional power to regulate an activity would be the significance of that activity, because any significant activity or serious problem will have an ultimate, though indirect, effect upon the economy, and therefore, at least presumptively, upon interstate commerce as well. While we do not question the significance of the problems posed by violence arising from gender animus, Lopez confirms that such

_____

minor details are ordained by the national government in Paris"); see generally Chief Justice William H. Rehnquist, The 1998 Year-End Report of the Federal Judiciary (January 1999) ("The trend to federalize crimes that traditionally have been handled in state courts not only is taxing the Judiciary's resources and affecting its budget needs, but it also threatens to change entirely the nature of our federal system.").

37

significance, standing alone, simply does not provide a meaningful limitation on federal power, and that a problem does not become a constitutionally permissible object of congressional regulation under the Commerce Clause merely because it is serious. See Lopez, 514 U.S. at 565 (rejecting Justice Breyer's argument that because "gun-related violence is a serious problem" with an ultimate effect on "trade and commerce," it may be regulated under the Commerce Clause). To hold otherwise would require us to adopt a purely quantitative view of the substantially affects test that would, in light of the relative institutional competencies of the legislature and the judiciary, be difficult to square either with the Lopez Court's clarification of this test as "ultimately a judicial rather than a legislative question," id. at 557 n.2 (citation omitted), or with the "independent evaluation of constitutionality under the Commerce Clause" that Lopez requires of the courts, id. at 562; see also Bird, 124 F.3d at 677 n.11 (noting qualitative aspects of substantially affects test under Lopez). As this case illustrates, to adopt such an understanding of Congress' power to regulate interstate commerce would be to extend federal control to a vast range of problems falling within even the most traditional areas of state concern -- problems such as violent crime generally, educational shortcomings, and even divorce, all of which are significant and as a result unquestionably affect the economy and ultimately interstate commerce. Cf. Lopez, 514 U.S. at 561 n.3 ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law.") (citation omitted)); Northern Sec. Co. v. United States, 193 U.S. 197, 402 (1904) (Holmes, J., dissenting) ("Commerce depends upon population, but Congress could not, on that ground, undertake to regulate marriage and divorce."). Such a sweeping interpretation of the Congress' power would arrogate to the federal government control of every area of activity that matters, reserving to the States authority over only the trivial and the insignificant.

After Lopez, it is simply insufficient to contend, as does the dissent, that principles of federalism are implicated only if a federal law "directly supersede[s] official state action in an area of traditional state concern." See infra at 207; see also id. at 204 (asserting that "Lopez stands for the proposition that Commerce Clause legislation may be unconstitutional if it directly supersedes official state action in an area of traditional state concern"); id . at 207 ("When a federal

38

statute directly supersedes official state action in an area of traditional state concern, then (and only then) may a court properly consider whether the rationale supporting the statute contains an inherent limiting principle."). Plainly put, neither the language nor the logic of Lopez permits, much less supports, such a parsimonious view of the rights of the States in our federal system. If anything, the Court in Lopez, as it has been over the past ten years or so, was at pains to express quite the opposite view, especially where, as here, the reasoning advanced in support of a given federal intrusion upon the prerogatives of the States would, if summoned, support a power in the Congress that is, for all intents and purposes, without limit. See, e.g., Lopez, 514 U.S. at 564 ("Under the theories that the Government presents . . . it is difficult to perceive any limitation on federal power, even in areas where States historically have been sovereign."); id. at 567 (rejecting reasoning "that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States"); id. at 580 (Kennedy, J., concurring) ("[W]e must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern."); id. at 583 (noting "tendency of this statute to displace state regulation in areas of traditional state concern" and explaining that "[w]hile the intrusion on state sovereignty may not be as severe in this instance as in some of our recent Tenth Amendment cases, the intrusion is nonetheless significant" and "contradicts the federal balance").

In short, to hold that an attenuated and indirect relationship with interstate commerce of the sort asserted here is sufficient to bring within Congress' power to regulate such commerce the punishment of gender-motivated violent crime, an activity that has nothing to do with commerce and that has traditionally been regulated by the States, we would have to do what the Supreme Court has never done, and what the Lopez Court admonished us not to do: "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States" and "conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local." Id. at 567-68 (citations omitted). Like the Supreme Court, "[t]his we are unwilling to do." Id. at 568.

39

D.

To the extent that appellants even acknowledge the precedential force of Lopez, see infra Part III.E, they attempt to distinguish that decision primarily in two ways. First, they argue that here, unlike in Lopez, the relationship between the regulated activity and interstate commerce upon which they rely is not just identified by them alone, but is also documented by congressional findings to which we are obliged to defer. Second, they contend that section 13981 regulates conduct implicating civil rights, that civil rights is an area of manifest federal concern, and that therefore the regulation of the conduct here, despite its noneconomic character and its lack of a close connection to interstate commerce, does not offend the first principles of federalism. Appellants argue that these distinctions are sufficient grounds for upholding the constitutionality of section 13981 under the Commerce Clause. We disagree.

1.

It is true that section 13981, unlike the Gun-Free School Zones Act as originally enacted, is accompanied by congressional findings regarding the extent and effects of the problem it addresses. However, though Congress' legislative expertise is entitled to deference, Lopez is unmistakable that our deference is not, and cannot be, absolute. And the principles articulated in that decision leave little doubt that the findings here are simply inadequate to sustain section 13981 as a constitutional exercise of Congress' power under Article I, Section 8.

(a)

The Lopez Court acknowledged that "legislative findings, and indeed even congressional committee findings," may assist the courts in determining constitutionality under the Commerce Clause. Lopez, 514 U.S. at 562; see also id. at 563 (noting the lack of findings that "would enable [the Court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye"). The Court emphasized, however, that "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." Id . at 557 n.2 (citation omit-

40

ted). Rather, because the question of whether particular activities "affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question," id., we cannot sustain a statute solely on the strength of a congressional finding as to the factual relationship between a particular activity and interstate commerce. Instead, we must undertake an "independent evaluation" to determine whether, as a legal matter, the substantially affects test is satisfied. Id. at 562 (noting that congressional findings may be considered "as part of our independent evaluation of constitutionality under the Commerce Clause" (emphases added)); cf. id. at 563 (stating that congressional findings "enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce" (emphasis added)); id. at 559 ("[W]e have upheld a variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." (emphasis added)).

Appellants concede, as they must, that, under Lopez, findings are not "conclusive," Reply Br. of Intervenor United States at 12, "that a court is not bound by congressional findings," Supp. Br. of Intervenor United States at 4, that "[C]ongress cannot, by fiat, establish a substantial effect on interstate commerce where none exists," id., and that "a court must conduct an independent investigation," id.; cf. Br. of Appellant Brzonkala at 35 n.29 (acknowledging "[t]he Lopez decision's recognition that a law's constitutionality ultimately is a judicial decision").

Despite such lip service to the Court's explicit pronouncements in Lopez that congressional findings are not conclusive of the constitutional inquiry, however, appellants contend that the Gun-Free School Zones Act's primary and dispositive flaw was that Congress did not document the connection between the conduct regulated by that Act and interstate commerce. In support of this contention, appellants cite the Lopez Court's cursory mention of the lack of congressional findings that might have "enable[d] [it] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye," Lopez, 514 U.S. at 563. They then construe that Court's refusal, four pages later, to sustain the government's contentions in

41

that case by "pil[ing] inference on inference," id. at 567, as referring to the lack of congressional documentation of the regulated activity's affect on interstate commerce.**13** According to appellants, had Congress provided such documentation, the Court could have sustained the statute without resorting to inference, and would in fact have done so.**14**

Lopez, however, cannot reasonably be understood to have turned on a mere lack of documentation of the effects of the regulated conduct on interstate commerce. Although the Supreme Court noted that findings could aid it in identifying an effect on interstate commerce that was not "visible to the naked eye," Lopez, 514 U.S. at 563, the Court never indicated that it did not understand the relationship alleged to exist between guns in school zones and interstate commerce. While the Court did not consult legislative materials to illuminate the contours of this relationship, both the government and the principal dissent detailed how such guns affected interstate commerce. See, e.g., id. at 618-25 (Breyer, J., dissenting). The Court's lucid recitation of the arguments of both the government, see Lopez, 514 U.S. at 563-64 (majority) (reciting government's arguments), and

---

**13** See, e.g., Supp. Br. of Intervenor United States at 3 (contending that because Congress failed to identify nexus between regulated conduct and interstate commerce or provide "findings of any sort," "the effect of gun possession on interstate commerce could be posited only hypothetically," and "it would be necessary to `pile inference upon inference' to sustain the statute") (quoting Lopez, 514 U.S. at 567); Reply Br. of Intervenor United States at 12 ("The Lopez Court found it could sustain the Gun Free School Zones Act only by `pil[ing] inference on inference,' Lopez, 115 S. Ct. at 1634, and explicitly noted the absence of any legislative findings that would have made the inferential process unnecessary. Id. at 1631."); Br. of Intervenor United States at 19 (similar); cf. Br. of Appellant Brzonkala at 38 (similar).
**14** See, e.g., Reply Br. of Intervenor United States at 12 n.8 ("The point for the Lopez majority . . . was that its inferential task was not lightened by the presence of legislative findings such as those that are present here. Defendant's insistence that the outcome in Lopez would have been identical regardless of the legislative record before the Court is flatly at odds with the Court's declaration and its reasoning."); cf. id. at 12 (noting "critical" nature of findings); id. at 11 ("Contrary to defendants' contention here, legislative findings are of key significance.").

42

the principal dissent, id. at 564-66 (reciting Justice Breyer's arguments), leaves no doubt that it understood the nature of the relationship asserted. Further, the Court nowhere questioned the factual validity of the arguments made by either the government or Justice Breyer. See id. at 563-66; see also id . ("Although Justice Breyer argues that acceptance of the Government's rationale would not authorize a general police power, he is unable to identify any activity that the States may regulate but Congress may not."); id. at 600 (Thomas, J., concurring) (same).

Had the Court's decision turned on either lack of understanding or skepticism of the factual link between guns in school zones and interstate commerce, the Court's failure to consult the massive documentation available regarding those effects would have been inexplicable. Not only did the Court have available before it a wealth of legislative, governmental, and other materials documenting these links, see, e.g., id. at 631-34 (Breyer, J., dissenting) (appendix listing numerous hearings, transcripts, committee reports, and other legislative materials bearing directly on these links); id. at 634-36 (listing other governmental materials); id. at 636-44 (listing other readily available materials), it also had before it explicit congressional findings that (1) crime was a nationwide problem exacerbated by the interstate movement of drugs, guns, and criminal gangs; (2) firearms and their component parts move easily in interstate commerce, and guns have been found in increasing numbers around schools; (3) citizens fear to travel through certain parts of the country due to concern about violent crime and gun violence; (4) the occurrence of violent crime in school zones has resulted in a decline in the quality of education, which in turn has had an adverse impact on interstate commerce; and (5) the States are unable to curb gun-related crime on their own. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 320904, 108 Stat. 1796, 2125. To be sure, these findings had been added to the statute after its adoption, and the government did not rely on them "in the strict sense of the word." Lopez, 514 U.S. at 563 n.4 (citation omitted). But had the Court desired only legislative corroboration of the government's arguments, it could easily have consulted these findings, and presumably would have done so. As the government explained, "at a very minimum [the findings] indicate that reasons can be identified why Congress wanted to regulate this particular activity." Id. (citation omitted).

43

The Court's indifference both to these findings and to the massive documentation assembled by the principal dissent confirms that the Court did not reject as insufficient the relationship between guns in school zones and interstate commerce asserted by the government and the dissents because it deemed that relationship opaque or dubious, but rather that it did so for the reason that it explicitly stated: accepting such indirect and attenuated relationships as sufficient to justify congressional regulation would render unto Congress a power so sweeping as to leave the Court "hard pressed to posit any activity by any individual that Congress is without power to regulate." Lopez, 514 U.S. at 564.

It is clear, therefore, that appellants fundamentally misunderstand the Lopez Court's refusal "to pile inference upon inference" to sustain the Gun-Free School Zones Act. Id. at 567. When quoted in full rather than as an isolated fragment -- as appellants would have it -- the Court's statement is of unmistakable import:

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose anything not enumerated, and that there never will be a distinction between what is truly national and what is truly local. This we are unwilling to do.

Id. at 567-68 (citations omitted). Rather than referring to the Court's passing mention of the original statute's lack of findings four pages earlier, this statement instead represents a powerful summary of an intervening three-and-a-half-page discussion emphatically reaffirming the existence of meaningful substantive limits on congressional authority under the Commerce Clause.

44

The indisputable abundance of the materials available to the Court in Lopez detailing the real, though indirect, effect of guns in school zones on interstate commerce strongly suggests that appellants' argument really is not that Lopez turned on a simple lack of documentation, but rather that it turned on a lack of legislative formalities. Thus, despite their concessions, see supra at 41, it is evident that appellants regard legislative formalities such as findings as dispositive -- at least as a practical matter -- of whether an activity may be regulated under the substantially affects test. In fairness to them, however, they are far more abashed in their reliance upon congressional findings than are our dissenting colleagues, who are quite candid about their prostrate deference to congressional pronouncements. The dissenters begin and end their Commerce Clause analysis by posing the dispositive question as "whether . . . Congress exceeded its constitutional authority in enacting" section 13981. In the immediately following two sentences, they then provide what, from their following discussion, we know is for them the answer -- namely, that Congress did not exceed its authority, because "Congress directly addressed this very question" and on the basis of findings and evidence concluded that, in fact, it did act constitutionally in enacting section 13981. See infra at 173.**15**

_____

**15 See also infra** at 195 ("Where Congress has supported a statute with an explicitly articulated rationale asserting its constitutionality, [ ] invalidation . . . [is] a direct repudiation of Congress's full authority."); id. at 214 ("No one doubts the validity of any of these principles [of federalism and enumerated powers]. The critical question, however, is who decides how they are to be upheld. The Constitution itself provides a clear and specific answer to that question. It allocates the fundamental power of government -- the power of legislation -- to Congress."); id. at 195 ("The statute itself articulates the existence of a congressional judgment of constitutionality, while findings articulate the content of that judgment. We defer to the former . . . and we grant an additional measure of deference to the latter. . . ."); id. at 183-184 ("Given Congress's clear finding that gender-based violence has a substantial effect on interstate commerce, the compelling evidence in the legislative record supporting that finding, and the fact that the challenged statute in no way interferes with state action on matters of traditional state concern, it seems to me that a court can only uphold Subtitle C."); id. at 187 (criticizing majority for "flyspeck[ing] congressional judgments"); id. at 189 (criticizing majority for claiming that gender-based violence lacks a meaningful connection to economic activities, given that "Congress expressly found that

45

And only as an afterthought (literally) -- and, for it, an empty one at that, see id. at 70-72 -- does the dissent even acknowledge that the courts must ensure compliance with the Constitution. Id. at 173-174, 191. So far from Lopez, appellants would not even dare to venture.

Appellants' position (and a fortiori the dissent's), however, flatly contradicts the Supreme Court's opinion in Lopez . While an understanding of legislative formalities as dispositive in practice if not theory would follow from the reasoning initially employed by the Fifth Circuit in striking down the Gun-Free School Zones Act, see Lopez, 2 F.3d at 1363 ("Practically speaking, [congressional] findings almost always end the matter."); id. at 1365-66 (holding that Congress "ha[d] not taken the steps necessary to demonstrate that such an exercise of power is within the scope of the Commerce Clause"); Lopez, 514 U.S. at 552 (noting that Fifth Circuit held the Act invalid "in light of what it characterized as insufficient congressional findings and legislative history"), such an understanding cannot be reconciled with the much different analysis of the statute's constitutionality undertaken by the Supreme Court. See, e.g., id. at 551 ("The Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. We hold that the Act exceeds the authority of Congress to regulate Commerce . . . among the several States . . . ." (internal quotation marks omitted)).

To read the Supreme Court's decision as if it were the Fifth Circuit's, one would have to dismiss as disingenuous the Supreme Court's explicit statements that "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so," id . at 557 n.2 (internal quotation marks and citation omitted); that "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question," id.; and even that "Congress nor-

_____

gender-based violence does affect specific economic activities. . . ."); id. at 195 ("[N]othing in Lopez suggests that when Congress has considered a matter and made a rational finding of constitutionality -- let alone an explicit finding based on a massive congressional record, as in this case -- a court should not defer to that finding.").

46

mally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," id. at 562. Further, the Court's self-described "independent evaluation of constitutionality under the Commerce Clause," id., together with its purported consideration of the government's arguments regarding the relationship between guns in school zones and interstate commerce, id. at 563-68, would likewise have to be disregarded as mere contrivance. And, most importantly, the Supreme Court's definitive invocation of the first principles of federalism as limitations on congressional power would have to be consigned to platitude, for legislative formalities are at most a mere procedural limit on congressional power. Cf. Seminole Tribe v. Florida, 517 U.S. 44, 64 (1996) ("If Hans means only that federal-question suits for money damages against the States cannot be brought in federal court unless Congress clearly says so, it means nothing at all.") (quoting Pennsylvania  v. Union Gas Co., 491 U.S. 1, 36 (1989) (Scalia, J., concurring in part and dissenting in part)). In short, to read Lopez as elevating legislative formality to a position dispositive of the constitutional inquiry, even as a practical matter, one would have to ignore everything the Court said in that opinion, other than its single, passing allusion to the statute's lack of findings.

Had the Court in Lopez intended so to elevate the existence or non-existence of findings or a formal legislative record, its holding that the Gun-Free School Zones Act exceeded Congress' power under the Commerce Clause would have constituted not a substantive limitation on congressional power, but rather a mere procedural hurdle -- in essence, a remand to Congress to make formal findings or compile a formal record. Not only would a judicial mandate that Congress construct a proper paper trail of the sort that might be demanded of an administrative agency ill befit the dignity of the Legislature, see, e.g., Turner Broad. Sys. v. FCC, 512 U.S. 622, 666 (1994) (opinion of Kennedy, J.) ("Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review."); City of Boerne, 117 S. Ct. at 2170 ("Judicial deference, in most cases, is based not on the state of the legislative record Congress compiles but on due regard for the decision of the body constitutionally appointed to decide. As a general matter, it is for Congress to determine the method by which it will reach a decision." (internal quotation marks and citation omit-

47

ted)); cf. Maryland v. Wirtz, 392 U.S. 183, 190 n.13 (1968) ("We are not concerned with the manner in which Congress reached its factual conclusions."), but had the Supreme Court intended to impose such a procedural requirement, Lopez would have been an unusual case in which to announce it. For after the Fifth Circuit's decision, but before the Supreme Court's, Congress had already amended the Gun-Free School Zones Act to include "congressional findings regarding the effects of firearm possession in and around schools upon interstate and foreign commerce." Lopez, 514 U.S. at 563 n.4. The Supreme Court's holding that the Gun-Free School Zones Act was unconstitutional, accordingly, would have constituted little more than historical irrelevancy. Surely we cannot conclude that the Lopez Court intended to authorize the enforcement of the Gun-Free School Zones Act against those who, unlike the defendant in Lopez , violated the statute after it was amended in 1994 to include explicit congressional findings. Not only did the Court never even hint that the addition of findings solved, even prospectively, the problems it identified with the statute, but such an inference would also be difficult to reconcile with the Court's manifest lack of interest in the subsequently adopted findings. See id. at 563 n.4 (mentioning these findings only briefly in a footnote). Finally, if there were any doubt, despite the government's litigation position in this proceeding, neither Congress nor the government has so interpreted Lopez, as evidenced by the fact that, in response to that decision, Congress, at the Administration's urging, amended 18 U.S.C. § 922(q) by adding a jurisdictional element. Compare 18 U.S.C. § 922(q)(2)(A) (limiting statute's reach to prohibition of possession, in a school zone, of a firearm"that has moved in or that otherwise affects interstate or foreign commerce"), with 31 Weekly Comp. Pres. Doc. 809 (May 15, 1995) (presenting Attorney General Reno's "analysis of Lopez" and recommended "legislative solution" of limiting statute's reach by adding jurisdictional element, "thereby bring[ing] it within the Congress' Commerce Clause authority").

Lopez, then, cannot reasonably be understood to contemplate absolute deference to legislative findings, either in theory or in practice. As the opinion instructs, such findings can clarify the factual relationship that exists between conduct that a statute seeks to regulate and interstate commerce. However, because constitutionality under the substantially affects test turns ultimately not on mere empirical fact

48

but on law, unless the relationship so clarified is sufficient to satisfy the legal requirements of that test, the statute cannot be sustained.

(b)

When viewed not with absolute deference, but rather"as part of our independent evaluation of constitutionality under the Commerce Clause," Lopez, 514 U.S. at 562, it is apparent that the congressional findings on which appellants rely cannot establish that section 13981 is a permissible regulation under the substantially affects test.

In the first place, although the appellants cite hearings and committee reports from at least three different Congresses-- raising the reasonable question of which Congress found what, a question we would be forced to pursue if we believed findings constituted a formal procedural requirement -- many of the congressional findings on which the appellants rely describe only indirectly the relationship between gender-motivated violent crime and interstate commerce. Although the committee reports recite numerous findings that violence against women generally, and domestic violence in particular, are significant problems, see, e.g., S. Rep. No. 103-138, at 38 (1993) (rape and murder statistics); id. at 41-42 (family violence); H.R. Rep. No. 103-395, at 26 (1993) (domestic violence statistics); S. Rep. No. 101-545, at 37 (1990) (same); H.R. Rep. No. 103-395, at 25 (violent crime generally), and even that domestic violence and other violence against women affects the economy, see, e.g., S. Rep. No. 103-138, at 41 (estimating "health care, criminal justice and other social costs of domestic violence" at $5 to $10 billion annually)); S. Rep. No. 101-545, at 33 ("Partial estimates show that violent crime against women costs this country at least 3 billion . . . dollars a year."), neither of these propositions clarifies the impact of gender-motivated violence against women -- as opposed to all violence against women -- on the economy. Cf., e.g., 42 U.S.C. § 13981(e)(1) (excluding from statute's purview "random acts of violence unrelated to gender" and "acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender"); S. Rep. No. 102-197, at 69 (1991) (statement of Sen. Biden) ("Title III [section 13981] does not cover everyday domestic violence cases . . . . This is stated clearly in the committee report and it is the only fair reading of the statutory language."). The findings linking this more narrow class of violence to the economy

49

are substantially more modest. <u>See</u>, <u>e.g.</u> , S. Rep. No. 103-138, at 54 ("Gender-based violence bars its most likely targets -- women -- from full partic[ipation] in the national economy."); <u>id.</u> ("Even the fear of gender-based violence affects the economy . . . ."). Not even these findings, however, describe the effects of gender-motivated violence on <u>interstate commerce</u>, let alone do they constitute a legislative judgment that gender-motivated violence substantially affects interstate commerce.

Ultimately, appellants cite only two congressional findings regarding the effects of gender-motivated violence on interstate commerce. First, they cite a House Conference Report finding, in a single conclusory sentence, that "crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce; crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." H.R. Conf. Rep. No. 103-711, at 385 (1994), <u>reprinted in</u> 1994 U.S. Code Cong. & Admin. News 1839, 1853. Second, they cite a Senate report finding that "[g]ender-based violent crimes meet the <u>modest threshold</u> required by the Commerce Clause. Gender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which <u>affect</u> interstate commerce and the national economy." S. Rep. No. 103-138, at 54 (emphases added).**16**

_____

**16** Although appellants cite this latter finding, they evince an understandable -- though barely excusable -- reluctance to quote it in its entirety. <u>Compare</u> Br. of Intervenor United States at 8 ("<u>See also</u> S. Rep. No. 103-138 at 54 (`[g]ender-based crimes and the fear of gender-based crimes restrict[ ] movement, reduce[ ] employment opportunities, increase[ ] health expenditures, and reduce[ ] consumer spending')."), <u>and id.</u> at 30 (same), <u>with</u> Supp. Br. of Intervenor United States at 1-2 ("`[G]ender-based crimes and the fear of gender-based crimes restrict[ ] movement, reduce[ ] employment opportunities, increase[ ] health expenditures, and reduce[ ] consumer spending, all of which affect interstate commerce and the national economy.' S. Rep. No. 103-138, at 54 (1993).").

Although these two lone findings do recite effects of gender-motivated violence on interstate commerce as a factual matter, to the extent these findings are intended also as a legal conclusion that such violence is sufficiently related to interstate commerce to satisfy the substantially affects test, under Lopez we cannot accept this conclusion uncritically. This is especially so where, as here, Congress' findings themselves reveal a profound misunderstanding of the constitutionally permissible scope of its Commerce power under Article I, Section 8. The Senate initially found not that gender-motivated violence substantially affects interstate commerce, but only that gender-based violence affects interstate commerce and the national economy sufficiently to satisfy what it described as the "modest threshold required by the Commerce Clause." And even this finding must be considered in light of its simultaneously and explicitly stated belief that "[t]he Commerce Clause is a broad grant of power allowing Congress to reach conduct that has even the slightest effect on interstate commerce." S. Rep. No. 138, at 54 (emphasis added); cf. Lopez, 514 U.S. at 559 ("We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity `substantially affects' interstate commerce." (emphasis added)). That this misapprehension of the scope of the power to regulate interstate commerce was not confined to the Senate is confirmed by section 13981's express statutory purpose "to protect the civil rights of victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce." 42 U.S.C. § 13981(a) (emphasis added). Not only does the explicit language of this provision misstate the scope of Congress' power under the Commerce Clause, but it also assumes a general power to regulate health and safety -- the very essence of the sort of police power the Constitution denies to the federal government and reserves to the States. Compare U.S. Const. art. I, § 8 (enumerated powers of Congress), with id. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."), and City of Boerne, 117 S. Ct. at 2171 (noting "the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens").

Therefore, as a court, we cannot avoid our duty to evaluate independently the constitutionality of section 13981 under the Commerce Clause.

51

The legislative record in this case, considered as a whole, shows that violence against women is a sobering problem and also that such violence ultimately does take a toll on the national economy. The record also supports an inference that some portion of this violence, and the toll that it exacts, is attributable to gender animus. And Congress' specific findings regarding the relationship between gender-motivated violence and interstate commerce, though somewhat conclusory, cf. Lopez, 514 U.S. at 612 n.2 (Souter, J., dissenting) (noting that the findings added by Congress to the GFSZA were made "at such a conclusory level of generality as to add virtually nothing to the record"), depict the manner in which such violence affects interstate commerce -- primarily by imposing medical, legal, and other costs upon its victims; by discouraging those who fear such violence from traveling, working, or transacting business at times or in places that they deem unsafe (thereby deterring some interstate travel, employment, and transactions); and, as a result, by inhibiting the productivity of its actual or potential victims and decreasing the supply and demand for interstate products.

This legislative record no doubt supports the wisdom and legitimacy of many of the measures Congress enacted in the Violence Against Women Act, such as the expenditure of federal funds, the criminalization of violence against women with an explicit interstate nexus, and the amendment of the Federal Rules of Evidence to better accommodate the victims of such violence. And, given the sweeping view of Congress' power to regulate interstate commerce suggested by the committee reports and the express statutory-purpose provision, it is not surprising that Congress believed the relationship between gender-motivated crimes of violence and interstate commerce sufficient to support, under the Commerce Clause, the regulation of this noneconomic activity, even in the absence of a jurisdictional element.

However, although appellants repeatedly assert that the relationship described by these findings is direct, see, e.g., Br. of Intervenor United States at 19, 28, 30-31; Reply Br. of Intervenor United States at 10, 12-13, it quite simply is not. Rather, it is almost precisely analogous to the attenuated, though undoubtedly real, relationship asserted to exist between guns in school zones and interstate commerce, see Lopez, 514 U.S. at 563-64 (rejecting arguments of costs of crime, decreased travel, and decreased national productivity as insuf-

ficient to bring the regulation of guns in school zones within the Commerce power), or, for that matter, to that which undoubtedly exists between any significant activity and interstate commerce. That the relationship here is asserted not by appellants alone, but also by Congress, cannot be dispositive. As noted, the Supreme Court did not reject the government's arguments in Lopez because they lacked formality. Nor did it reject them because it did not understand them or because it questioned their factual validity. Rather, the Supreme Court held that the Commerce power could not be extended to the regulation of activities having only such an attenuated relationship with interstate commerce without granting Congress an unlimited police power inconsistent with a Constitution of enumerated and limited federal powers. Here, as in Lopez, the power that Congress has asserted is essentially limitless; the existence of findings or documentation, standing alone, does not provide the type of meaningful limitation on congressional power required by a Constitution that withholds from Congress "a general police power of the sort retained by the States." Id. at 567.

53

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTY BRZONKALA,
Plaintiff-Appellant,

v.

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; ANTONIO J.
MORRISON; JAMES LANDALE CRAWFORD,
Defendants-Appellees,

and

CORNELL D. BROWN; WILLIAM E.
LANDSIDLE, in his capacity as
Comptroller of the Commonwealth,
Defendants.

LAW PROFESSORS; VIRGINIANS ALIGNED

AGAINST SEXUAL ASSAULT; THE ANTI-
DEFAMATION LEAGUE; CENTER FOR
WOMEN POLICY STUDIES; THE DC RAPE
CRISIS CENTER; EQUAL RIGHTS
ADVOCATES; THE GEORGETOWN
UNIVERSITY LAW CENTER SEX
DISCRIMINATION CLINIC; JEWISH WOMEN
INTERNATIONAL; THE NATIONAL
ALLIANCE OF SEXUAL ASSAULT
COALITIONS; THE NATIONAL COALITION
AGAINST DOMESTIC VIOLENCE; THE
NATIONAL COALITION AGAINST SEXUAL
ASSAULT; THE NATIONAL NETWORK TO
END DOMESTIC VIOLENCE; NATIONAL
ORGANIZATION FOR WOMEN;

No. 96-1814(L)

NORTHWEST WOMEN'S LAW CENTER; THE
PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE, INCORPORATED;
VIRGINIA NATIONAL ORGANIZATION FOR
WOMEN; VIRGINIA NOW LEGAL
DEFENSE AND EDUCATION FUND,

INCORPORATED; WOMEN EMPLOYED;
WOMEN'S LAW PROJECT; WOMEN'S
LEGAL DEFENSE FUND; INDEPENDENT
WOMEN'S FORUM; WOMEN'S FREEDOM
NETWORK,
Amici Curiae.

_____

2.

Appellants also argue that section 13981 is a "civil rights" statute,
see 42 U.S.C. § 13981(a) (noting purpose of Act "to protect the civil
rights of victims of gender motivated violence"), and as such cannot
offend the first principles of federalism because civil rights represents
an area of "quintessential federal responsibility." Supp. Br. of Interve-
nor United States at 6; see also Br. of Intervenor United States at 32
(same).

It is unquestionably true that Congress has traditionally assumed an
essential role in enacting legislation to protect civil rights and to root
out discrimination and its vestiges. However, the Congress has never
asserted a general authority, untethered to any specific constitutional
power, to enact such legislation. And the Supreme Court has never
upheld such legislation solely for the reason that it is civil rights in
character. Appellants do not contend otherwise, nor do they really
even contend seriously that the Court should do so. Instead, as would
be expected under our Constitution of enumerated powers, the Court
has upheld such legislation, as all other legislation, only when it has
been enacted in exercise of a specific power conferred upon Congress
by the Constitution. Compare Heart of Atlanta Motel, Inc. v. United

56

States, 379 U.S. 241, 261-62 (1964) (upholding Title II of the Civil Rights Act of 1964 under Commerce Clause of Article I), and Katzenbach v. McClung, 379 U.S. 294, 305 (1964) (same), with Lopez, 514 U.S. at 559-60 (describing Heart of Atlanta and McClung as cases upholding regulation governing economic activity and therefore falling comfortably within the contours of the Commerce power); id. at 573-74 (Kennedy, J., concurring) (same). In fact, the Court has not hesitated to invalidate even the most paradigmatic of civil rights initiatives, like the Civil Rights Acts of 1871 and 1875, when there was lacking such support in the Constitution. See United States v. Harris, 106 U.S. 629 (1883); Civil Rights Cases, 109 U.S. 3 (1883).

Unlike those civil rights laws that have been readily enacted by Congress and readily sustained by the Supreme Court, however, section 13981 is untethered to, and otherwise unsupported by, any such enumerated power. Although appellants attempt to justify section 13981 as a legitimate exercise of Congress' power over interstate commerce, the intrastate, noncommercial violence reached by the section, and its consequences, are far removed from interstate "commercial concerns that are central to the Commerce Clause." Lopez, 514 U.S. at 583 (Kennedy, J., concurring).

Moreover, the conduct targeted by section 13981 bears little resemblance to the discriminatory state denial of equal protection or other conduct that is the concern of the Reconstruction Amendments. See infra Part IV. Although assertedly enacted out of concern, in part, for inadequate state law enforcement, the particular shortcomings ascribed by Congress to the States are not so much intentional -- and thus unconstitutional -- discrimination by the States, but rather the failure, despite "fervent" and "sincere" efforts, S. Rep. No. 102-197, at 39; S. Rep. No. 101-545, at 33, to eradicate the"subtle prejudices" and "stereotypes" that prevent the victims of gender-motivated crimes from obtaining legal vindication in the state courts, S. Rep. No. 102-197, at 39. And the legislation does not even address these shortcomings directly by regulating the States or their officials, but, instead, creates a cause of action against private individuals. The reach of section 13981 is not even limited to private acts of violence committed with the active connivance of the States or their officials, or to private acts of violence purposely aimed at depriving the victims of equal access to legal redress or other constitutional rights. Accordingly, not

57

even appellants seriously contend that the purely private gender-motivated violence reached by section 13981 itself violates the Constitution. See, e.g., Reply Br. of Intervenor United States at 3 ("To be sure, § 1 of the Fourteenth Amendment speaks to state action and does not proscribe purely private conduct."); Br. of Intervenor United States at 21 (similar).

And, not only does section 13981 regulate wholly intrastate and private conduct, but the conduct regulated also falls within the most traditional of state concerns. That is, Congress' motive notwithstanding, the legislation indisputably shifts power from the States to the federal government, blurring the "distinct and discernable lines of political accountability" required by our Constitution. See Lopez, 514 U.S. at 576 (Kennedy, J., concurring).**17**

_____

**17** Appellants assert that because section 13981 regulates not all violent crime -- or even all violent crime against women-- but only such crime arising from gender animus, it does not impermissibly intrude upon traditional areas of state authority. To the extent this argument rests on the assumption that gender-motivated crime constitutes a relatively small subset of all violent crime against women, it is in marked tension with appellants' reliance upon congressional findings of the total economic costs of all violence against women to support section 13981. See supra Part III.D.1.a. And if appellants believe that gender-motivated violence constitutes a relatively large subset of violence against women, it is difficult to understand how the statutory limitation upon which appellants rely substantially lessens the impact of section 13981 on the balance of state and federal authority.

In reliance upon inapposite precedent, however, appellants maintain that crime motivated by animus uniquely implicates federal interests and falls outside traditional areas of state concern. Even were this precedent relevant to the scope of congressional authority under the Commerce Clause, the rationale of the cases upon which appellants rely is clearly limited to crime that is itself tied to a specific constitutional violation or is purposefully aimed at depriving its victims of their constitutional rights. Compare Griffin v. Breckenridge , 403 U.S. 88, 102 (1971), with United States v. Guest, 383 U.S. 745, 784 (1966) (Brennan, J., dissenting), and Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 275 (1993).

In any event, appellants' argument is inconsistent with Lopez itself. For, in that case, the Court found that the GFSZA interfered with state

58

If we were to hold that a statute like section 13981, which regulates purely private, noneconomic activity at the very core of traditional state concern and has only the most attenuated relation to interstate commerce, could nonetheless be sustained under the Commerce Clause based upon no more than the kind of generalized findings of state shortcomings made here, then Congress could circumvent the constitutional limits on federal power imposed by both the Commerce Clause and the Fourteenth Amendment, see infra Part IV, and claim a general police power, because charges that States have failed fully to eradicate or remedy bias can be made about nearly every area of traditional state concern. See, e.g., Leslie Bender & Perette Lawrence, Is Tort Law Male?: Foreseeability Analysis and Property Managers' Liability for Third Party Rapes of Residents, 69 Chi.-Kent L. Rev. 313 (1993) (tort law); Jane Goodman et al., Money, Sex, and Death: Gender Bias in Wrongful Death Damage Awards, 25 Law & Soc'y Rev. 263 (1991) (same); Martha Chamallas & Linda K. Kerber, Women, Mothers, and the Law of Fright: A History, 88 Mich. L. Rev. 814 (1990) (same); Mary Pat Treuthart & Laurie Woods, Mediation -- A Guide for Advocates and Attorneys Representing Battered Women 13-14, 75 (1990) (contract law); Sylvia A. Law & Patricia Hennessey, Is the Law Male?: The Case of Family Law, 69 Chi.-Kent L. Rev. 345 (1993) (family law). In fact, the very findings on which appellants rely in this case would, themselves, justify not only section 13981, but the federalization of all crimes against women, see, e.g., S. Rep. No. 103-138, at 49 (citing studies concluding "that crimes disproportionately affecting women are often treated less seriously than comparable crimes affecting men"). For that matter, they would justify federal regulation, and even occupation, of the entire field of family law, including divorce, alimony, child custody, and the equitable division of property. See S. Rep. No. 102-197, at 43 n.40 (citing

_____

authority over violent crime and education, even though it did not regulate all violent crime or all matters relating to education, but only the possession of firearms in school zones. And it did so despite the argument that firearm regulation represented an area in which the federal government has "accumulated institutional expertise." Lopez, 514 U.S. at 563. Clearly, under Lopez, a statute regulating only a subset of a traditional area of state concern still implicates the balance of state and federal authority, and it does so even when that subset involves conduct similar to that regulated by the federal government in other contexts.

59

studies of state task forces on gender bias that find bias and state failings throughout the entire area of domestic relations and family law); S. Rep. No. 103-138, at 49 n.52 (similar).

Accordingly, although we respect the concerns underlying appellants' argument that Congress has a general power to pass "civil rights" statutes and acknowledge the argument's intuitive appeal, the Constitution does not extend to Congress the unlimited power that would necessarily follow were we to accept the argument. To the contrary, the extension of such power to the Congress solely on the grounds that appellants urge would be in contravention both of Lopez and of the first principles of federalism on which that opinion rests.

E.

Despite their half-hearted attempts to distinguish Lopez, it is apparent that, ultimately, Brzonkala and the government (not to mention the dissent) would have us ignore that decision altogether. Not only do appellants clearly, though mistakenly, regard Lopez as at most a decision of little importance, they also make no serious attempt to come to grips with the core reasoning of that opinion. Instead, appellants merely rely on arguments that repeat the opinions of the dissenting Justices in Lopez but are squarely foreclosed by the Lopez majority, even while criticizing the district court for its efforts to understand and apply the Lopez analysis. Unlike Brzonkala and the government, however, we are unwilling to consign the Supreme Court's most significant recent pronouncement on the Commerce Clause to the status of inconvenient but ultimately insignificant aberration.

Throughout their briefs, both Brzonkala and the government repeatedly note that Lopez reaffirmed, rather than overturned, the Supreme Court's Commerce Clause decisions of the last sixty years. Apparently on this ground, they also repeatedly assert that Lopez did not work any change in the Supreme Court's Commerce Clause jurisprudence, or in the framework for analyzing a statute's constitutionality under the Commerce Clause. See, e.g., Br. of Appellant Brzonkala at 35 ("Rather than creating a new standard, the Lopez Court merely declined to expand the Commerce Clause's scope."); Br. of Intervenor

60

United States at 27 (asserting that, in <u>Lopez</u>, "the Supreme Court reaffirmed its previous half century of Commerce Clause jurisprudence").

We find such a superficial understanding of <u>Lopez</u>, especially by the United States, surprising. Although it is true that the <u>Lopez</u> Court did not disturb the precise <u>holdings</u> of any previous Supreme Court precedents, it is equally true that the <u>Lopez</u> Court renounced or limited some of the most sweeping <u>reasoning</u> and <u>dicta</u> of its Commerce Clause opinions:

> Admittedly, some of our prior cases have taken long steps down that road [toward converting congressional authority under the Commerce Clause into a police power], giving great deference to congressional power. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further.

<u>Lopez</u>, 514 U.S. at 567 (citation omitted). **18**

Not only did the Court specifically reject earlier statements suggesting that congressional power extends to the regulation of activities that merely affect interstate commerce, <u>id</u>. at 559 (admitting that "our case law has not been clear whether an activity must `affect' or `substantially affect' interstate commerce" to fall within the Commerce power, and approving, "consistent with the great weight of our case law," the latter analysis as "the proper test"); <u>cf</u>. <u>id</u>. at 616 (Breyer, J., dissenting) ("[T]he word `substantial' implies a somewhat narrower power than recent precedent suggests."), but it also drew a clear distinction between regulations of economic and noneconomic activities, <u>see supra</u> note 5 and accompanying text, limiting to the for-

_____

**18** Although appellants cite this passage as authority for the proposition that <u>Lopez</u> reaffirmed the Supreme Court's"previous half century of Commerce Clause jurisprudence," they tellingly do not quote the passage, but instead provide only the following parenthetical description: "recognizing the breadth of the Commerce Clause power under its precedents and simply `declin[ing] here to proceed any further.'" Br. of Intervenor United States at 27 & n.13. This description, of course, as the textual quotation shows, misrepresents the import of the Supreme Court's pronouncement.

mer category the reach of the authority and reasoning of its most per-missive Commerce Clause cases. Compare id. at 560 (majority) ("Even Wickard, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved eco-nomic activity in a way that the possession of a gun in a school zone does not."), with id. at 561 (holding that because GFSZA had "noth-ing to do with `commerce' or any sort of economic enterprise," it could not "be sustained under [the Court's] cases upholding regula-tions of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects inter-state commerce"); cf. id. at 627-28 (Breyer, J., dissenting) (noting the Court's "apparent belief that it can reconcile its holding with earlier cases by making a critical distinction between `commercial' and non-commercial `transaction[s]'").

Furthermore, the Court elevated to a majority opinion statements from previous concurring opinions that "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so," Lopez, 514 U.S. at 557 n.2 (quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring in judgment)) (internal quotation marks omitted), and that "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judi-cial rather than a legislative question, and can be settled finally only by this Court," id. (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 273 (1964) (Black, J., concurring)) (internal quotation marks omitted). Thus, the Court made clear that courts may not merely defer to a legislative judgment that an activity sufficiently affects interstate commerce to satisfy the substantially affects test, but must instead independently evaluate constitutionality under the Com-merce Clause, id. at 562, a proposition that had not always been apparent from the earlier cases, see, e.g., United States v. Lopez, 2 F.3d 1342, 1362-63 (5th Cir. 1993) (suggesting that findings appeared to be dispositive under then existing Supreme Court authority), aff'd, 514 U.S. 549 (1995).

Finally, the Lopez Court was emphatic that it would not find an activity sufficiently related to interstate commerce to satisfy the sub-stantially affects test in reliance upon arguments that lacked any prin-

62

cipled substantive limitations and that consequently would justify plenary federal regulation of anything. See, e.g., Lopez, 514 U.S. at 564 ("paus[ing] to consider the implications of the Government's arguments" and noting that "[u]nder the theories that the Government presents in support of § 922(q) [the GFSZA], it is difficult to perceive any limitation on federal power"); id. at 567 (refusing "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States").

Thus, although Lopez may have left intact all of the Supreme Court's previous holdings, and even the analytical framework for determining the constitutionality of regulations of economic activity, see, e.g., id. at 573-74 (Kennedy, J., concurring) (noting that "[s]tare decisis operates with great force in counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature" and that precedents upholding regulations of "commercial transactions" were "within the fair ambit of the Court's practical conception of commercial regulation and are not called in question by our decision today" (emphases added)), appellants' suggestion that Lopez changed nothing at all is in serious error.

In accordance with their misunderstanding of Lopez as an aberrational decision that worked little change in the Supreme Court's Commerce Clause jurisprudence, appellants hardly even cite the opinion at all, let alone those portions of the opinion that set forth the Court's holding and essential reasoning.

Although Lopez is emphatically clear that the Gun-Free School Zones Act's principal defects were its failure either to regulate an economic activity or to include a jurisdictional element -- so clear, it bears repeating, that the Court both began and ended its opinion, as well as framed its holding, by reference to these defects, see, e.g., id. at 551; id. at 557 -- appellants neither discuss nor even cite these aspects of the opinion. Instead, appellants completely ignore the crucial distinctions drawn by the Supreme Court between regulations of economic and noneconomic activities, and between regulations that include a jurisdictional element and those that do not, and even chastise the district court for considering section 13981's failure to regu-

63

late an economic activity or to include a jurisdictional element.**19** <u>See</u>, e.g., Br. of Appellant Brzonkala at 34 (criticizing the district court for "ignor[ing] the last half-century of Commerce Clause cases prohibiting public and private discrimination that in the aggregate substantially affects interstate commerce," but citing only to cases upholding regulations of <u>economic</u> activities); <u>id</u>. at 38 n.32 (similar); <u>id</u>. at 39 n.34 (asserting that "<u>Lopez</u> does not . . . preclude federal criminal statutes when state law enforcement has proven inadequate," but citing only to a lower court decision upholding a statute that contained a jurisdictional element); <u>id</u>. at 36 ("Without any basis, the court below interpreted <u>Lopez</u> as limiting valid Commerce Clause legislation to laws that (1) have a jurisdictional element linking the activity to interstate commerce, or (2) regulate economic activity. Nothing in <u>Lopez</u> imposes those prerequisites." (citation and footnote omitted)); Reply Br. of Intervenor United States at 10 (similar); Supp. Br. of Appellant Brzonkala at 4 (similar). <u>Compare</u> Supp. Br. of Intervenor United States at 4 ("[T]he Supreme Court's concern with federalism did not lead it to overrule any precedent or to confine Congress's authority under the Commerce Clause to the regulation of economic activity."), <u>and</u> Br. of Intervenor United States at 18-19 (similar), <u>with id</u>. at 33-34 (criticizing the district court for placing "considerable emphasis" on section 13981's failure to regulate economic activity).**20**

_____

**19** Almost by way of afterthought, the government, in the final paragraph of its principal brief, and without citation, concedes that the fact "[t]hat a statute does not address economic activity directly may, as in <u>Lopez</u>, suggest that the connection between federal legislation and interstate commerce is impermissibly attenuated." Br. of Intervenor United States at 33-34. Among the six briefs filed by Brzonkala and the United States before this court, this lone sentence constitutes the sum total of the appellants' attention to the critical distinction <u>Lopez</u> draws between regulations of economic and noneconomic activities.

**20** At times, in fact, appellants come dangerously close to affirmatively misrepresenting the holding and analysis of <u>Lopez</u>. <u>Compare</u> Br. of Intervenor United States at 34 ("The Court in <u>Lopez</u> did not, however, hold that Congress was limited to the direct regulation of economic activity under the Commerce Clause. Instead, the Court reiterated that `"[e]ven if [an] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce . . . ."' <u>Lopez</u>, 115 S. Ct.

It is evident that appellants' refusal to acknowledge the clear distinctions drawn by the Lopez Court between laws that regulate economic activities or include jurisdictional elements and those that do not cannot be squared with the majority or concurring opinions in Lopez. And, indeed, their attempts to paper over these distinctions and persuade us to sustain section 13981 on the authority of Wickard and similar cases are but echoes of the arguments that failed to persuade a majority of the Court in Lopez. See , e.g., Lopez, 514 U.S. at 608-09 (Souter, J., dissenting) (recognizing but criticizing the importance placed by the Court on both distinctions); id . at 616 (Breyer, J., dissenting) (arguing that Wickard-style reasoning applies to the evaluation of all congressional regulations); id. at 627-30 (recognizing, but criticizing, Court's distinction between regulation of economic and noneconomic activities).

_____

at 1628 (quoting Wickard v. Filburn, 317 U.S. at 125)." (alterations and omissions in Br.)); id. at 27-28 (similar); and Br. of Appellant Brzonkala at 36 n.2 ("In Wickard v. Filburn, which Lopez did not purport to reverse, the Court held that even if an activity is not commercial, it may be reached by Commerce Clause if it exerts a`substantial economic effect.' 317 U.S. 111, 125 (1942) (emphasis added)."), with Lopez, 514 U.S. at 560-61 (characterizing Wickard as a case involving economic activity and holding that because the GFSZA "had nothing to do with `commerce' or any sort of economic enterprise," it could not be sustained under the authority or reasoning of cases such as Wickard that had upheld regulations of economic activities); id . at 559-60 (listing Wickard among "examples" of cases upholding regulations of economic activities); and supra Part III.B.1. Compare also Br. of Intervenor United States at 27 & n.2 (stating that Lopez merely reaffirmed the "previous half century of Commerce Clause jurisprudence"; citing for this proposition Lopez, 115 S. Ct. at 1637 (Kennedy, J., concurring), and characterizing this passage with the following parenthetical description: "Commerce Clause precedents `are not called into question by our decision today'"), with Lopez, 514 U.S. at 573-74, 115 S. Ct. at 1637 (Kennedy, J., concurring) ("Later examples of the exercise of federal power where commercial transactions were the subject of the regulation include Heart of Atlanta Motel, Inc. v. United States, Katzenbach v. McClung, and Perez v. United States. These and like authorities are within the fair ambit of the Court's practical conception of commercial regulation and are not called in question by our decision today." (citations omitted; emphases added)); cf. supra Part III.A & nn.5, 18, 19.

65

Similarly, despite the Lopez Court's clarification of the judicial role in independently evaluating constitutionality under the Commerce Clause, see Lopez, 514 U.S. at 557 n.2; id. at 562-63, appellants also ignore the clear import of these passages, seizing instead upon references by the Court to "rational basis" review, see id. at 557 (describing the Court's post-New Deal Commerce Clause analysis); id. at 564 (describing the government's argument), in a transparent attempt to relegate the decision to insignificance.**21** Although Lopez undoubtedly preserves a healthy degree of judicial deference to reasonable legislative judgments of fact, it is plain that appellants do not by their incessant invocations of "rational basis review" contemplate merely such deference. Rather, it is evident that they use this fashionable label of judicial restraint to disguise their advocacy of a deference so absolute as to preclude any independent judicial evaluation of constitutionality whatsoever -- a deference indistinguishable from judicial abdication. And the dissent does likewise; indeed, laying bare appellants' and the dissent's standard of review to an extent that will surely prove disquieting to appellants, the dissent, after announcing the "rational basis" standard of review, offers not a single sentence-- not one -- of independent analysis of whether gender-motivated violence substantially affects interstate commerce.

Such a view of the judicial role obviously cannot be reconciled with the opinions of the Court and of the concurring Justices in Lopez. And it is clear from the paucity of attention given by appellants and

_____

**21** See, e.g., Br. of Appellant Brzonkala at 35 n.29 (asserting, without analysis, that "[t]he Lopez decision's recognition that a law's constitutionality ultimately is a judicial decision does not disturb the deferential rational basis review the Court endorsed"); id. at 35 ("Lopez leaves undisturbed the well-established principle that Commerce Clause legislation will be upheld as long as Congress had a rational basis for concluding that the regulated activity sufficiently affected interstate commerce."); id. ("Lopez does not disturb the standard Commerce Clause rational basis review."); Br. of Intervenor United States at 19 ("[T]he rational basis standard [was] reaffirmed in Lopez."); Supp. Br. of Intervenor United States at 1 (same); cf. Br. of Intervenor United States at 28 (referring to "rational basis" review); Reply Br. of Appellant Brzonkala at 14 (same); Reply Br. of Intervenor United States at 13 (same); Supp. Br. of Appellant Brzonkala at 1-2 (same); Supp. Br. of Intervenor United States at 4, 6 (same); id. at 2 (similar).

the dissent to these opinions that they do not derive their understanding of the judicial role in evaluating constitutionality under the Commerce Clause from these sources, but rather, again, from the Lopez dissents, the core rhetoric and reasoning of which their arguments closely parallel. Compare Br. of Appellant Brzonkala at 37 ("Rather than apply the traditional Commerce Clause analysis ratified by Lopez, the District Court instead substituted its own analysis and judgment."); id. (criticizing district court for "abandon[ing]" the "rational basis test"); Br. of Intervenor United States at 31 (similar); Reply Br. of Intervenor United States at 12 ("The VAWA may be invalidated only if the Court chooses to set aside the findings of a direct connection between gender-motivated violence and interstate commerce. . . . [T]his task requires broad-scale second-guessing of legislative findings and judgment."); and Br. of Intervenor United States at 31 (similar), with Lopez, 514 U.S. at 603 (Souter, J., dissenting) (invoking rational basis review); id. at 604 ("The practice of deferring to rationally based legislative judgments is a paradigm of judicial restraint." (internal quotation marks and citation omitted)); id. at 604-07 (discussing the genesis of rational basis review); id. at 608 (decrying the majority's "qualification of rational basis review"); id. at 609 (stating that the implications of the Court's opinion could not "square with rational basis scrutiny"); id . at 614-15 ("Because Justice Breyer's opinion demonstrates beyond any doubt that the Act in question passes the rationality review that the Court continues to espouse, today's decision may be seen as only a misstep . . .."); id. at 616-17 (Breyer, J., dissenting) (invoking rational basis review); id. at 618-25 (purportedly applying rational basis review); and id. at 631 ("Upholding this legislation would do no more than simply recognize that Congress had a `rational basis' for finding a significant connection between guns in or near schools and (through their effect on education) the interstate and foreign commerce they threaten.").

Whether one agrees or disagrees with our conclusion, it is the majority, not the dissent, that has undertaken the "rational basis" review contemplated by the Court in Lopez. That is, having been presented with Congress' findings on the matter, we have "independent[ly] evaluat[ed]" "whether a rational basis exist[s] for concluding that a regulated activity [here, gender-motivated violence] sufficiently affect[s] interstate commerce," to justify the exercise of Congress' broad powers under Article I, section 8. And we have done this mind-

67

ful of the Supreme Court's pointed admonitions that "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so" and that "[w]hether particular operations affect interstate commerce sufficiently . . . is ultimately a judicial rather than a legislative question." Lopez, 514 U.S. at 557 & n.2, 562 (internal quotation omitted). In this undertaking emphatically required by the Supreme Court in Lopez, appellants would have us only half-heartedly engage and the dissent would have us engage not at all.

Finally, not content simply to emasculate the judicial role in the determination of whether Congress has exceeded its constitutional authority, appellants also would disregard the first principles of federalism that collectively constitute the infrastructure of the majority opinion in Lopez, only grudgingly acknowledging even their existence. See Reply Br. of Intervenor United States at 14; Supp. Br. of Intervenor United States at 4. Specifically, like the dissent, which at the same time that it roundly criticizes us for attempting a principled line between that which is "truly national" and that which is "truly local," Lopez, 514 U.S. at 567-68, tellingly omits quotation of all of the passages from Lopez reflecting the Court's commitment to such a limitation on the Commerce power,**22** appellants never address either the Lopez Court's concern with the implications of the government's

_____

**22 See**, e.g., Lopez, 514 U.S. at 557 ("In Jones & Laughlin Steel, the Court warned that the scope of the interstate commerce power `must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between between what is national and what is local and create a completely centralized government.'"); id. at 564 ("Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign."); id. ("Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate."); id. at 567 ("To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." (emphasis added)).

68

arguments or its refusal to rely upon arguments that lack any princi-pled limitations and would justify federal regulation of any activity. Instead, they simply note a series of particular characteristics of sec-tion 13981 that they believe minimize the statute's disruption of the balance between state and federal authority, such as its partial reliance on state law in defining the conduct that it regulates; its exclusion of supplemental jurisdiction over divorce, custody proceedings, and sim-ilar matters; and its relatively narrow focus on gender animus.

Not only do these statute-specific characteristics not eliminate the impact of section 13981 on the balance of federal and state authority, see supra at 32-37, 56-58 & nn.10, 16, the logic of the argument that appellants advance for sustaining the statute is independent of these characteristics; that is, the argument would require us to sustain sec-tion 13981 even without the particular characteristics upon which the government relies to distinguish the provision. For the essence of appellants' contention is that Congress can regulate any problem solely by finding that it affects the economy and has not been fully remedied by the States. See, e.g., Br. of Intervenor United States at 32; but cf. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 320904, 108 Stat. 1796, 2125 (adding to GFSZA, inter alia, statutory finding that the States are unable to curb gun-related violence). But if Congress has found that the States have failed adequately to address violence against women, and that such violence affects the economy, then surely it need not rely on state law definitions of violent crime, but can itself define such crime, preempt-ing the States' criminal and tort laws altogether. And if Congress has found that the States have failed to eradicate gender bias, a problem that is not limited to violent crime but permeates the law generally, and family law in particular, then Congress need not proscribe federal jurisdiction over the core areas of family law, but can extend supple-mental jurisdiction over these areas, or even regulate them directly and perhaps exclusively, because issues of divorce, alimony, the equi-table division of property, and child custody, like violent crime, indis-putably have ultimate economic effects. Furthermore, if the congressional findings in this case as to the shortcomings of the States and the effects of violence against women would support the regula-tion of gender-motivated violence against women, then they would also support the regulation of all violence against women. Indeed, the States' failure to eliminate gender-motivated violent crime can surely

69

be cited as a specific example of failure to resolve fully not only problems of animus, but also the scourge of violent crime generally. And it cannot be doubted that if gender-motivated violent crime affects the economy, a fortiori all violent crime affects the economy. Accordingly, there is no reason that Congress must, under the logic of appellants' arguments, limit its reach to violent crime motivated by gender animus, rather than assume control over the entire field of violent crime, or, for that matter, all crime within all of the States.

The dissent stands in what we suspect will be, for appellants, uncomfortable testament to this infinite reach of appellants' argument. In the single paragraph of overarching significance in the dissent, our colleagues do nothing more than recite the following statement from the conference committee and assert, in ipse dixit protestingly characterized as "independent evaluation," that gender-motivated violence really does substantially affect interstate commerce:

> [C]rimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate commerce, and from transacting with business, and in places involved, in interstate commerce . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products. . . . [M]y independent evaluation of Congress's "legislative judgment" compels me to conclude that Congress had a rational basis for finding that gender-based violence substantially affects interstate commerce.

Infra at 177, 182 (quoting H.R. Conf. Rep. No. 103-711, at 385; citation and footnote omitted); see also id. at 182-183 n.5.

But with only a moment's reflection it is apparent-- as the dissent certainly recognizes -- that what is said by the dissent (and Congress) to be true of gender-motivated violence is true of all crime many times over, as the simple deletion of the phrases "motivated by gender" and "gender-based" from this passage confirms:

70

[C]rimes of violence have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate commerce, and from transacting with business, and in places involved, in interstate commerce . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products. . . . [M]y independent evaluation of Congress's "legislative judgment" compels me to conclude that Congress had a rational basis for finding that violence substantially affects interstate commerce.

Cf. Lopez, 514 U.S. at 564 (rejecting argument from "costs of crime" and "national productivity" as leading to congressional power to "regulate not only all violent crime, but all activities that might lead to violent crime" and as eliminating "any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign").[23] The implications of such reasoning for the sovereign States need hardly be particularized.

_____

[23] Indeed, the substitution of "violent crime" or "crime" for "gender-based violence" in even the individualized statements regarding section 13981 relied upon by the dissent and the government, none of which was by Congress as an institution and few of which were even made by congressional members or staff, confirms the boundless power that would reside in the Congress were the section to be sustained upon such statements:

> Violent crime and the fear of violent crime restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy.

Infra at 176-177.

> [E]stimates suggest that we spend [billions] a year on health care, criminal justice, and other social costs of violence . . . [and lose billions] annually due to absenteeism in the workplace.

Id. at 177-178.

> Violent crime bars its [targets] from full participation in the national economy.

71

To these sweeping implications of their arguments, appellants offer little response other than that Congress here has enacted a more limited statute. Such a meager response is palpably insufficient, although we acknowledge that it may well be the one even remotely plausible argument available in the wake of Lopez.

The only other argument, which appellants advisedly forgo, is that of our colleagues in dissent, who would, in blissful denial of the Court's most recent precedents on Our Federalism, proceed to import into Commerce Clause analysis a doctrine whose legitimacy even in the context in which it was fashioned was in doubt from inception, see Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985), and hold that Congress alone is constitutionally responsible for the protection of the sovereign States. Thus says the dissent in a passage that is so startling in its quaint innocence that it bears repetition in full:

_____

Id. at 177.

> Even the fear of violent crime affects the economy because it deters [men and] women from taking jobs in certain areas or at certain hours that pose a significant risk of such violence.

Br. of Intervenor United States at 7.

> [Men and] women often refuse higher paying night jobs in service/retail industries because of the fear of attack.

Infra at 178.

> Fear of crime even deters [men and] women from using public transportation and thus acts as a barrier to mobility, particularly for those . . . who have no alternative to public transportation because of economic constraints.

Br. of Intervenor United States at 8 (internal quotation omitted).

> The threat of violence has made many [men and] women understandably afraid to walk our streets or use public transportation.

Id.

> But the costs do not end there: violent crime has a devastating social and economic effect on the family and the community.

Infra at 178 (internal quotation omitted).

72

My colleagues in the majority iterate and reiterate that the enumeration of powers in the Constitution reserves authority to the states, that ours is a system of dual sovereignty, and that the states must operate as independent governmental bodies for that system to continue to exist. No one doubts the validity of any of these principles. The critical question, however, is who decides how they are to be upheld.

The Constitution itself provides a clear and specific answer to that question. It allocates the fundamental power of government -- the power of legislation -- to Congress. Congress is not some central dictatorial assembly with interests independent of and antithetical to the states. Rather, Congress is composed entirely of members elected from each state to represent the interests of the people of that state, and is specifically designed to preserve state authority and protect state interests. Congressional legislation accordingly is not, as the majority suggests, a command from an autonomous central power to totally subjugated states. Congressional legislation is instead the product of the constitutionally coordinated authorities of the states, the localities, and the people. Courts thus have slender authority to invalidate the result of Congress's legislative process in order to protect the states or localities, unless there is some reason to suspect that the legislative process has been or will be unreliable.

Infra at 213-14.

As the Chief Justice (then-Justice Rehnquist) and Justice O'Connor might have said in their impassioned dissents predicting that the "Court will in time" overrule Garcia and "again assume its constitutional responsibility," Garcia, 469 U.S. at 580, 589 (O'Connor, J., dissenting, joined by Powell and Rehnquist, JJ.); see also id. at 580 (Rehnquist, J., dissenting), such is nothing short of putting the fox in charge of the chicken coop. For, as Justice O'Connor wrote in critique of the Garcia majority, under Justice Blackmun's formulation, "all that stands between the remaining essentials of state sovereignty and Congress is the latter's underdeveloped capacity for self-restraint." And,

73

> [i]f federalism so conceived and so carefully cultivated by the Framers of our Constitution is to remain meaningful, [the courts] cannot [so] abdicate [their] constitutional responsibility to oversee the Federal Government's compliance with its duty to respect the legitimate interests of the States.

Id. at 589 (O'Connor, J., dissenting).

One need not rely upon the prescience of the Chief Justice and Justice O'Connor, however, for the conclusion that the dissent's view of federalism bears no resemblance to the Supreme Court's. He need only look to the Court's decision in Lopez itself where, in virtual anticipation of the very argument made by the dissent, Justice Kennedy wrote for himself, for Justice O'Connor, and just as assuredly for the three remaining Justices of the majority, that

> the absence of structural mechanisms to require[Congress] to undertake this principled task [of ensuring the proper federal balance], and the momentary political convenience often attendant upon their failure to do so, argue against a complete renunciation of the judicial role. Although it is the obligation of all officers of the Government to respect the constitutional design, the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far.

Lopez, 514 U.S. at 578 (Kennedy, J., concurring, joined by O'Connor, J.).

Thus does the dissent, even more than do appellants, fundamentally misapprehend the Court's recent pronouncements on our dual sovereignty and the affirmative constitutional obligation of the judiciary to safeguard the sovereignty of the States against congressional encroachment. As Lopez forcefully reminds us, our federal system of government exists not as a mere matter of legislative grace, as the dissent (and ultimately appellants) would have, but rather as a matter of constitutional design.

74

IV.

Although in the wake of City of Boerne appellants have returned to defend section 13981 primarily as a constitutional exercise of Congress' power under the Commerce Clause, they still contend alternatively, though now less enthusiastically, that section 13981 is a constitutionally legitimate exercise of Congress' power under Section 5, one of the explicit bases upon which section 13981 was enacted. See 42 U.S.C. § 13981(a) (describing statute as adopted "[p]ursuant to the affirmative power of Congress to enact this part . . . under section 5 of the Fourteenth Amendment . . .").

The Fourteenth Amendment, of course, provides in pertinent part as follows:

> Section 1. No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.
>
> Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV, §§ 1, 5. Appellants maintain that Congress properly invoked Section 5 in enacting section 13981 because Congress concluded that bias and discrimination against women in the state criminal justice systems "often deprive[ ] victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled" and that section 13981 was "necessary to guarantee equal protection of the laws." H.R. Conf. Rep. No. 103-711, at 385, reprinted in 1994 U.S. Code Cong. & Admin. News 1839, 1853. The remaining issue for us, therefore, is whether section 13981 is "appropriate legislation" to "enforce" the substantive constitutional guarantee that "[n]o State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §§ 1, 5. In light of Supreme Court precedent, and particularly given the Court's recent decision in City of Boerne, we hold that it is not.

A.

Section 13981 creates a cause of action against private parties who commit acts of gender-motivated violence, and that action may be

75

pursued without regard to whether the State connived in those acts or otherwise violated the particular plaintiff's constitutional rights. To sustain section 13981 under Section 5 of the Fourteenth Amendment, therefore, we would have to hold that Section 5 permits Congress to regulate purely private conduct, without any individualized showing of unconstitutional state action. Because, under the Amendment's text, its history, and a consistent line of Supreme Court precedent dating from just after the Amendment's ratification to the present, it is established that Congress may not regulate purely private conduct pursuant to its Fourteenth Amendment enforcement power, we cannot so hold.

1.

Section 1 of the Fourteenth Amendment, which defines the rights "enforceable" by Congress through "appropriate legislation," provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added). The Supreme Court observed in United States v. Guest, 383 U.S. 745 (1966), that this prohibition is directed exclusively to the States:

> The Equal Protection Clause does not add anything to the rights which one citizen has under the Constitution against another. . . . This has been the view of the Court from the beginning [and] [i]t remains the Court's view today.

Id. at 755 (internal quotation marks and citations omitted). In the thirty years since Guest, not only the Court as a whole but nearly every Member of the Court individually has expressly embraced this longstanding view as to the state action limitation of the Amendment. In Lugar v. Edmondson Oil Co., 457 U.S. 922 (1981), the Court, characterizing its prior precedents as "insist[ing] that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State," id. at 937, wrote simply, but unequivocally, that "[b]ecause the [Fourteenth] Amendment is directed at the States, it can be violated only by conduct that may be fairly characterized as `state action,'" id. at 924. A year later, in Blum v. Yaretsky, 457 U.S. 991 (1982), the Court again forcefully stated the state action requirement: "[T]he principle has become firmly embedded in our constitu-

tional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States." Id. at 1002 (internal quotation marks and citation omitted). And in Georgia v. McCollum, 505 U.S. 42 (1992), the Court observed that "[r]acial discrimination, although repugnant in all contexts, violates the Constitution only when it is attributable to state action." Id. at 50 (emphasis added). As the Court explained at some length in NCAA v. Tarkanian, 488 U.S. 179 (1988),

> Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be. As a general matter the protections of the Fourteenth Amendment do not extend to private conduct abridging individual rights. Careful adherence to the `state action' requirement preserves an area of individual freedom by limiting the reach of federal law. . .

Id. at 191 (internal quotation marks and citations omitted).

Even when they have not joined the Court's opinions in particular cases or have written separately, the individual Members of the Court have not hesitated to express their agreement that the Fourteenth Amendment confers rights only against the States. See Morse v. Republican Party, 517 U.S. 186, 248 (1996) (Kennedy, J., dissenting) ("[W]e have been cautious to preserve the line separating state action from private behavior that is beyond the Constitution's reach."); J.E.B. v. Alabama, 511 U.S. 127, 150 (1994) (O'Connor, J., concurring) ("The Equal Protection Clause prohibits only discrimination by state actors."); McCollum, 505 U.S. at 59 (Rehnquist, C.J., concurring); id. (Thomas, J., concurring in the judgment); id. at 63 (O'Connor, J., dissenting) (noting that distinction between private and state action "appears on the face of the Fourteenth Amendment"), id. at 69 (Scalia, J., dissenting); Lugar, 457 U.S. at 945 (Powell, J., dissenting, joined by Rehnquist and O'Connor, JJ.) ("[The Fourteenth Amendment] does not create rights enforceable against private citizens . . . but only against the States.").

77

Indeed, even Justices Brennan and Marshall, who typically advocated the most expansive interpretations of the Fourteenth Amendment, agreed that the Amendment extends only to state action. Justice Brennan, for example, dissenting in Blum, described the Fourteenth Amendment as "a restraint on the abuse of state power." Blum, 457 U.S. at 1012 (Brennan, J., dissenting). And Justice Marshall fully concurred in that view of the reach of the Amendment. See Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 185 (1972) (Brennan, J., dissenting, joined by Marshall, J.); cf. Tarkanian , 488 U.S. at 199 (White, J., dissenting, joined by Brennan, Marshall, and O'Connor, JJ.) (stating issue as "whether the NCAA . . . became a state actor").

Unsurprisingly, in accord with its uniform understanding of Section 1 as conferring rights only against the States, the Court has consistently held that Congress' Section 5 power to enforce Section 1 is correspondingly limited to remedial action against States and state actors. Thus, and significantly for the disposition of the question before us, as recently as 1997 in City of Boerne , the Court explained that Section 5 grants Congress only a "remedial" power to "make . . . effective" Section 1's "substantive prohibitions against the States." 117 S. Ct. at 2165. Such "remedial" legislation, the Court emphasized, "should be adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against" -- unconstitutional action by the States. Id. at 2170 (internal quotation marks and citation omitted); see also id. at 2166 (that "Congress' § 5 power [is] corrective or preventive, not definitional, has not been questioned"); cf. Morse, 517 U.S. at 276 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia, J.) ("[I]t is well-established that Congress may not regulate purely private behavior pursuant to its enforcement power under the Fourteenth . . . Amendment[ ]."); Metro Broad., Inc. v. FCC, 497 U.S. 547, 605-06 (1990) (O'Connor, J. dissenting, joined by Rehnquist, C.J., and Scalia and Kennedy, JJ.) ("Section 5 empowers Congress to act respecting the States" and"provides to Congress a particular, structural role in the oversight of certain of the States' actions.").

These many and recent expressions by the Court of the reach of Sections 1 and 5 of the Fourteenth Amendment rest firmly not only on the Amendment's plain language, but also on the legislative history and early jurisprudence of the Amendment. In City of Boerne, the

78

Court recounted the historical justification for its interpretation of the Amendment as limited to state action and Congress' power thereunder as limited to the enactment of legislation aimed at the States. In particular, the Court contrasted the language and original understanding of the Amendment, as adopted, with the language and understanding of an earlier, rejected draft of the Amendment. See generally City of Boerne, 117 S. Ct. at 2164-66. This earlier draft, the so-called Bingham Amendment, was reported early in 1866 by Republican Representative John Bingham of Ohio to the House of Representatives on behalf of the Joint Committee on Reconstruction:

> The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property.

Cong. Globe, 39th Cong., 1st Sess. 1034 (1866), quoted in City of Boerne, 117 S. Ct. at 2164. By its terms, this draft Amendment would have authorized Congress to secure equality in the rights of life, liberty, and property of all citizens, by legislating directly upon these rights. Consequently, that proposed broad grant of congressional power quickly generated enormous opposition from members of the Reconstruction Congress who feared that a congressional power to legislate in such a manner would reduce the role of the States to a virtual nullity. See, e.g., City of Boerne, 117 S. Ct. at 2164 (Bingham Amendment would permit "Congress to legislate fully upon all subjects affecting life, liberty, and property, such that there would not be much left for the State Legislatures.") (quoting Sen. Stewart); id. ("Members of Congress from across the political spectrum criticized the Amendment, and the criticisms had a common theme: The proposed Amendment gave Congress too much legislative power at the expense of the existing constitutional structure."); id. ("Democrats and conservative Republicans argued that the proposed Amendment would give Congress a power to intrude into traditional areas of State responsibility, a power inconsistent with the federal design central to the Constitution.").

In the face of these objections, the Bingham Amendment was tabled, and the Joint Committee on Reconstruction thereafter drafted

79

the proposal that eventually became the Fourteenth Amendment. This draft, like the Fourteenth Amendment itself, "imposed several self-executing limits on the States," 117 S. Ct. at 2165, and also authorized Congress "to enforce, by appropriate legislation, the provisions of this article," Cong. Globe, 39th Cong., 1st Sess. 2286, quoted in City of Boerne, 117 S. Ct. at 2165. Subsequently adopted and ratified (with modifications not relevant here), this Amendment was understood by the Reconstruction Congress only to grant Congress "the power to make the substantive constitutional prohibitions against the States effective." City of Boerne, 117 S. Ct. at 2165 (emphasis added); see also id. (Section 5 "enables Congress, in case the States shall enact laws in conflict with the principles of the amendment, to correct that legislation by a formal congressional enactment") (quoting Sen. Howard); id. (new draft would "allow[ ] Congress to correct the unjust legislation of the States" (emphasis added)) (quoting Rep. Stevens); id. (new draft would vest Congress with authority "to protect by national law the privileges and immunities of all the citizens of the Republic . . . whenever the same shall be abridged or denied by the unconstitutional acts of any State" (emphasis added)) (quoting Rep. Bingham).

Accordingly, this proposed Amendment did not raise the concerns that had ignited the debate over the Bingham Amendment, namely, that authorizing Congress to legislate directly upon individual rights would unduly expand Congress' powers at the expense of the States and authorize Congress "to prescribe uniform national laws with respect to life, liberty, and property." Id . As the Supreme Court emphasized in City of Boerne, this legislative history -- that Congress explicitly considered an earlier draft Amendment that would have given Congress power to regulate purely private conduct, rejected that draft in the face of sharp opposition, and subsequently adopted an Amendment that gave Congress only the power to "enforce" a "provision" that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws" -- has a "direct bearing on the central issue of defining Congress' enforcement power." Id. at 2164 (emphasis added). In our view, and as the Supreme Court has consistently held, this history confirms the plain-language and common-sense understanding that Section 1 provides rights only against the States and that, correspondingly, Section 5 only grants Congress power to enforce the rights provided in Section 1 through legislation

80

directed against state action, not a power to regulate purely private conduct.

This understanding is reinforced by two Supreme Court decisions rendered nearly contemporaneously with the Amendment's ratification -- United States v. Harris, 106 U.S. 629 (1883), and the Civil Rights Cases, 109 U.S. 3 (1883). Although the particular prohibitions voided in these cases have since been properly sustained under different constitutional provisions, the broader holdings of these cases limiting the Fourteenth Amendment and its enforcement power to state action remain unassailable. See infra Part IV.B; see also City of Boerne, 117 S. Ct. at 2166, 2170 (quoting the Civil Rights Cases and citing with approval both Harris and the Civil Rights Cases).

In Harris, the Court invalidated section two of the Civil Rights Act of 1871, which forbade any person to "conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws." 106 U.S. at 632. The Court began its constitutional inquiry by emphasizing "that the government of the United States is one of delegated, limited, and enumerated powers," id. at 635, that "`the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively[,] or to the people,'" id. at 636 (quoting U.S. Const. amend. X), and, therefore, that section two of the Act could stand only if it were a valid exercise of one of Congress' enumerated powers.

The Court then went on to hold that section two of the Act, which punished private individuals for interfering with other private individuals' rights, exceeded Congress' power under Section 5. In reaching this conclusion, the Court first canvassed the language and meaning of the Fourteenth Amendment and concluded both that Section 1 of that Amendment imposes an obligation only upon the States and that Section 5 of the same authorizes Congress to enforce the guarantees of Section 1 only against the States themselves :

> [The Fourteenth Amendment] is a guaranty of protection against the acts of the State government itself. It is . . . not a guaranty against the commission of individual offenses; and the power of Congress . . . to legislate for the enforcement of such a guaranty, does not extend to the passage of

81

> laws for the suppression of crime within the States. The enforcement of the guaranty does not require or authorize congress to perform "the duty that the guaranty itself supposes it to be the duty of the State to perform, and which it requires the State to perform."

Id. at 638 (internal quotation marks omitted; emphasis added); see also id. at 638-39 ("The Fourteenth Amendment prohibits a State from depriving any person of life, liberty, or property without due process of law, or from denying to any person the equal protection of the laws; but this provision does not add anything to the rights of one citizen against another. . . . The duty of protecting all its citizens in the enjoyment of an equality of rights was originally assumed by the States, and it remains there. The only obligation resting upon the United States is to see that the States do not deny the right. This the amendment guarantees, and no more. The power of the national government is limited to this guaranty." (citation omitted)); Virginia v. Rives, 100 U.S. 313, 318 (1879) ("The provisions of the Fourteenth Amendment of the Constitution have reference to State action exclusively, and not to any action of private individuals.").

Additionally, reasoned the Court, not only did section two apply to purely private conduct, but it also did so without regard to the conduct of the State in which the underlying crime occurred and without so much as requiring an individualized showing that the State had unconstitutionally deprived the particular victim of a right protected by the Fourteenth Amendment:

> The language of the amendment does not leave this subject in doubt. When the State has been guilty of no violation of its provisions; when it has not . . . denied to any person within its jurisdiction the equal protection of the laws; when, on the contrary, the laws of the State, as enacted by its legislative, and construed by its judicial, and administered by its executive departments, recognize and protect the right of all persons, the amendment imposes no duty and confers no power upon Congress.

> [Section two of the 1871 Act] is not limited to take effect only in case the State shall . . . deny to any person the equal

82

> protection of the laws. It applies, no matter how well the
> State may have performed its duty. Under it private persons
> are liable to punishment for conspiring to deprive any one
> of the equal protection of the laws enacted by the State.
>
> In the indictment in this case, for instance, . . . there is no
> intimation that the State [in which the acts occurred] has
> passed any law or done any act forbidden by the Fourteenth
> Amendment.

Harris, 106 U.S. at 639-40. Thus, in spite of the "strenuous[ ] insist-e[nce]" by the United States that the Act fell within Congress' Section 5 power, id. at 637, and even after affording the statute the full presumption of constitutionality warranted for any enactment of Congress, id. at 635, the Court invalidated this section of the 1871 Civil Rights Act as having exceeded Congress' power under Section 5:

> As, therefore, the section of the law under consideration is
> directed exclusively against the action of private persons,
> without reference to the laws of the State, or their adminis-
> tration by her officers, we are clear in the opinion that it is
> not warranted by any clause in the Fourteenth Amendment
> to the Constitution.

Id. at 640 (emphasis added).

Later that same year, in the Civil Rights Cases , the Court similarly invalidated the public-accommodations provisions of the Civil Rights Act of 1875 -- provisions that are directly analogous to section 13981 in their application to purely private conduct and establishment of civil liability -- as beyond the scope of Congress' Section 5 enforcement power. The 1875 Act created a substantive right of equal access to "inns, public conveyances on land or water, theatres, and other places of public amusement . . . applicable alike to citizens of every race and color." 109 U.S. at 9 (quoting Civil Rights Act of 1875, § 1). In order to enforce the right, the Act authorized criminal penalties against those who violated the right, and further authorized persons aggrieved by violations of the Act to bring private causes of action for damages against those who denied them their rights to the enjoyment of public accommodations. Id.

83

Using language similar to that in Harris, the Court summarized the nature and extent of congressional enforcement power under Section 5 thus:

> [Section 5 of the Fourteenth Amendment] invests Congress with power to enforce it by appropriate legislation. To enforce what? To enforce the prohibition. To adopt appropriate legislation for correcting the effects of such prohibited State laws and State acts, and thus to render them effectually null, void, and innocuous. This is the legislative power conferred upon Congress, and this is the whole of it. It does not invest Congress with power to legislate upon subjects which are within the domain of State legislation; but to provide modes of relief against State legislation, or State action, of the kind referred to. It does not authorize Congress to create a code of municipal law for the regulation of private rights; but to provide modes of redress against the operation of State laws, and the action of State officers executive or judicial, when these are subversive of the fundamental rights specified in the amendment. Positive rights and privileges are undoubtedly secured by the Fourteenth Amendment; but they are secured by way of prohibition against State laws . . . [and] by power given to Congress to legislate for the purpose of carrying such prohibition into effect; and such legislation must necessarily be predicated upon such supposed State laws or State proceedings, and be directed to the correction of their operation and effect.

Id. at 11-12 (emphases added). And, again, the Court explained that Congress may not regulate private conduct when legislating pursuant to Section 5:

> In fine, the legislation which Congress is authorized to adopt in this behalf is not general legislation upon the rights of the citizen, but corrective legislation, that is, such as may be necessary and proper for counteracting such laws as the States may adopt or enforce, and which, by the amendment, they are prohibited from making or enforcing, or such acts and proceedings as the States may commit or take, and

84

which, by the amendment, they are prohibited from committing or taking.

Id. at 13-14. A contrary interpretation of the Enforcement Clause, the
Court emphasized, would permit Congress to regulate directly those
rights protected against state interference by the Fourteenth Amendment, opening the floodgates to the promulgation of a congressional
"code of municipal law regulative of all private rights between man
and man in society." Id. at 13. Eventually, the Court observed, such
would result in "Congress tak[ing] the place of the State legislatures
and . . . supersed[ing] them" in a manner "repugnant to the Tenth
Amendment of the Constitution," id. at 15.

Turning to the statute at issue, the Court held that the first two sections of the 1875 Act, like section two of the Civil Rights Act of 1871
invalidated in Harris, exceeded Congress' Section 5 power. First,
these provisions of the 1875 Act were illegitimate under the principle
that Congress may not reach purely private conduct. As the Supreme
Court put the point:

> An inspection of the law shows that it makes no reference
> whatever to any supposed or apprehended violation of the
> Fourteenth Amendment on the part of the States. It is not
> predicated on any such view. It proceeds ex directo to
> declare that certain acts committed by individuals shall be
> deemed offences, and shall be prosecuted and punished by
> proceedings in the courts of the United States.

Id. at 14 (emphasis added). Second, also like the provision at issue in
Harris, the challenged provisions were not limited by their terms to
take effect only in particular cases in which the plaintiff could make
an individualized showing that the State had violated the victim's
Fourteenth Amendment rights. Id. at 14 ("An inspection of the law
shows that it makes no reference whatever to any supposed or apprehended violation of the Fourteenth Amendment on the part of the
States."). Rather, the provisions "applie[d] equally to cases arising in
States which have the justest laws respecting the personal rights of
citizens, and whose authorities are ever ready to enforce such laws,
as to those which arise in States that may have violated the prohibition of the amendment." Id. The Court concluded, therefore, that the

85

Act was "not corrective legislation," but rather was "primary and direct," "tak[ing] immediate and absolute possession of the subject of the right of admission to inns, public conveyances, and places of amusement." Id. at 19.

Finally, and in stark contrast to the approach urged on us by appellants, the Court emphasized, as it had in Harris , that a court entertaining a Section 5 challenge is not simply to defer to the apparent conclusion of Congress that the statute is within its constitutional powers, but rather is duty-bound to form "an independent judgment" regarding the constitutionality of the statute and to "exercise [that judgment] according to the best lights" available to the court. Id. at 10. Exercising such judgment, the Court held that the provisions of the 1875 Act were not a permissible exercise of Section 5 power, and inter alia affirmed the judgments for the defendants, including the defendant in the private cause of action.

In later cases, such as United States v. Guest, 383 U.S. 745 (1966),[24]

_____

[24] At issue in Guest was whether certain indictments stated chargeable offenses under 18 U.S.C. § 241, a statute that prohibits conspiracies to deprive persons of constitutional rights. The disputed indictments in Guest alleged that certain white citizens conspired for the purpose of interfering with various constitutional rights of black citizens, including their rights to equal utilization of public facilities and to interstate travel. The Supreme Court reversed the lower court's dismissal of the indictments for failure to state a chargeable offense. With respect to the counts in the indictment alleging that the defendants interfered with the victims' right to "equal utilization, without discrimination upon the basis of race, of public facilities," Guest, 383 U.S. at 753, the Court concluded, as a matter of statutory construction, that such a right was protected by § 241 to the extent that it was protected by the Equal Protection Clause. Id. at 754. It then held that the indictment stated a chargeable offense because it alleged sufficient state involvement in the conspiracy -- "active connivance" between the private defendants and state officials -- for the conspiracy to fall within the prohibitions of the Equal Protection Clause under state action principles. Id. at 756-57 ("[T]he allegation is broad enough to cover a charge of active connivance by agents of the State in the making of the `false reports,' or other conduct amounting to official discrimination."). Therefore, the Court in Guest at most extended the Fourteenth Amendment's state action concept to include those who act

the Supreme Court clarified that the state action limitation on Congress' power under Section 5 permits Congress to regulate not only the States themselves and those on the States' payroll, but also those individuals who, through active connivance or conspiracy with the State, in effect act under color of state law or otherwise on behalf of the State. But the Court has never overruled either Harris or the Civil Rights Cases.**25** And, sinceHarris and the Civil Rights Cases, when

_____

in cooperation and active connivance with the State. Cf. United States v. Price, 383 U.S. 787 (1966) (holding that involvement of a sheriff, deputy sheriff, and a patrolman in lynching conspiracy was sufficient to render the conspiracy under color of state law).

Because the Court construed this count to allege state interference with a right protected by the Equal Protection Clause, it did not address the question whether Congress could, under Section 5, proscribe private conduct without any nexus to state action. The Court similarly did not consider whether Congress could regulate wholly private conduct in the course of reinstating the other counts in the indictment that alleged a private interference with the victims' constitutional right to travel. In reinstating these counts, the Court emphasized that"the constitutional right of interstate travel is a right secured against interference from any source whatever, whether governmental or private," and it "reiterate[d] that the right to travel freely from State to State finds constitutional protection that is quite independent of the Fourteenth Amendment." Guest, 383 U.S. at 760 n.17 (emphasis added).

**25 See**, e.g., Romer v. Evans, 517 U.S. 620, 628 (1996) (citing the Civil Rights Cases for the proposition that "it was settled early that the Fourteenth Amendment did not give Congress a general power to prohibit discrimination in public accommodations"); Lugar, 457 U.S. at 936 (citing Civil Rights Cases and stating that"[c]areful adherence to the `state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power" (emphasis added)); Blum, 457 U.S. at 1002 (citing Civil Rights Cases as origin of the "firmly embedded" doctrine that Section 1 only protects against state action (internal quotations omitted)); Moose Lodge, 407 U.S. at 172 (citing Civil Rights Cases as "set[ting] forth the essential dichotomy" between state and private action); Adickes v. S.H. Kress & Co., 398 U.S. 144, 147 n.2 (1970) (declining to reconsider the Section 5 holding of the Civil Rights Cases); Collins v. Hardyman , 341 U.S. 651, 657-58 (1951) (noting that Harris was "in harmony with . . . other important decisions dur-

87

the Court has upheld the application of civil rights statutes to purely private conduct, it has conspicuously done so under provisions of the Constitution other than Section 5 which are not subject to state-action requirements.**26**

_____

ing that period [of Cruikshank and the Civil Rights Cases] by a Court, every member of which had been appointed by President Lincoln, Grant, Hayes, Garfield or Arthur -- all indoctrinated in the cause which produced the Fourteenth Amendment, but convinced that it was not to be used to centralize power so as to upset the federal system" (footnote omitted)); United States v. Williams, 341 U.S. 70 (1951) (opinion of Frankfurter, J.) ("[W]e have consistently held that the category of rights which Congress may constitutionally protect from interference by private persons excludes those rights which the Constitution merely guarantees from interference by a State."), overruled by United States v. Price, 383 U.S. 787, 798 (1966) (overruling Williams construction of 18 U.S.C. § 241 and holding that statute extends to conspiracies to interfere with Fourteenth Amendment where conspirators acted under color of state law); United States v. Powell, 212 U.S. 564, 564-65 (1909) (per curiam) (holding that individual right to a fair trial in state court cannot be constitutionally vindicated by a federal prosecution of private persons); Ex Parte Virginia, 100 U.S. 339, 346 (1880) ("The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial." (emphasis added)); id. at 347 (legislation pursuant to section 5 "must act upon persons, not upon the abstract thing denominated a State, but upon the persons who are the agents of the State in the denial of the rights which were intended to be secured" (emphasis added)); United States v. Cruikshank, 92 U.S. 542, 555 (1875) ("The only obligation resting upon the United States [under the Fourteenth Amendment] is to see that the States do not deny the right [to equal protection of the laws]. This the amendment guarantees, but no more. The power of the national government is limited to the enforcement of this guaranty." (emphasis added)); cf. James v. Bowman, 190 U.S. 127, 139 (1903) ("These authorities show that a statute which purports to punish purely individual action cannot be sustained as an appropriate exercise of the power conferred by the Fifteenth Amendment upon Congress to prevent action by the State through some one or more of its official representatives . . . .").

**26** See, e.g., Guest, 383 U.S. at 757 (upholding action under precursor to section 241 against private conspiracy to interfere with constitutional

Thus, not only under the text and legislative history of the Fourteenth Amendment, but also under a consistent line of Supreme Court cases from Harris and the Civil Rights Cases to City of Boerne, it is now well established that, under the Fourteenth Amendment, Congress may adopt "appropriate legislation" to"enforce" its affirmative prohibitions against state action and action taken under color of state law. Congress may also regulate the conduct of nominally private persons who act in connivance with the State or whose conduct receives the "imprimatur of the State." And, although the Supreme Court has never so held and has not addressed the issue in recent years, it has left open the possibility that Congress may regulate private conduct pursuant to a statute that applies only on an individualized showing of a State's violation of the Fourteenth Amendment. But Congress may not regulate purely private conduct under the Fourteenth Amendment. On this the Court has never wavered.

2.

City of Boerne, Harris, the Civil Rights Cases, and the principles underlying these cases confirm beyond question that section 13981

_____

right to travel); Ex Parte Yarbrough, 110 U.S. 651, 665 (1884) (upholding private action under precursor to section 241 against private conspiracy to interfere with right to vote in federal elections); Griffin v. Breckenridge, 403 U.S. 88, 105 (1971) (upholding action brought under 42 U.S.C. § 1985(3) against private individuals as an exercise of congressional power to enforce the Thirteenth Amendment); United Bhd. of Carpenters and Joiners v. Scott, 463 U.S. 825, 833 (1983) (refusing to extend 42 U.S.C. § 1985(3) to private conspiracies "aimed at a right [e.g., free speech] that is by definition a right only against state interference"); id. (reciting in dictum that even if § 1985(3) did cover private interference with rights not to associate with a labor union, such would be constitutional under the Commerce Clause); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439 (1968) (upholding action under 42 U.S.C. § 1982 against private individuals as an exercise of congressional power to enforce the Thirteenth Amendment); Runyon v. McCrary, 427 U.S. 160, 179 (1976) (same for 42 U.S.C. § 1981); Heart of Atlanta, 379 U.S. at 249-50 (noting that "Congress based the [Civil Rights] Act [of 1964] on § 5 and the Equal Protection Clause of the Fourteenth Amendment as well as its power to regulate interstate commerce," but concluding that "since the commerce power is sufficient for our decision here we have considered it alone").

cannot be sustained under the Enforcement Clause of the Fourteenth Amendment. Section 13981 unmistakably regulates private action; it creates a cause of action against private individuals who commit acts of gender-motivated violence. Under section 13981, liability is not limited to the States, to their officials, to those who act under color of state law, or even to those who actively conspire with state officials. See 42 U.S.C. § 13981(c). Section 13981, like the statutes invalidated in Harris and the Civil Rights Cases, "proceeds ex directo to declare that certain acts committed by individuals shall be deemed offences, and shall be prosecuted and punished by proceedings in the courts of the United States." Civil Rights Cases, 109 U.S. at 14; cf. 42 U.S.C. § 13981(b) ("All persons within the United States shall have the right to be free from crimes of violence motivated by gender."). Indeed, the complaint in the instant case, which clearly states a claim under the statute -- at least as to appellee Morrison -- see supra Part II, does not even intone, much less allege, that appellees Morrison or Crawford are state actors, that they acted under color of state law, or that they otherwise conspired with state officials to deprive appellant Brzonkala of her rights guaranteed by the Equal Protection Clause.

Further, like the statutes invalidated in Harris and the Civil Rights Cases, section 13981 is not limited to take effect only upon an individualized showing of unconstitutional state action. Indeed, liability under section 13981 attaches without regard to whether the State adequately enforced its applicable criminal or civil laws. The statute even applies where, as here, no prior criminal or state civil complaint was even filed. 42 U.S.C. § 13981(d)(2)(A) (cause of action may lie without regard to whether the predicate acts of violence "have actually resulted in criminal charges, prosecution, or conviction"); id. § 13981(e)(2) ("[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action"). Like the law invalidated by the Supreme Court in Harris, section 13981 is "directed exclusively against the action of private persons, without reference to the laws of the States or their administration by her officers." Harris, 106 U.S. at 640. Section 13981 imposes liability for gender-motivated acts of violence, regardless of whether the predicate act of violence occurs in a State that at the time has "the justest laws" and authorities "ever ready to enforce such laws," Civil Rights Cases, 109 U.S. at 14, or whether it occurs

90

in a State that has unconstitutionally turned a blind eye toward or deliberately contributed to or participated in the particular act of violence.

The absence of any such jurisdictional limitations confirms that section 13981, much like the provisions of the Civil Rights Acts of 1871 and 1875 invalidated by the Supreme Court in Harris and the Civil Rights Cases respectively, is not legislation designed to "correct[ ] the effects of such prohibited State laws and State acts, and thus to render them effectually null, void, and innocuous," id. at 11, but rather is "primary and direct" legislation that "takes immediate and absolute possession of the subject of" individual acts of violence. Id. at 19. This is precisely the type of statute that the Supreme Court warned over a century ago would, if held valid under Section 5 of the Fourteenth Amendment, authorize a congressional"municipal code" through which the federal government could act directly upon all the rights of life, liberty, and property of all citizens and thereby eliminate altogether any role for the several States.

Accordingly, although we afford section 13981 the full presumption of constitutionality due an enactment of a coordinate branch of the federal government, we must hold, in spite of the "strenuous[ ] insist[ence]" of the government to the contrary, see Harris, 106 U.S. at 637, that section 13981 simply cannot be sustained under Section 5 of the Fourteenth Amendment.

91

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTY BRZONKALA,
<u>Plaintiff-Appellant,</u>

v.

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; ANTONIO J.
MORRISON; JAMES LANDALE CRAWFORD,
<u>Defendants-Appellees,</u>

and

CORNELL D. BROWN; WILLIAM E.
LANDSIDLE, in his capacity as
Comptroller of the Commonwealth,
<u>Defendants.</u>

LAW PROFESSORS; VIRGINIANS ALIGNED

AGAINST SEXUAL ASSAULT; THE ANTI-
DEFAMATION LEAGUE; CENTER FOR
WOMEN POLICY STUDIES; THE DC RAPE
CRISIS CENTER; EQUAL RIGHTS
ADVOCATES; THE GEORGETOWN
UNIVERSITY LAW CENTER SEX
DISCRIMINATION CLINIC; JEWISH WOMEN
INTERNATIONAL; THE NATIONAL
ALLIANCE OF SEXUAL ASSAULT
COALITIONS; THE NATIONAL COALITION
AGAINST DOMESTIC VIOLENCE; THE
NATIONAL COALITION AGAINST SEXUAL
ASSAULT; THE NATIONAL NETWORK TO
END DOMESTIC VIOLENCE; NATIONAL
ORGANIZATION FOR WOMEN;

No. 96-1814(L)

NORTHWEST WOMEN'S LAW CENTER; THE
PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE, INCORPORATED;
VIRGINIA NATIONAL ORGANIZATION FOR
WOMEN; VIRGINIA NOW LEGAL
DEFENSE AND EDUCATION FUND,

INCORPORATED; WOMEN EMPLOYED;
WOMEN'S LAW PROJECT; WOMEN'S
LEGAL DEFENSE FUND; INDEPENDENT
WOMEN'S FORUM; WOMEN'S FREEDOM
NETWORK,
Amici Curiae.

_____

B.

In obvious recognition of these fundamental principles, as well as
the import, for the arguments they advance, of Harris, the Civil Rights
Cases, and the modern precedents reaffirming the broader holdings of
these cases as to the scope of Section 1 and Section 5, appellants
attempt variously to argue that Harris and the Civil Rights Cases are
distinguishable, that they have been sub silentio overruled or quali-
fied, and that they have been explicitly repudiated by the Supreme
Court and other authorities. But none of these arguments is availing,
as appellants themselves appear to understand.

1.

Albeit maunderingly, appellants first attempt to distinguish Harris
and the Civil Rights Cases, contending that, in these cases, the Court
only limited Congress' power to regulate private conduct as an end
in itself, and that those cases are inapplicable where, as here, Con-
gress regulates such conduct not as an end in itself but only as a
means to the legitimate end of remedying unconstitutional state
action. To prove that Harris and the Civil Rights Cases were thus rea-
soned, appellants identify three features of the Civil Rights Acts

94

invalidated in those cases, features that they argue establish that those statutes were enacted not out of concern for state deprivations of equal protection, but rather only out of concern for purely private conduct. Having so characterized the 1871 and 1875 Civil Rights Acts and Congress' motives in enacting those statutes, appellants argue that the Supreme Court's reasoning in invalidating those Acts establishes only that legislation passed for the exclusive purpose of addressing private conduct, unrelated to any concern for actions by the States, is impermissible under Section 5. Appellants then claim that the Civil Rights Acts of 1871 and 1875 differ from section 13981 in that Congress' concern in the latter was with unconstitutional conduct by the States and, accordingly, section 13981 is a permissible exercise of Congress' remedial power under Section 5.

The obvious flaw in this argument -- apart from the fact that it finds no support whatsoever in the opinions of the Court in Harris and the Civil Rights Cases and, in fact, directly contradicts the reasoning of those cases -- is its central premise that Congress enacted the Civil Rights Acts of 1871 and 1875 only out of a concern with private conduct and without any concern for unconstitutional conduct by the States. This premise is demonstrably incorrect, as even a cursory examination of the legislative history surrounding passage of these Acts discloses. Indeed, as an historical matter, it is indisputable that Congress enacted those civil rights laws for the precise purpose of remedying massive and systemic violations of equal protection by the States. That such was Congress' motive in passing the 1871 Act is evident from the following statement as to the law's purpose by Representative James Garfield, a statement that was frequently echoed by Representative Garfield's colleagues:

> [T]he chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them.

Cong. Globe, 42d Cong., 1st Sess. app. 153 (1871) (statement of Rep. Garfield); see also id. at 653 (statement of Sen. Osborn) ("The State courts . . . are utterly powerless. . . . Justice is mocked, innocence punished, perjury rewarded, and crime defiant in the halls of justice");

95

id. at 457 (statement of Rep. Coburn) ("We find that the commission of a certain class of high crimes is not noticed; that the offenders are not arrested, put on trial, or punished"); id . at 481 (statement of Rep. Wilson); id. at app. 78 (statement of Rep. Perry) ("Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices."). And it is no less clear that the 1875 Act was passed for the same purpose. As Senator Sumner, by reference to the South Carolina legislature, representatively described the Congress' concern with the States' nonenforcement of their laws:

> The Legislature of South Carolina has passed a law giving precisely the right contained in your "supplementary civil rights bill." But such a law remains a dead letter on her statute-books, because the State courts, comprised largely of those whom the Senator wishes to obtain amnesty for, refuse to enforce it.

Cong. Globe, 42d Cong., 2d Sess. 430 (1872) (quoting Letter of F.L. Cardozo, South Carolina Secretary of State) (internal quotation marks omitted); see also id. at 726; 2 Cong. Rec. 383 (1874) (statement of Rep. Ransier) ("Mr. Speaker, the States will not give us protection in these matters, and well do these `State-rights' men know this."); id. at 457 (statement of Rep. Butler) ("The learned gentleman from Georgia [Mr. Stephens] agrees with me that every colored man now has all the rights which this bill gives him, but insists it is the States' duty to enforce them. But because of prejudice the States will not enforce them."); 3 Cong. Rec. 945 (1875) (statement of Rep. Lynch) ("You may ask why we do not institute civil suits in the State courts. What a farce! Talk about instituting a civil-rights suit in the State courts of Kentucky, for instance, where the decision of the judge is virtually rendered before he enters the court-house, and the verdict of the jury substantially rendered before it is impaneled . . . ."); 2 Cong. Rec. 427 (statement of Rep. Stowell); 3 Cong. Rec. app. 15 (statement of Rep. White).

In light of this legislative history -- not to mention the contemporaneous history generally -- it borders on the frivolous to contend, as appellants do, that Congress was unconcerned with violations of equal

96

protection by the States when it enacted the Civil Rights Acts of 1871 and 1875.**27**

Not only is the central premise of appellants' attempted distinction of <u>Harris</u> and the <u>Civil Rights Cases</u> demonstrably incorrect, but, ironically although not surprisingly, an examination of the purported differences between section 13981 and the Civil Rights Acts of 1871 and 1875, upon which appellants' attempted distinction rests, proves beyond question the applicability of the analysis of Congress' Section 5 enforcement power in <u>Harris</u> and the <u>Civil Rights Cases</u> and the unconstitutionality of section 13981 under these authorities.

First, appellants contend that the 1871 and 1875 Acts "fail[ed] to reference any Fourteenth Amendment violation by the States" and did not "respond[ ] to state officials' constitutional violations," Br. of Appellant Brzonkala at 30, and they contrast this legislative history with the legislative history of section 13981, which they contend clearly reveals that Congress enacted section 13981 in response to state-sponsored discrimination against women, <u>see</u> Br. of Intervenor United States at 22 n.11 (distinguishing section 13981 because it "respond[s] to systemic state equal protection violations"); Br. of Appellant Brzonkala at 30 (section 13981 "has none of[the] defects" identified by the Supreme Court in the <u>Civil Rights Cases</u> because Congress in enacting section 13981 "found a `classic' denial of equal protection by state law enforcement systems" and"specifically sought to remedy the equal protection violations resulting from the States' failings"); Reply Br. of Appellant Brzonkala at 11 (asserting that "Congress' express purpose [in enacting section 13981], documented throughout the legislative history, including the Conference Report, [was] to correct historic state-sponsored commission and tolerance of gender-based violence" (citation omitted)). As we explain, however,

_____

**27** Appellants note that the Supreme Court did not cite this widely known legislative history in its opinions in <u>Harris</u> and the <u>Civil Rights Cases</u>. However, if not as a matter of common sense, then from the Supreme Court's statement that it had "carefully considered" "the views and arguments of distinguished senators, advanced while the [1875] law was under consideration, claiming authority to pass it by virtue of that amendment," <u>Civil Rights Cases</u>, 109 U.S. at 10, it is apparent that the Supreme Court was fully aware of this history.

contrary to appellants' breathtaking ahistoricism, the legislative history of the 1871 and 1875 Acts not only evidences a concern with conduct by the States violative of the Equal Protection Clause, it evinces a considerably more profound concern with even more open and obvious violations of that Clause by the States than does the legislative history of section 13981. Compare supra at 95-96 (1871 and 1875 Acts were enacted in response to massive and open refusal of southern States to enforce the civil rights of blacks) with S. Rep. No. 102-197, at 39; H.R. Conf. Rep. No. 103-711, at 385, reprinted in 1994 U.S. Code Cong. & Admin. News at 1853 (Congress' concern in enacting section 13981 was with "subtle" types of "bias" against women), and infra Part IV.C.3.b (Congress was primarily concerned with private conduct and public attitudes, not with state action, whether constitutional or unconstitutional.). Indeed, appellants' assertions that Congress found a "classic" denial of equal protection in enacting section 13981 cannot be understood except as an attempted comparison between the States' treatment of women today and the southern States' treatment of the freed slaves after the Civil War.

Next, the government contends that the Acts of 1871 and 1875, unlike section 13981, imposed the same "constitutional norms" upon private individuals that the Equal Protection Clause imposes upon the States. However, section 13981 is no less "premised on the explicit assumption that purely private conduct could violate the Fourteenth Amendment," Reply Br. of Intervenor United States at 3, and no less represents a "congressional attempt[ ] to apply the affirmative requirements of the Fourteenth Amendment to purely private conduct," id., than did the Civil Rights Acts of 1871 and 1875. Compare United States v. Virginia, 518 U.S. 515 (1996) (gender discrimination by State violates Equal Protection Clause), with 42 U.S.C. § 13981(b) (prohibiting gender-motivated discrimination performed by private individuals); S. Rep. No. 103-138, at 55 (section 13981 is "appropriate" legislation because, inter alia,"it attacks gender-motivated crimes that threaten women's equal protection of the laws").

Finally, the government contends that the Civil Rights Acts of 1871 and 1875 criminalized private conduct that was not already prohibited under state law, see, e.g., id. at 4-5 (asserting that the 1871 and 1875 Acts "prohibit[ed] . . . conduct .. . not already prohibited . . . by law," laid "`down rules for the conduct of individuals in soci-

98

ety toward[s] each other,'" and thus "`create[d] a code of municipal law for the regulation of private rights'") (quoting Civil Rights Cases, 109 U.S. at 11, 14), whereas section 13981 does not"prohibit . . . any conduct that is not already prohibited . . . by[state] law," Reply Br. of Intervenor United States at 5, but instead merely creates a federal remedy that may be pursued when the States fail to enforce their own laws, id. ("This structure reflects the wholly remedial purpose of the statute: it corrects for deficiencies in the administration of state law by providing a federal remedy."). In fact, however, not only do the Civil Rights Acts of 1871 and 1875 actually appear only to have prohibited conduct that was already prohibited by the States (and simply not prosecuted), see, e.g., supra at 95-96 (citing legislative history of 1871 and 1875 Acts stating that the conduct regulated by those statutes was already prohibited under state law but underenforced); Civil Rights Cases, 109 U.S. at 25 ("Innkeepers and public carriers, by the laws of all the states, so far as we are aware, are bound, to the extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them." (emphasis added)), but, contrary to the government's suggestion, section 13981 actually does criminalize a substantial range of conduct not prohibited under state law, see supra Part III.C (section 13981 abrogates interspousal and intrafamily tort immunities, the marital rape exception, and other defenses that might exist under state law by virtue of the relationship between the violent actor and the victim). Section 13981 even creates a substantive federal criminal standard below which no State may deviate, see supra id. (section 13981 creates a federal cause of action for conduct occurring anywhere within the United States that satisfies federal definitions of various violent felonies).

In sum, a careful consideration of the differences between section 13981 and the Civil Rights Acts asserted by the government confirms both that Harris and the Civil Rights Cases are, in the relevant respects, controlling authorities as to the instant case and that section 13981 is an impermissible exercise of Congress' power under Section 5. In fact, even if appellants' reading of Harris and the Civil Rights Cases were correct (which it is not), section 13981 would be even more clearly unconstitutional than were the Acts of 1871 and 1875.

Under the state action principles of Harris and the Civil Rights Cases, which, it bears repeating, have been consistently and recently

99

reaffirmed by the Supreme Court, section 13981 is invalid, regardless of whether its end is to remedy unconstitutional state action, for the simple reason that it regulates purely private conduct and is not limited to individual cases in which the state has violated the plaintiff's Fourteenth Amendment rights. These are the same constitutional defects that inhered in the Civil Rights Acts of 1871 and 1875.

2.

Evidently aware of the speciousness of these distinctions and, ultimately, of the fundamental premise on which they rest, appellants argue in the alternative that Harris and the Civil Rights Cases have been tacitly overruled by, or at least qualified by analogy to, the distinct line of cases holding that Congress may, as a "prophylactic" measure under Section 5, proscribe some conduct that does not violate Section 1 of the Fourteenth Amendment. City of Boerne, 117 S. Ct. at 2163 ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional . . . ."); Katzenbach v. Morgan, 384 U.S. 641, 648-49 (1966) (similar); cf. City of Rome v. United States, 446 U.S. 156, 173-78 (1980) (Enforcement Clause of Fifteenth Amendment); South Carolina v. Katzenbach, 383 U.S. 301, 324-27 (1966) (same). That is, appellants argue, just as Congress may prohibit the States from employing voting literacy tests as "appropriate legislation" to "enforce" the Reconstruction Amendments, even though the Supreme Court has upheld the facial constitutionality of such tests under those Amendments, compare id. at 337 (upholding congressional ban on voting literacy tests), with Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 53-54 (1959) (upholding facial constitutionality of voting literacy tests), so too may Congress regulate purely private violence against women as "appropriate legislation" to "enforce" the Equal Protection Clause, even though such private violence does not violate the Clause itself. Thus, although appellants concede, as they must, that wholly private acts of gender-motivated violence can never violate the Equal Protection Clause, see , e.g., Collins v. Hardyman, 341 U.S. 651, 658 (1951) (stating that "the principle has become firmly embedded in our constitutional law" that "[the Fourteenth] Amendment erects no shield against merely private conduct, however discriminatory or wrongful" (internal quotation marks and

100

footnote omitted)), they nonetheless contend that, under the Katzenbach v. Morgan and South Carolina v. Katzenbach line of cases, Congress may regulate such private violence as a means of remedying the bias and discrimination against women in the States' criminal justice systems, which "often deprive[ ] victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled," H.R. Conf. Rep. No. 103-711, at 385, reprinted in 1994 U.S. Code Cong. & Admin. News at 1853.

Appellants are doubtless correct that Congress may, pursuant to Section 5, prophylactically regulate or proscribe certain state conduct that does not violate Section 1 of the Fourteenth Amendment. In the prophylactic cases, however, the Court has only upheld federal statutes that prohibited state action; it has never upheld statutes, like section 13981, that prohibited private action. None of the prophylactic cases (nor any other Supreme Court case) holds or suggests that Congress may employ such a rationale to reach purely private conduct.

Recognizing as much, appellants ask us to extend these prophylactic cases to permit Congress to regulate purely private conduct, insisting that there is "no constitutional precept" for limiting these prophylactic cases to federal legislation that proscribes state conduct. Br. of Intervenor United States at 24. The "constitutional precept" that limits the prophylactic cases to their context, however, is the Fourteenth Amendment itself, which provides that "[n]o State shall" deny any person equal protection of the laws, and accords Congress only the power to "enforce" "the provisions of this article." U.S. Const. amend. XIV, §§ 1, 5 (emphases added). Because the Fourteenth Amendment only prohibits action by the States, the prophylactic rationale of cases like Katzenbach v. Morgan, South Carolina v. Katzenbach, and City of Boerne is simply inapplicable where, as here, Congress attempts to regulate purely private conduct, because such private conduct can never violate Section 1 of the Fourteenth Amendment.

In South Carolina v. Katzenbach, for example, the Supreme Court sustained a federal statute that categorically prohibited certain States from imposing voting literacy requirements, even though the Court had upheld the facial constitutionality of such literacy tests in cases such as Lassiter. But it did so because such tests could be applied in

101

a racially unconstitutional manner in many circumstances. See Lassiter, 360 U.S. at 53; South Carolina v. Katzenbach, 383 U.S. at 309, 328, 329-30, 334; Oregon v. Mitchell, 400 U.S. 118, 131-34 (1970) (opinion of Black, J.). The reasoning of the case, and of the like prophylactic cases, therefore, is simply that Congress may categorically prohibit the States from enacting or enforcing certain types of constitutional laws in order to "remedy" the significant likelihood that such laws will be applied unconstitutionally in a manner that could be either difficult to detect in particular instances or otherwise difficult to remedy in case-by-case judicial proceedings. See, e.g., South Carolina v. Katzenbach, 383 U.S. at 313-15, 327-29.

Although it makes sense for Congress, as a prophylactic measure, to proscribe categorically a type of state law that is facially constitutional in order to prevent that law's certain and frequent unconstitutional application, cf. City of Boerne , 117 S. Ct. at 2170 ("Preventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." (emphasis added)), it makes no sense at all to extend such reasoning to purely private conduct that can never violate the prohibition that "[n]o State" deny any person the "equal protection of the laws." U.S. Const. amend. XIV, § 1. Indeed, we would have to stretch the "prophylactic" rationale well beyond recognition in order to permit Congress to regulate purely private conduct that can never be unconstitutional, on the strength of a generalized concern over potentially unconstitutional conduct by the States. Such freewheeling prophylaxis would, in effect, transmogrify the actual Fourteenth Amendment into the Bingham Amendment, which was defeated for the very reason that it would have permitted Congress thus to secure directly the life, liberty, property, and equality rights of all citizens. See supra Part IV.A.1; see also City of Boerne, 117 S. Ct. at 2166 (quoting statement of Representative Garfield that "we cannot, by any reasonable interpretation, give to [§ 5] .. . the force and effect of the rejected [Bingham] clause").

It is not surprising, in light of the fundamental distinction drawn in the Fourteenth Amendment between action by the States and private action, that the Supreme Court itself has never treated the prophylactic line of cases upon which appellants rely as having sub silentio

102

overruled <u>Harris</u> and the <u>Civil Rights Cases</u>. In fact, during the very period of time in which the Supreme Court was deciding several of the prophylactic cases, <u>see</u>, <u>e.g.</u>, <u>South Carolina</u> v. <u>Katzenbach</u>, 383 U.S. 301 (1966); <u>Katzenbach</u> v. <u>Morgan</u>, 384 U.S. 641 (1966); <u>Oregon</u> v. <u>Mitchell</u>, 400 U.S. 118 (1970), it was scrupulously adhering to, and conspicuously refusing to overrule, <u>Harris</u> and the <u>Civil Rights Cases</u> in cases such as <u>Guest</u>,<u>Griffin</u>, and <u>Jones</u>. <u>See supra</u> Part IV.A.1; <u>see also Guest</u>, 383 U.S. at 762 n.1 (Harlan, J., concurring in part and dissenting in part) (asserting that the Section 5 issue was "deliberately not reached" by the majority in that case). And, as we discuss above at pages 83-86 and note 25, the Supreme Court has consistently affirmed the state-action principles of <u>Harris</u> and the <u>Civil Rights Cases</u>, even as recently as two years ago. <u>See City of Boerne</u>, 117 S. Ct. at 2166.

Rather than grapple with this basic textual, historical, and precedential distinction between laws regulating <u>state</u> action and laws regulating <u>private</u> conduct, the government instead resorts to speculation and hypothesizing as to why Congress' power to regulate state action that does not necessarily violate the Fourteenth Amendment entails a congressional power to regulate private conduct that can never violate the Fourteenth Amendment.

In this regard, the government argues, first, that congressional regulation of private conduct may in this case be a less "flawed or ineffective" remedy than direct regulation of the States. Br. of Intervenor United States at 25. For example, the government hypothesizes that "[p]roviding a cause of action against the state or state officials might create unseemly pressures on state officials to prosecute, even if the evidence of the defendant's guilt was weak, if the victim seemed poised to sue." <u>Id</u>. As the Supreme Court held in this precise context, however, "[w]hether it would not have been a more effective protection of the rights of citizens to have clothed Congress with plenary power over the whole subject, is not now the question. What we have to decide is, whether such plenary power has been conferred upon Congress by the Fourteenth Amendment; and, in our judgment, it has not." <u>Civil Rights Cases</u>, 109 U.S. at 19. In any event, the government's argument assumes that the only alternative to section 13981 is to permit a private plaintiff to bring an action for damages against the State or its officers and ignores the possibility that Congress could

103

have simply nullified a category of state laws that discriminate against women. Moreover, the government's expressed concerns of overenforcement lack credibility; it strikes us as particularly suspicious that the government would, on the one hand, dramatize the need for section 13981 by trumpeting the "massive" evidence of underenforcement of criminal laws due to bias and discrimination against women, and, on the other hand, defend the constitutionality of section 13981 on the grounds that a remedy against the very source of this "massive" state discrimination would lead to a rash of frivolous and fraudulent strike suits by women "poised to sue." In fact, it seems to us that this line of argument appears to all but concede that section 13981 was not designed to remedy the States' discriminatory exercise of prosecutorial discretion -- a concession that puts the lie to the government's argument that section 13981 is truly aimed at remedying state law-enforcement failures rather than at purely private acts of violence.

The government maintains, second, that in enacting section 13981, Congress might have chosen to regulate private action, rather than the States directly, so as not to offend the sovereignty of the States. This argument, however, confuses the Fourteenth Amendment with the Commerce Clause and other similar grants of federal power. The Supreme Court has often held that it violates principles of state sovereignty for the federal government to impose certain obligations directly upon the States when acting pursuant to the federal power to regulate interstate commerce, see, e.g. , Printz v. United States, 117 S. Ct. 2365 (1997); New York v. United States, 505 U.S. 144 (1992), and various other federal powers, see, e.g., Kentucky v. Dennison, 24 Wall. 66 (1860) (Extradition Clause); Collector  v. Day, 11 Wall. 113 (1871) (Taxation power); James v. Dravo Contracting Co., 302 U.S. 134 (1937) (same); Hans v. Louisiana, 134 U.S. 1 (1890) (Article III). However, the Court has made clear that, by its very nature, the Fourteenth Amendment is a limitation on the governments of the States, Fitzpatrick v. Bitzer, 427 U.S. 445, 453 (1976) (reasoning that the Fourteenth Amendment "quite clearly contemplates limitations on [the States'] authority" and "[t]he substantive provisions are by express terms directed at the States"); Ex Parte Virginia, 100 U.S. 339, 346 (1880) ("The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to

104

enforce against State action, however put forth, whether that action be executive, legislative, or judicial."), and therefore that it "is no invasion of State sovereignty" for the federal government to impose obligations directly upon the States when enforcing the Fourteenth Amendment. Id. Compare Fitzpatrick, 427 U.S. at 456 (holding that state sovereign immunity may be abrogated by federal statute enacted pursuant to Section 5 of the Fourteenth Amendment), and EEOC v. Wyoming, 460 U.S. 226, 243 n.18 (1983) ("[W]hen properly exercising its power under § 5, Congress is not limited by the same Tenth Amendment constraints that circumscribe the exercise of its Commerce Clause powers."), with Seminole Tribe v. Florida, 517 U.S. 44, 72 (1996) (holding that state sovereign immunity may not be abrogated by federal statute enacted pursuant to Indian or Interstate Commerce Clauses). In fact, if anything, it may well be federal regulation of private conduct pursuant to the Fourteenth Amendment that poses the greater danger to the sovereignty of the several States. The Fourteenth Amendment recognizes the sovereignty of the States to protect their citizens' rights of life, liberty, property, and equality. See, e.g., United States v. Cruikshank, 92 U.S. 542, 553 (1875) ("[t]he very highest duty of the States" is to protect "[t]he rights of life and personal liberty" and that "[s]overeignty, for this purpose, rests alone with the States"). A federal power under Section 5 to legislate against private interference for the protection of these rights would permit Congress to regulate all of "the rights which one citizen has . . . against another," id. at 554-55, and thereby eliminate any role for the States whatsoever. See, e.g., Civil Rights Cases, 109 U.S. at 14 ("[I]t is difficult to see where it is to stop. Why may not Congress, with equal show of authority, enact a code of laws for the enforcement and vindication of all rights of life, liberty, and property? . . . [T]he implication of a power to legislate in this manner . . . is repugnant to the Tenth Amendment of the Constitution.").

In sum, the prophylactic cases such as City of Boerne, Morgan, and Katzenbach all address the question of how broadly Congress may legislate when it imposes statutory requirements upon the States pursuant to Section 5. These cases do not address the very distinct question of whether Congress may, under Section 5, regulate purely private conduct at all. The answer to this latter question has been settled for over a hundred years:

105

> [W]here a subject is not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular State legislation or State action in reference to that subject, the power given is limited by its object, and any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited State laws or proceedings of State officers.

Civil Rights Cases, 109 U.S. at 18. To conflate these two lines of cases, and thereby allow a complete disjunction between the constitutional evil to be remedied and the object of Congress' legislation, would be nothing less than to recognize in the Congress itself, contrary to the Constitution, an authority to redefine the scope of the substantive provisions of the Fourteenth Amendment. And as the Supreme Court observed in City of Boerne,

> Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the"provisions of [the Fourteenth Amendment]."

City of Boerne, 117 S. Ct. at 2164.

3.

Appellants contend, finally, that, even if not formally overruled, Harris and the Civil Rights Cases have been repudiated by subsequent authorities and are no longer good law, a contention in support of which appellants rely upon dicta from concurring and dissenting opinions written during the 1960s, a speculative footnote from an opinion in the early 1970s, a passing observation from the Court's decision in City of Boerne, and a law review article from 1964. Reply Br. of Appellant Brzonkala at 11 n.13 (arguing that it"overstates the case law" to suggest that "those outdated cases remain good law"); see also Br. of Appellant Brzonkala at 29, 31; Br. of Intervenor United States at 22 n.11. As appellants themselves must no doubt recognize, none

106

of these authorities is sufficient to draw into question the broad state action holdings of Harris and the Civil Rights Cases, much less to establish the expansive power in Congress to regulate purely private conduct for which appellants argue.

First, although appellants, and Brzonkala in particular, place considerable weight upon language in the concurring and dissenting opinions in Guest to the effect that Section 5 permits Congress to reach purely private conduct, their reliance upon that case -- even if as a last resort -- is misguided. As we discussed above, the Court in Guest could not have been clearer that it was not construing the outer limits of Section 5:

> [W]e deal here with issues of statutory construction, not with issues of constitutional power," 383 U.S. at 749 (citation omitted), [and] nothing said in this opinion goes to the question of what kinds of other . . . legislation Congress might constitutionally enact under § 5 of the Fourteenth Amendment to implement that Clause.

Guest, 383 U.S. at 755 (emphasis added). And, as previously discussed, the holding of the Court in Guest was only that the indictment pled enough state involvement in the defendants' conspiracy -- active connivance of state officials -- to allege a violation of the Equal Protection Clause and therefore sufficient state action to support the indictment under section 241.

Notwithstanding the unambiguous disclaimer by the Court that nothing it said should be read to comment upon the extent of Congress' Section 5 enforcement power, appellants cite two passages from the concurring and dissenting opinions in Guest in support of their assertion that Congress may freely regulate purely private behavior when legislating pursuant to the Enforcement Clause of the Fourteenth Amendment. The first such statement is that of Justice Clark, who, joined by Justices Black and Fortas, concurred in the opinion of the Court, but also wrote, inexplicably and without citation or analysis in a single conclusory sentence, that"there now can be no doubt that the specific language of § 5 empowers the Congress to enact laws punishing all conspiracies -- with or without state action -- that interfere with Fourteenth Amendment rights." Id. at 762

107

(Clark, J., concurring, joined by Black and Fortas, JJ.). By Justice Clark's own admission, this pronouncement was dictum, unnecessary to any legal conclusion reached by himself and the two Justices who joined his opinion. See id. (noting that "[t]he Court carves out of its opinion the question of the power of Congress, under § 5 of the Fourteenth Amendment, to enact legislation implementing . . . the Fourteenth Amendment"); id. at 762 (noting that the construction of the indictment adopted by the Court "clearly avoids the question whether Congress, by appropriate legislation, has the power to punish private conspiracies that interfere with Fourteenth Amendment rights"). In fact, so unnecessary was the statement that Justice Harlan was constrained to remark in a separate opinion that

> [t]he action of three of the Justices who join the Court's opinion in nonetheless cursorily pronouncing themselves on the far-reaching constitutional questions deliberately not reached in [the Court's opinion] seems to me, to say the very least, extraordinary.

Id. at 762 n.1 (Harlan, J., concurring in part and dissenting in part).

The second statement, that by Justice Brennan in dissent, although even more unequivocal than Justice Clark's, is no more authority for the assertion that Congress' power under Section 5 reaches purely private conduct. Writing for himself, Chief Justice Warren and Justice Douglas, Justice Brennan, unlike the majority and the three Justices in concurrence, construed the law at issue to protect the right to equal utilization of public facilities from both state and private interference. Because of this construction of the statute, Justice Brennan reached the constitutional question expressly not addressed by the majority and unnecessary to the concurrence, and stated, similarly without citation of controlling authority, that he would have held that the statute was constitutional despite its extension to private conduct. Id. at 784 (Brennan, J., concurring in part and dissenting in part, joined by Warren, C.J., and Douglas, J.). As Justice Brennan stated:

> I acknowledge that some of the decisions of this Court, most notably an aspect of the Civil Rights Cases, 109 U.S. 3, 11, have declared that Congress' power under § 5 is confined to the adoption of "appropriate legislation for correcting the

108

effects of prohibited State laws and State acts, and thus to render them effectually null, void, and innocuous." I do not accept -- and a majority of the Court today rejects -- this interpretation of § 5.

Id. at 782-83. Justice Brennan's (and Chief Justice Warren's and Justice Douglas') views in dissent, of course, are not binding authority, any more than are Justice Clark's (and Justice Black's and Justice Fortas') in concurrence. Significantly, the Supreme Court, only two years ago, rejected Justice Brennan's equally sweeping companion theory of congressional power under Section 5. Compare City of Boerne, 117 S. Ct. at 2168 (expressly repudiating reading of Katzenbach v. Morgan that would permit Congress to redefine the substantive guarantees of the Fourteenth Amendment), with Katzenbach v. Morgan, 384 U.S. at 654 (Brennan, J.) (asserting that Congress may be able to redefine the substantive guarantees of the Fourteenth Amendment). And, it goes without saying, the combination of these separately stated views by the concurring and dissenting Justices no more constitutes binding authority overruling Harris and the Civil Rights Cases than does either of the separate opinions standing alone. See, e.g., City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 765 n.9 (1987) (noting that it is the Court's "settled jurisprudence" that "when no single rationale commands a majority, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." (internal quotation marks and citation omitted)).

The footnote statement that appears in Justice Brennan's opinion for the Court in District of Columbia v. Carter, 409 U.S. 418 (1973), in which the Justice states merely that "[t]his is not to say, of course, that Congress may not proscribe purely private conduct under § 5 of the Fourteenth Amendment," id. at 424 n.8, is likewise unavailing for appellants. As the government concedes, this statement, like Justice Clark's in Guest, is the purest of dicta, the holding of the Court having been merely that the District of Columbia was not a "State or territory" within the meaning of 42 U.S.C. § 1983 (a holding, incidentally, that has been overruled by statute). **28** And the statement,

---

**28** Acknowledging this statement from Carter to be dictum, the government nonetheless urges us "not [to] lightly dismiss[ ]" such dictum

109

of course, does not even say that Congress may proscribe purely private conduct under Section 5. Moreover, as authority for this dictum, Justice Brennan cites Katzenbach v. Morgan, see id., in which the Court expressed the view that Congress may redefine the substantive provisions of the Fourteenth Amendment when legislating pursuant to Section 5 -- a view that, as we have explained, see supra at 101-102, has been rejected by the full Supreme Court.

Finally, in support of their contention that Harris and the Civil Rights Cases are no longer good law, appellants cite the Court's recent observation in City of Boerne that

> [a]lthough the specific holdings of [Harris and the Civil Rights Cases] might have been superseded or modified, see, e.g., Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964), United States v. Guest, 383 U.S. 745, 86 S. Ct. 1170, 16 L. Ed. 2d 239 (1966), their treatment of Congress' § 5 power as corrective or preventative, not definitional, has not been questioned.

City of Boerne, 117 S. Ct. at 2166. Appellants contend that this passing reference draws into doubt the Court's repeated holdings that Congress may not reach purely private conduct pursuant to Section 5.

We do not understand the Supreme Court in City of Boerne to have called into question in any way, in dictum or otherwise, its square holdings that Congress may not regulate purely private conduct pursuant to Section 5 of the Fourteenth Amendment. This understanding of the cited passage from City of Boerne in particular is confirmed by the overall context of, and subsequent language in, the City of Boerne opinion itself. See, e.g., id. ("[T]hese early cases['] [including Harris and the Civil Rights Cases] . . . treatment of Congress' § 5 power as corrective or preventive, not definitional, has not been questioned."); id. ("The power to `legislate generally upon' life, liberty, and prop-

_____

because it is the "declaration" of a "20th century" Supreme Court opinion. Reply Br. of Intervenor United States at 6. The implication of the government's argument, of course, is that square holdings from the "19th century" -- i.e., those of Harris and the Civil Rights Cases -- may be "lightly dismissed" by a court of appeals. Of course, this is incorrect.

110

erty, as opposed to the `power to provide modes of redress' against offensive state action, was `repugnant' to the Constitution." (citation to the Civil Rights Cases omitted)).

It is obvious that the Court's reference to the superseding or modi-fication of the Civil Rights Cases is only to the fact that, since the Civil Rights Cases, the Court has upheld, under different grants of federal power than Section 5, federal civil rights statutes similar to the Civil Rights Act of 1875 invalidated in that case. See, e.g., Heart of Atlanta, 379 U.S. at 261 (upholding constitutionality of public-accommodations provisions of 1964 Civil Rights Act as exercise of Congress' power under the Commerce Clause); id . at 250-52 (discuss-ing Civil Rights Cases as "inapposite, and without precedential value in determining the constitutionality" of the public-accommodations provisions of the 1964 Civil Rights Act whose applicability was "carefully limited to enterprises having a direct and substantial rela-tion to the interstate flow of goods and people"); see also supra Part III.A.1. In other words, although Congress today doubtless has the constitutional power to enact legislation like the invalidated 1875 Civil Rights Act proscribing racial discrimination in public accommo-dations, it has such power not under Section 5, but rather under the Commerce Clause, Spending Clause, or similar constitutional authority.**29**

Equally obvious is that the Court's citation of Guest in City of Boerne refers to the fact that Guest and similar cases have extended the concept of state action under the Fourteenth Amendment to include nominally private individuals who act in"active connivance" with the State and state officials. Guest, 383 U.S. at 756-57. That the Court did not intend by this citation to affirm the views of congressio-nal power under Section 5 expressed by the concurring and dissenting opinions in Guest is plain from the fact that the Court cited only the majority opinion in Guest; it did not cite either the concurring or dis-senting opinions, which, as we explained above, are the only opinions

_____

**29** Of course, the government can find no solace in these later cases, as we have already considered and rejected its sole attempt to find an alter-native constitutional basis for section 13981. See supra Part III.

111

in Guest that express a view of Congress' power to reach purely private conduct under Section 5.**30**

4.

In summary, although appellants expressly contend that Harris and the Civil Rights Cases are distinguishable, have tacitly been overruled or modified, and have been repudiated by subsequent authorities, it is apparent from the character of each of these arguments and the "authorities" upon which they rely that appellants really have no argument other than that we should ignore these decisions because they are "too old" to be controlling. To the point of histrionics, in fact, appellants incant that Harris and the Civil Rights Cases are simply "outdated," Reply Br. of Appellant Brzonkala at 9, "century-old," Reply Br. of Appellant Brzonkala at 10, from the"1870's [sic] and 1880's," Br. of Intervenor United States at 22 n.11, "19th century" cases, Reply Br. of Intervenor United States at 3, and of little interest to "modern courts," Br. of Appellant Brzonkala at 31, or those with "modern" views about the proper scope of Congress' powers. Id.

_____

**30** In the effort to convince us that neither Harris nor the Civil Rights Cases are any longer sound precedents, the United States and appellant Brzonkala also direct us to a law-review article by Laurent B. Frantz, Congressional Power To Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L.J. 1353 (1964). Indeed, in its original brief, the United States cites this journal article twice as often as it cites the Supreme Court's decision in the Civil Rights Cases. See Br. of Intervenor United States at 22 n.11; id. at 23 n.12 (citing Frantz article, and, in particular, citing the page of that article in which Frantz sets forth his own "subtle" and "complex" reinterpretation of Harris and the Civil Rights Cases); see also Br. of Appellant Brzonkala at 33 n.24 (citing Frantz article). The author of that article does argue that Congress may in some cases regulate private conduct when acting under Section 5, but his conclusion is that "[c]ongressional legislation which impinges directly on the conduct of private individuals and which operates uniformly regardless of the role played by the state is unconstitutional." See Frantz, supra, at 1359 (emphasis in original). Under this interpretation of the Fourteenth Amendment, section 13981 would yet be unconstitutional because it operates uniformly in all States, without regard to the role played by those States in the alleged discriminatory violence. See supra Part IV.A.2.

112

Indeed, the government in its principal brief cites Harris and the Civil Rights Cases but once, and that citation is a parenthetical embedded within footnote. Br. of Intervenor United States at 22. As we are confident appellants appreciate, however, especially in light of the Supreme Court's recent explicit reliance upon both Harris and the Civil Rights Cases in City of Boerne, we are not at liberty simply to conclude that these cases do not represent the Court's current view of congressional power to regulate exclusively private conduct under Section 5. If Harris and the Civil Rights Cases are to be overruled, which the present Supreme Court apparently has no inclination to do, such must come from that Court itself. See, e.g., Rodriguez de Quijas v. Shearson/American Express Inc., 490 U.S. 477, 484 (1989).

C.

Given the scope of the Fourteenth Amendment's guarantees as articulated by the Supreme Court and explained above, it is apparent in light of the Supreme Court's recent pronouncement in City of Boerne that section 13981 is not "appropriate legislation" to "enforce" those guarantees, because section 13981 is neither sufficiently aimed at safeguarding the Equal Protection rights guaranteed by that Amendment nor an appropriate means to protect those rights. In fact, as we noted, so crippling to appellants' Section 5 defense of section 13981 is the Court's intervening decision in City of Boerne, that both appellants now defend section 13981 primarily under the Commerce Clause, and only secondarily under Section 5, whereas before the panel of this court, immediately after the Court's decision in Lopez, they quite understandably defended the statute primarily as an exercise of Congress' Section 5 authority and only secondarily as a valid exercise of Congress' Commerce power under Article I, Section 8.

1.

According to appellants, section 13981 is a legitimate exercise of Congress' Section 5 powers because it is designed and operates to enforce the Equal Protection Clause by remedying sex discrimination in the enforcement of state laws. This argument turns entirely on a congressional finding in a House Conference Report that "bias and discrimination in the criminal justice system[s of the States] often deprives victims of crimes of violence motivated by gender of equal

113

protection of the laws and the redress to which they are entitled" and that section 13981 is "necessary to guarantee equal protection of the laws." H.R. Conf. Rep. No. 103-711, at 385, reprinted in 1994 U.S. Code Cong. & Admin. News at 1853; see also S. Rep. No. 103-138, at 55 (asserting that section 13981 "provides a necessary remedy to fill the gaps and rectify the biases of existing State laws"). Appellants insist that this legislative history confirms that Congress enacted section 13981 for the purpose of enforcing the Equal Protection Clause, and that, as long as we can perceive any rational basis for Congress to have enacted section 13981 as a means to that end, we should defer to Congress' considered judgment and uphold the statute. See, e.g., Br. of Appellant Brzonkala at 33 (criticizing district court for "substitut[ing] its own judgment about a suitable remedy" by engaging in means-end analysis of section 13981 and for "defying its obligation to defer to Congress' construction of the problem as long as it could perceive a basis upon which the Congress might resolve the conflict" (emphasis added and citation omitted)); Br. of Intervenor United States at 26-27 ("Congress itself found evidence of widespread equal protection violations . . . [and] though the district court might have preferred a different remedy, the choice was Congress's to make."); id. at 27 ("`It is not for [a court] to review the congressional resolution of these factors. It is enough that [it] be able to perceive a basis upon which the Congress might resolve the conflict as it did."') (quoting Katzenbach v. Morgan, 384 U.S. at 653). The underlying premise of this argument is that Congress possesses such "exceptionally broad discretion" to legislate pursuant to Section 5, Supp. Br. of Intervenor United States at 7, and that, at least in practice, it is for Congress to decide whether a statute is "appropriate legislation" to "enforce" the Fourteenth Amendment.

2.

The Supreme Court has made clear, however, that we cannot simply defer to these congressional findings or conclusions; rather, we must arrive at an independent judgment as to the constitutionality of section 13981. As recently as two years ago, in City of Boerne, the Court held that the Religious Freedom Restoration Act, a statute Congress had found necessary to enforce the Free Exercise Clause, City of Boerne, 117 S. Ct. at 2162 ("Congress relied on its Fourteenth Amendment enforcement power in enacting" the Religious Freedom

114

Restoration Act), was not "appropriate legislation" to "enforce" the rights of religious exercise protected by Section 1 of the Fourteenth Amendment. Congress had enacted the Religious Freedom Restoration Act in response to Employment Division v. Smith, 494 U.S. 872 (1990), in which the Court held that generally applicable and religion-neutral laws virtually never violate the Free Exercise Clause. The Religious Freedom Restoration Act created a right of religious exercise that was more generous than that right protected by the Constitution because it forbade States from imposing substantial burdens upon religious exercise, even pursuant to generally applicable and religion-neutral laws. City of Boerne, 117 S. Ct. at 2162.

By invalidating the Religious Freedom Restoration Act, the Supreme Court in City of Boerne reaffirmed the principle that, in order to secure a federal government of limited and enumerated powers, id., congressional legislation enacted pursuant to Section 5 must be carefully scrutinized by the courts to ensure that Congress is truly enforcing the provisions of the Fourteenth Amendment, rather than redefining the substance of those provisions under the guise of enforcement. Id. at 2164. Although acknowledging that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law" is not always "easy to discern," id., the Court emphasized that this distinction "exists and must be observed," id. (emphases added). To this end, the Court declared that a court entertaining a Section 5 challenge can uphold the statute only if there exists a "congruence and proportionality between the [constitutional] injury to be prevented or remedied and the means adopted to that end," id., or, in other words, only if the statute is actually aimed at, and is a closely tailored means of, enforcing a provision of Section 1. The Supreme Court then applied this "congruence and proportionality" test to the Religious Freedom Restoration Act and concluded that the statute exceeded Congress' powers under Section 5, both because it appeared from the Act's legislative history that the statute was aimed at remedying those constitutionally permissible burdens imposed upon religion by generally applicable and religion-neutral laws rather than any unconstitutional laws that targeted religion, id. at 2168-69, and also because the Act's "sweeping coverage" of all state laws regardless of subject matter, level of government, and without any geographic restriction or termination mechanism, was "so out of proportion to a

115

supposed remedial or preventive object" as to betray the non-remedial character of that statute. Id. at 2170.

City of Boerne therefore eliminates the fundamental premise of appellants' arguments, namely, that a court cannot independently evaluate Congress' decision that section 13981 is"appropriate legislation" to "enforce" the Equal Protection Clause. Although in support of their contrary premise the parties rely heavily on some exceptionally broad pronouncements of congressional power appearing in Katzenbach v. Morgan, 384 U.S. 641 (1966), see, e.g., Br. of Appellant Brzonkala at 27; Br. of Intervenor United States at 21, this broad language has now been repudiated by the Supreme Court in City of Boerne, 117 S. Ct. at 2168 (explicitly renouncing language in Katzenbach v. Morgan that could be construed to give Congress the power to redefine, as opposed to simply enforce, the provisions of the Fourteenth Amendment); id. (emphasizing that under a broad reading of Katzenbach v. Morgan, "it is difficult to conceive of a principle that would limit congressional power"); id . at 2170 (characterizing Katzenbach v. Morgan as a case only about "a particular type of voting qualification, one with a long history as a notorious means to deny and abridge voting rights on racial grounds" (internal quotation marks and citation omitted)). City of Boerne similarly renders fanciful the government's suggestion that our inquiry into section 13981's validity under Section 5 should mirror our inquiry into the reasonableness of ordinary economic regulation in an economic substantive due process challenge. See Br. of Intervenor United States at 26 (quoting economic substantive due process cases including Williamson v. Lee Optical, 348 U.S. 483 (1955)).**31** Ultimately, City of Boerne forcefully

_____

**31** The government characterizes as"inexplicable" any suggestion that cases like Williamson v. Lee Optical are inapposite in the Section 5 context because Williamson and other similar cases "were quoted and applied by Morgan itself in addressing Congress's § 5 powers." Reply Br. of Intervenor United States at 9. In Katzenbach v. Morgan, however, the Supreme Court cited Williamson only to respond to the distinct argument that the challenged statute at issue in Katzenbach v. Morgan violated individual liberties by "invidious[ly] discriminati[ng]" between American-flag and non-American-flag schools. Katzenbach v. Morgan, 384 U.S. at 656-57. It did not, contrary to the government's representation, cite Williamson "in addressing Congress's § 5 powers." Reply Br.

116

affirms that Congress' power under Section 5 is not without limits, and that those limits are not simply theoretical or speculative, but are real and concrete, and are to be enforced by the courts, even at the expense of invalidating laudable and otherwise socially beneficial legislation. City of Boerne, 117 S. Ct. at 2163 ("[a]s broad as the congressional enforcement power is, it is not unlimited" (internal quotation marks and citation omitted)); id. at 2172 (although "[i]t is for Congress in the first instance to determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment," "Congress' discretion is not unlimited . . . and the courts retain the power, as they have since Marbury v. Madison, to determine if Congress has exceeded its authority under the Constitution" (emphases added)); id. ("as the provisions of the federal statute here invoked are beyond congressional authority, it is this Court's precedent, not [the Religious Freedom Restoration Act], which must control"); see also Civil Rights Cases, 109 U.S. at 10 ("the responsibility of an independent judgment is now thrown upon this court; and we are bound to exercise it according to the best lights we have").

3.

Application of the principles set forth in City of Boerne to section 13981 reveals that section 13981 clearly represents an illegitimate exercise of Section 5 authority, because it is neither aimed at violations of the Equal Protection Clause nor a closely tailored means of correcting any such violations.

(a)

First, it is clear under City of Boerne that we cannot simply defer wholesale to Congress' purely legal conclusion that "bias and dis-

_____

of Intervenor United States at 9. In any event, and as our above discussion makes clear, even if the Supreme Court had so cited Williamson in Katzenbach v. Morgan, the Supreme Court more recently, in City of Boerne, repudiated any language in Katzenbach v. Morgan that could be interpreted to mean that Congress' Section 5 power is as broad as a State's power to enact ordinary economic regulations of the type upheld in Williamson.

117

crimination in the criminal justice system[s of the States] often deprives victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled." H.R. Conf. Rep. No. 103-711, at 385, reprinted in 1994 U.S. Code Cong. & Admin. News at 1853; see also S. Rep. No. 103-138, at 55 ("the criminal justice system is not providing equal protection of the laws of women in the classic sense") (quoting Prof. Cass Sunstein). Indeed, as a legal conclusion, this particular finding may be worthy of little, if any, deference. The finding is an essentially verbatim recitation of the congressional testimony of a single law professor, and it was added to the legislative history only after that law professor testified that such a "finding" would be instrumental in defending the constitutionality of section 13981 under Section 5.**32** This finding thus appears to be less a considered congressional judgment as to the constitutionality of section 13981 than legal boilerplate belatedly appended to the

_____

**32 Compare** 137 Cong. Rec. S579, S608 (1991) (text of S. 15, 102d Cong. § 301(a) (1991)) (earlier version of section 13981 cause of action for damages, which recited no findings of state bias or discrimination in the enforcement or application of state laws), and Crimes of Violence Motivated by Gender: Hearing Before the Subcomm. on Civil and Const. Rights of the House Comm. on the Judiciary, 103d Cong., 1st Sess. 52 (1993) (statement of Prof. Sunstein) (testimony recommending that Congress amend S.15 as follows: "In particular, Title III [section 13981] might include provisions that . . . emphasize the existence of current bias or discrimination in the criminal justice system-- bias or discrimination that, Congress believes, in many cases deprives women subject to violent crime of the equal protection of the laws."), with H. R. Conf. Rep. No. 103-711, at 385, reprinted in 1994 U.S. Code Cong. & Admin. News at 1853 (finding that "bias and discrimination in the criminal justice system often deprives victims of crimes of violence motivated by gender of equal protection of the laws and the redress to which they are entitled"). Interestingly, the earlier version of section 13981, included within S. 15, appears to ground the constitutionality of section 13981's damages cause of action not in the Equal Protection Clause at all, but rather in the Privileges and Immunities Clause of the Fourteenth Amendment. 137 Cong. Rec. at S608 (Title III, § 301(b)) ("All persons within the United States shall have the same rights, privileges and immunities in every State as is enjoyed by all other persons to be free from crimes of violence motivated by the victim's gender"). Presumably, the Privileges and Immunities rationale was abandoned by Congress because it was without merit. See, e.g., Slaughter-House Cases, 16 Wall. 36, 74-80 (1873).

118

House Conference Report in an effort to insulate section 13981 from judicial review. Moreover, even if this finding did represent a considered congressional judgment as to the constitutionality of section 13981, the soundness of that judgment is drawn into question by the fact that Congress also "found" -- contrary to Supreme Court precedent applying the Equal Protection Clause only to state action -- that purely private acts of violence against women also "threaten women's equal protection of the laws." S. Rep. No. 103-138, at 55. Therefore, instead of deferring wholesale to Congress' conclusion that section 13981 is aimed at, and a remedy for, violations of Equal Protection, we must examine the legislative history and structure of section 13981 to determine the basis of Congress' conclusion.

The legislative history of section 13981, like that of the Religious Freedom Restoration Act invalidated in City of Boerne, reveals that section 13981 was not enacted as a remedy for action that violates, or may violate, the Constitution. Although this legislative history does establish that the States enforce and apply certain laws in a manner that may ultimately prevent the victims of gender-motivated violence from obtaining vindication through the criminal or civil systems, the portions of the legislative history cited by appellants do not demonstrate that Congress "[was] concern[ed]," City of Boerne, 117 S. Ct. at 2169, with the type of purposeful discrimination against women in the enforcement of facially neutral laws that could give rise to an equal protection violation. Personnel Adm'r. v. Feeney, 442 U.S. 256 (1979) (holding that Equal Protection Clause sex-discrimination challenge to facially neutral law must fail without a showing of purposeful discrimination); cf. Washington v. Davis, 426 U.S. 229 (1976); Village of Arlington Heights v. Metropolitan Hous. Corp, 429 U.S. 252 (1977).

Although appellants are doubtless correct that the legislative history of the Violence Against Women Act -- a statute that includes but is not limited to section 13981 -- comprises an impressive array of reports and hearings detailing the scope of the problem of violence against women, these extensive findings are, in the final analysis, of little value in the Section 5 inquiry. Many of them do not relate to burdens imposed by state action, see, e.g, S. Rep. No. 102-197, at 46 ("Even if we could eradicate these legal rules and practices tomorrow, it is unlikely that prosecution and reporting rates for rape would

119

increase."); <u>Women and Violence: Hearing Before the Comm. of the Judiciary, United States Senate</u>, 101st Cong., 2d Sess. 39, 44 (1990) (noting low percentage of recoveries in civil rape cases due to impecunious defendants). And, most importantly, even if we were to concede that the legislative history detailed state discrimination of some sort, the record recites few, if any, specific findings that the States are engaging in <u>unconstitutional</u> discrimination against women in the enforcement or application of their criminal and civil laws. <u>See</u> H.R. Conf. Rep. No. 103-711, at 385-86, <u>reprinted in</u> 1994 U.S. Code Cong. & Admin. News at 1853-54 (discussing findings without any mention of purposeful discrimination); S. Rep. No. 103-138, at 54-55 (discussing basis for enacting section 13981 under Section 5 without any mention of purposeful discrimination). Furthermore, although the legislative history also discusses some specific features of state laws that need reform, neither appellant has cited any portion of this massive legislative history indicating that the failure of the States to adopt such reforms is the result of purposeful and unconstitutional discrimination against women. <u>See</u>, <u>e.g.</u>, S. Rep. No. 101-545, at 31-33; S. Rep. No. 102-197, at 45-46. This legislative record is therefore quite unlike that before the Court in <u>South Carolina</u> v. <u>Katzenbach</u>, in which there was voluminous evidence that the provisions of the challenged Voting Rights Act were designed to remedy purposeful discrimination or otherwise unconstitutional deprivations of voting rights. <u>South Carolina</u> v. <u>Katzenbach</u>, 383 U.S. at 308, 309-315, 329-30 (detailing a century of racially discriminatory deprivations of the right to vote in certain southern States). In fact, section 13981's legislative record is almost perfectly analogous to the record found to be deficient by the Supreme Court in <u>City of Boerne</u>, which recited little, if any, evidence that Congress enacted the Religious Freedom Restoration Act out of concern with purposeful or unconstitutional discrimination against religion by the States. <u>Cf</u>. <u>City of Boerne</u>, 117 S. Ct. at 2169 ("Congress' concern [in enacting the Religious Freedom Restoration Act] was with the incidental burdens imposed, not the object or purpose of the legislation.").

If anything, the hearings and reports on section 13981 bear out that the States and state law enforcement officials are <u>not</u> purposefully discriminating against women in the enforcement of laws against gender-motivated crimes of violence, but rather that they have undertaken the "most fervent," S. Rep. No. 102-197, at 39, and "sin-

120

cere efforts . . . to assist . . . victims of rape and domestic violence," S. Rep. No. 101-545, at 33, and that <u>despite</u> such efforts, "subtle prejudices" and "stereotypes," S. Rep. No. 102-197, at 39, among society at large continue to prevent women from filing criminal complaints, bringing suit, and otherwise obtaining vindication through the legal system. <u>See</u>, <u>e.g.</u>, S. Rep. No. 101-545, at 33 (attributing low prosecution and conviction rates of gender-motivated violent crime against women, in part, to "the press and society"); S. Rep. No. 102-197, at 39-46; <u>cf.</u> <u>Violent Crimes Against Women: Hearing Before the Comm. on the Judiciary, United States Senate</u>, 103d Cong., 1st Sess. 25 (1993) (noting that every State in the union has adopted legislation authorizing protective orders for victims of domestic violence, and use of such orders has increased dramatically); <u>Domestic Violence -- Not Just A Family Matter: Hearing Before the Subcomm. on Crime and Criminal Justice of the Comm. on the Judiciary, House of Representatives</u>, 103d Cong., 2d Sess. 131 (1994) (results of Attorneys General survey that "[t]hroughout the country, Attorneys General have developed innovative projects to prevent domestic violence" and "have produced a number of excellent resources to prevent sexual violence in their States"); <u>Violence Against Women -- Fighting the Fear: Hearings Before the Comm. on the Judiciary, United States Senate</u>, 103d Cong., 1st Sess. 42-43 (1993) (noting "a spirit and commitment" in the States to address problem of violent crime against women). The legislative history thus clearly demonstrates that the aim of section 13981 was not so much to redress violations of Equal Protection, but rather to send a national signal about the harms of violence against women. <u>See</u>, <u>e.g.</u>, S. Rep. No. 103-138, at 50 (Section 13981 "has the entirely different function [from state tort law] of providing a special societal judgment that crimes motivated by gender bias are unacceptable because they violate the victims' civil rights.").

The structure of section 13981 and other provisions of the VAWA further confirm the lack of congruence between the statute and its asserted aim of addressing purposefully unequal law enforcement by the States. Most telling, of course, is the fact that section 13981 directly regulates only private individuals who commit acts of violence and subjects those individuals to liability for the harms resulting from that violence. That is, the statute does not regulate the actions of the States or any other action taken under color of state law, much less <u>remedy</u> or <u>correct</u> the States' discriminatory enforcement or

121

application of their laws. For example, if a State consistently refuses to prosecute rapists because of its gender animus against their female victims, the victim's ability to obtain some small measure of justice through federal damages suits against the rapist would hardly eliminate or correct the State's constitutional violations. See, e.g., City of Boerne, 117 S. Ct. at 2170 ("Remedial legislation under § 5 `should be adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against.'") (quoting Civil Rights Cases, 109 U.S. at 13). That section 13981 provides a remedy only against private individuals who commit violent crimes is significant, and perhaps dispositive, evidence that section 13981 does not truly aim at correcting unequal and unconstitutional enforcement of the laws by the States, but aims instead only to remedy or deter the underlying acts of violence to which that liability attaches.

Other features of the statute likewise belie the suggestion that section 13981 is designed to remedy purposeful discrimination against women by the States. For example, section 13981 vests the state courts with concurrent jurisdiction over section 13981 claims. 42 U.S.C. § 13981(e)(3). This mandatory concurrent jurisdiction provision is hard to square with the asserted rationale that section 13981 was designed to remedy unconstitutional state discrimination. If Congress were truly concerned that state courts, judges, and juries were hostile to women and purposefully discriminating against them in the enforcement and application of law, the more natural response would have been to create exclusive federal jurisdiction over section 13981 claims, or, at the very least, only to allow concurrent jurisdiction in state courts that Congress concluded were not purposefully discriminating against women. Section 13981 instead permits its authorized causes of action to be brought in the very fora that the appellants must contend are hostile to the interests of women.**33** Indeed, section 13981

_____

**33** More evidence of the nonremedial character of section 13981 is the fact that there is virtually nothing in the record cited by the parties to prove that federal courts, federal judges, or federal juries are significantly less susceptible to the subtle prejudices and stereotypes that often prevent women from obtaining recovery in civil actions against the perpetrators of gender-motivated violence than are their counterparts in the state judicial systems. See also Br. of Appellees Morrison and Crawford at 34 n.13 (citing scholarly commentary and studies that the federal court systems are prone to the identical types of gender-bias that exist in state court systems).

122

does not merely permit claims to be brought in state court; it may actually channel section 13981 claims into state court. Most notably, for example, section 13981(e)(4) forbids federal courts entertaining claims brought under section 13981(c) from exercising supplemental jurisdiction over "divorce, alimony, equitable distribution of marital property, or child custody decree" cases. Thus, plaintiffs who wish to bring both section 13981 claims and divorce or child-custody actions against their spouses -- a class of plaintiff very likely to have suffered the most egregious forms of gender-motivated domestic violence or marital rape -- will either be forced to prosecute two separate actions in different legal fora at greater cost, or else bring all of their claims in state court.

The conclusion that Congress did not design section 13981 as a remedy for purposeful discrimination against women by hostile state courts is also borne out by features of the VAWA whose constitutionality is not at issue here. For example, in addition to creating a private cause of action, other provisions of the VAWA appropriated approximately $1.6 billion in federal funds, subject to enhancement, to help the States eliminate the causes and effects of rape and domestic violence. 42 U.S.C. § 3796gg (law enforcement); id. § 300w-10 (education and prevention programs); id. § 10402(a) (battered women's shelters). Such a generous subsidy to the state governments casts serious doubt upon any suggestion that the Congress that enacted section 13981 was truly concerned with purposeful and unconstitutional deprivations of Equal Protection rights at the hands of hostile state governments.

In sum, the combined effect of the legislative history, the structure of section 13981, and the other provisions of VAWA is to disprove any contention that section 13981 was actually aimed at purposeful acts of unconstitutional sex discrimination. Cf . City of Boerne, 117 S. Ct. at 2170 ("Preventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional." (emphasis added)). To the contrary, these materials establish that Congress' true concerns in enacting VAWA were to deter or remedy individual and private acts of violence and to raise public consciousness about the seriousness of violent crimes against women by sending a national signal of opposi-

123

tion to this class of violent crime. Although these are unquestionably worthy public policy goals, they are not sufficient in and of themselves to render section 13981 a legitimate exercise of Congress' power under Section 5 of the Fourteenth Amendment.

(b)

Even if section 13981 were intended as a means to remedy unconstitutional discrimination by the States, it, much like the provisions of the Religious Freedom Restoration Act invalidated in City of Boerne, is so out of proportion to any possible unconstitutional state action at which it might conceivably be aimed as to exceed congressional power to "enforce" the Fourteenth Amendment. Liability under section 13981 attaches to all felonious acts of violent crime motivated by gender, 42 U.S.C. § 13981(c), and the provision creates a statutory right and a cause of action to enforce that right for all persons in the United States who suffer from such violent crime. Id. § 13981(b) (conferring upon "[a]ll persons within the United States" the statutory right to be free from gender-based crimes); id . § 13981(c) (creating cause of action for the same). This sweeping coverage is in no way tailored to the asserted ends of equal enforcement of the laws. For example, under section 13981, liability attaches to all gender-motivated crimes whether committed by private individuals acting alone, or by those acting under color of state law. Id. (liability extends to a person "including a person who acts under color of" state law (emphasis added)). Liability also attaches to any criminal act, whether or not the plaintiff filed a criminal complaint in the state criminal justice system, and without regard to whether the State failed adequately to investigate or prosecute the case because of bias or discrimination. Id. § 13981(d)(2)(A) (cause of action may lie without regard to whether the predicate acts of violence "have actually resulted in criminal charges, prosecution, or conviction"); id. § 13981(e)(2) ("Nothing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action."). Section 13981 applies equally in all jurisdictions, whether those jurisdictions evidence a pattern of chronic under-enforcement of laws prohibiting rape and domestic violence, S. Rep. No. 102-197, at 45-46, or whether those jurisdictions are the States or metropolitan areas Congress applauded for strengthening the enforcement of their rape and sexual assault laws, S. Rep. No. 101-545, at 33. Also, although

124

Brzonkala and the government attempt to defend section 13981 as a remedy for inequalities caused by certain States that either immunize spousal rape or that have failed to adopt rape shield evidentiary rules, section 13981 does not exempt from its coverage those forty-seven States that at the time of section 13981's adoption did criminalize spousal rape, S. Rep. No. 102-197, at 45 & n.50, or those States that have adopted rape shield laws in civil cases. In addition, like the sweeping provisions of the Religious Freedom Restoration Act invalidated in City of Boerne, 117 S. Ct. at 2170, and unlike the provisions upheld in City of Rome, 446 U.S. at 177, and South Carolina v. Katzenbach, 383 U.S. at 331-32, section 13981 contains no termination date or termination mechanism. And, finally, section 13981 is written in gender-neutral terms and would presumably create a cause of action for a male plaintiff, even though there is no evidence, or even any suggestion, that the States have unconstitutionally enforced their laws that disproportionately affect men. See S. Rep. No. 102-197, at 43 (citing state gender bias task force conclusions that "crimes disproportionately affecting women are often treated less seriously than comparable crimes against men"); cf. Br. of Appellant Brzonkala at 26 n.12 ("While [section 13981] is gender-neutral, Congress recognized that women overwhelmingly are the victims of gender-motivated violence . . . . Consequently, this brief refers throughout to gender-motivated violence against women.").

In short, section 13981's "sweeping coverage," City of Boerne, 117 S. Ct. at 2170, reaches all victims of gender-motivated violent felonies, all defendants who commit such crimes, all States and jurisdictions without regard to the adequacy of their enforcement efforts, substantive laws, or evidentiary rules and procedures, and does so without any time limit or termination mechanism. See id. (distinguishing sweeping coverage of the Religious Freedom Restoration Act from other relatively more narrow and measured federal statutes that the Supreme Court had previously upheld as valid exercises of congressional enforcement powers under the Enforcement Clauses of the Fourteenth and Fifteenth Amendments); cf. South Carolina v. Katzenbach, 383 U.S. at 315, 331 (upholding provisions of federal statute that were confined to certain regions of the country where voting discrimination had been most flagrant, that affected a discrete class of state voting laws, and that contained a five year termination mechanism); Katzenbach v. Morgan, 384 U.S. at 641 (similar);

125

Mitchell, 400 U.S. at 112 (upholding provisions of federal statute that prohibited States from imposing a particular type of voting qualification with a long history of racially discriminatory use); City of Rome, 446 U.S. at 177 (upholding federal statute that applied to state "jurisdictions with a demonstrable history of intentional racial discrimination" deemed to "create the risk of purposeful discrimination"). Therefore, even assuming that section 13981 were truly intended or designed as a means to remedy state discrimination, the remedy created by the section is so clearly out of proportion to any suggested unequal treatment as to be an illegitimate means of enforcement of the Equal Protection Clause. Cf. City of Boerne, 117 S. Ct. at 2171 ("The substantial costs [the Religious Freedom Restoration Act] exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional general regulatory power, far exceed any pattern or practice of unconstitutional conduct . . . .").

(c)

The Supreme Court concluded its Section 5 analysis in City of Boerne by observing that, if it were to uphold the Religious Freedom Restoration Act as an appropriate exercise of Section 5, such would "contradict[ ] vital principles necessary to maintain separation of powers and the federal balance," id. at 2172, namely, that the federal government not be accorded a general police power but rather be confined to its limited and enumerated powers, id . at 2162 ("Under our Constitution, the Federal Government is one of enumerated powers."); id. (citing The Federalist No. 45). Or, as Justice Kennedy explained in the analogous context of construing 42 U.S.C. § 1985(3), "essential considerations of federalism are at stake here. The federal balance is a fragile one, and a false step in interpreting § 1985(3) risks making a whole catalog of ordinary State crimes a concurrent violation of a single congressional statute . . . ." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 287 (1993) (Kennedy, J., concurring) (emphases added). We are convinced that we would disrupt the "vital" "federal balance," and essentially confer upon Congress a general police power, were we to hold that section 13981 is a legitimate exercise of congressional remedial power under Section 5.

If the congressional findings cited here suffice to render section 13981 a legitimate enforcement of the Fourteenth Amendment, then

in effect the federal government could constitutionally regulate every aspect of society, even including those areas traditionally thought to be reserved exclusively to the several States, such as general criminal and domestic relations law. See supra Part III.C. For example, if section 13981 were an appropriate means to remedy gender-motivated bias in the States, then the federal government could similarly adopt a general federal criminal code to replicate or preempt the existing criminal laws of the fifty States in order to root out any such bias. Presumably, the very same or similar legislative record of section 13981 could support an analogous finding that all state criminal laws are infused with gender bias. See, e.g., S. Rep. No. 102-197, at 44 ("gender bias permeates the court system and . . . women are most often its victims" (internal quotation omitted)). And many of the same state gender-bias task forces that were cited in section 13981's legislative history also appear to find gender bias in state domestic-relations law. Compare Br. of Appellees Morrison and Crawford at 33 n.12 (citing various state task force conclusions of gender bias in domestic relations law), with S. Rep. No. 102-197, at 43 n.40, and S. Rep. No. 103-138, at 49 n.52 (citing these and other task forces' conclusions on gender bias in state criminal systems). Thus, if section 13981 were constitutional under Section 5, then presumably the federal government could adopt and enforce a federal divorce and domestic relations code. And federal preemption, or even occupation, of other substantive fields of law, such as tort and contract law, would soon follow. See, e.g., Br. of Appellees Morrison and Crawford at 33-34 (citing various law review articles and studies in support of argument that gender bias pervades tort law, contract law, and several other substantive areas of State law). Because the logic of appellants' argument would not be limitable to the Equal Protection Clause, the federal government presumably would even be permitted to create a national burglary statute in order to protect from private interference the Fourteenth Amendment's guarantee that "[n]o State" "deprive any person of life, liberty, or property, without due process of law." Indeed, we think it no overstatement that such an interpretation of Section 5 would, in a way "repugnant" to the Constitution, City of Boerne, 117 S. Ct. at 2166 (quoting the Civil Rights Cases, 109 U.S. at 15), permit Congress, upon but a generalized finding of bias, to occupy the entire field of state law and to legislate directly upon all

127

of the rights of life, liberty, and property of all the citizens of the United States.

We cannot conclude, therefore, that section 13981 is a valid exercise of Congress' authority under Section 5 of the Fourteenth Amendment.

V.

At the end of the day, it is apparent that, for objectives unquestionably laudable, Congress has sought, through its powers to enforce the Constitution's prohibitions against state deprivations of equal protection and to regulate commerce among the several States, to direct private individuals in their activities wholly local and noneconomic. It has sought to reach conduct quintessentially within the exclusive purview of the States through legislation that neither conditions the federal intervention upon proof of misconduct imputable to a State or upon a nexus to interstate commerce, nor is tailored so as to address activity closely connected with constitutional failures of the States or with interstate commerce. This the Congress may not do, even in pursuit of the most noble of causes, lest be ceded to the Legislature a plenary power over every aspect of human affairs -- no matter how private, no matter how local, no matter how remote from commerce.

Appellants have labored to defend such an unprecedented power in the Congress first, in the immediate aftermath of United States v. Lopez, as a valid exercise of Congress' indisputably broad Fourteenth Amendment power under Section 5, then, after City of Boerne v. Flores, as a valid exercise of Congress' equally broad power under Article I, section 8, and, finally, countercurrently, as legislation that should usher in a new era not of congressional restraint, but of congressional expansion into the affairs of the States and of the People. Ultimately, however, certain of section 13981's constitutionality but uncertain of the reason, and recognizing that we are without authority to deviate from binding Supreme Court precedent, they have been left with little more than the sincerest of assertions that section 13981 is laudable social policy. While this is undoubtedly true -- no one favoring violence against women -- the desirability of section 13981 is, as it must be under a Constitution that separates the powers one

128

from the other, a matter that has been placed beyond our cognizance by the Constitution we interpret.

We are not unaware that in invalidating section 13981 today, we invalidate a provision of a statute denominated the"Violence Against Women Act." No less for judges than for politicians is the temptation to affirm any statute so decorously titled. We live in a time when the lines between law and politics have been purposefully blurred to serve the ends of the latter. And, when we, as courts, have not participated in this most perniciously machiavellian of enterprises ourselves, we have acquiesced in it by others, allowing opinions of law to be dismissed as but pronouncements of personal agreement or disagreement. The judicial decisionmaking contemplated by the Constitution, however, unlike at least the politics of the moment, emphatically is not a function of labels. If it were, the Supreme Court assuredly would not have struck down the "Gun-Free School Zones Act," the "Religious Freedom Restoration Act," the "Civil Rights Act of 1871," or the "Civil Rights Act of 1875." And if it ever becomes such, we will have ceased to be a society of law, and all the codification of freedom in the world will be to little avail.

Accordingly, the Congress having exceeded its constitutional authority in enacting Subtitle C of the Violence Against Women Act, the judgment of the district court dismissing plaintiff-appellant Brzonkala's claims under 42 U.S.C. § 13981 is affirmed.

AFFIRMED

129

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTY BRZONKALA,
Plaintiff-Appellant,

v.

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; ANTONIO J.
MORRISON; JAMES LANDALE CRAWFORD,
Defendants-Appellees,

and

CORNELL D. BROWN; WILLIAM E.
LANDSIDLE, in his capacity as
Comptroller of the Commonwealth,
Defendants.

LAW PROFESSORS; VIRGINIANS ALIGNED                     No. 96-1814(L)
AGAINST SEXUAL ASSAULT; THE ANTI-
DEFAMATION LEAGUE; CENTER FOR
WOMEN POLICY STUDIES; THE DC RAPE
CRISIS CENTER; EQUAL RIGHTS
ADVOCATES; THE GEORGETOWN
UNIVERSITY LAW CENTER SEX
DISCRIMINATION CLINIC; JEWISH WOMEN
INTERNATIONAL; THE NATIONAL
ALLIANCE OF SEXUAL ASSAULT
COALITIONS; THE NATIONAL COALITION
AGAINST DOMESTIC VIOLENCE; THE
NATIONAL COALITION AGAINST SEXUAL
ASSAULT; THE NATIONAL NETWORK TO
END DOMESTIC VIOLENCE; NATIONAL
ORGANIZATION FOR WOMEN;

NORTHWEST WOMEN'S LAW CENTER; THE
PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE, INCORPORATED;
VIRGINIA NATIONAL ORGANIZATION FOR
WOMEN; VIRGINIA NOW LEGAL
DEFENSE AND EDUCATION FUND,

INCORPORATED; WOMEN EMPLOYED;
WOMEN'S LAW PROJECT; WOMEN'S
LEGAL DEFENSE FUND; INDEPENDENT
WOMEN'S FORUM; WOMEN'S FREEDOM
NETWORK,
Amici Curiae.

_____

WILKINSON, Chief Judge, concurring:

As this century draws to a close, it seems appropriate to examine
the course of its jurisprudence and the place of this case within it. The
decision before us is an especially difficult one because it pits the
obligation to preserve the values of our federal system against the
imperative of judicial restraint.

I agree that section 13981 of the Violence Against Women Act
exceeds the authority of Congress under both the Commerce Clause
and Section 5 of the Fourteenth Amendment. Our ruling reaffirms the
fundamental principle that our national government is one of enumer-
ated -- and therefore limited -- powers. See, e.g., United States v.
Lopez, 514 U.S. 549 (1995).

Nonetheless, it is a grave judicial act to nullify a product of the
democratic process. The hard question is whether our decision consti-
tutes an indefensible example of contemporary judicial activism or a
legitimate exercise in constitutional interpretation. Respect for the
institutions of self-government requires us, in all but the rarest of
cases, to defer to the actions of legislative bodies. In particular, "[t]he
history of the judicial struggle to interpret the Commerce Clause . . .
counsels great restraint before [we] determine[ ] that the Clause is

132

insufficient to support an exercise of the national power." Lopez, 514 U.S. at 568 (Kennedy, J., concurring). I would add to that cautionary tale not only the judiciary's parallel experience with economic due process but also the activist legacy of the Warren and early Burger Courts. By considering today's decision in light of history's often cold assessment of the product of those prior eras, we may ascertain whether we forsake to our peril the high ground of judicial restraint.

I.

A.

Judicial activism in this century falls into three general stages. The first, beginning roughly with the decision in Lochner v. New York, 198 U.S. 45 (1905), and continuing through the early New Deal, has come to symbolize judicial activism taken to excess. The Lochner decision remains the foremost reproach to the activist impulse in federal judges. And the Lochner era is still widely disparaged for its mobilization of personal judicial preference in opposition to state and federal social welfare legislation. In a series of decisions, the Supreme Court pressed the doctrine of "liberty of contract" against state and federal laws protecting union members, see Coppage v. Kansas, 236 U.S. 1 (1915); Adair v. United States, 208 U.S. 161 (1908), and laws prescribing minimum wages for women and children, see Morehead v. New York ex rel. Tipaldo, 298 U.S. 587 (1936); Adkins v. Children's Hospital, 261 U.S. 525 (1923). Even though the Court during the same period upheld several maximum-hours provisions, see Bunting v. Oregon, 243 U.S. 426 (1917); Muller v. Oregon, 208 U.S. 412 (1908); Holden v. Hardy, 169 U.S. 366 (1898), as well as other labor legislation, see, e.g., Chicago, B. & Q. R.R. Co. v. McGuire, 219 U.S. 549 (1911), contemporary critics assailed the Court for indulging its "judicial sense of what was good for the business community" and ignoring the plight of the common citizen. Robert H. Jackson, The Struggle for Judicial Supremacy 164 (1941); see also Morehead, 298 U.S. at 619 (Hughes, C.J., dissenting). The irreconcilability of such cases as Lochner and Adkins on one side and Holden and Bunting on the other fostered the impression of a Court that was picking and choosing without principle, on occasion voiding legislative acts "simply because they [were] passed to carry out economic views which

133

the Court believe[d] to be unwise or unsound," Adkins, 261 U.S. at 562 (Taft, C.J., dissenting).

Then, as now, the scope of the commerce power was a major battleground. The New Deal Court used the Commerce Clause to rein in the expanding scope of federal economic legislation. These cases protected the authority of the states vis-a-vis the federal government, rather than restricting government action entirely. Nonetheless, doctrinal inconsistency again lent fuel to those who charged the Supreme Court with favoring the corporate class. Compare Hammer v. Dagenhart, 247 U.S. 251 (1918) (Congress may not bar goods made with child labor from the channels of interstate commerce), with, e.g., Hoke v. United States, 227 U.S. 308 (1913) (Congress may keep channels of commerce free of transportation for prostitution). These results suggested to many that the Court's line-drawing was not truly constitutional, but that it simply reflected opposition to "[t]he fundamental consideration . . . that industry should take care of its human wastage." Railroad Retirement Bd. v. Alton R.R. Co., 295 U.S. 330, 384 (1935) (Hughes, C.J., dissenting).

Moreover, the shadows cast by such aggressive Commerce Clause decisions as Carter v. Carter Coal Co., 298 U.S. 238 (1936) (striking the Bituminous Coal Conservation Act of 1935), A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935) (striking the National Industrial Recovery Act as applied), and Alton Railroad Co., 295 U.S. 330 (striking the Railroad Retirement Act), obscured earlier cases in which the Court upheld expansive federal regulation, see, e.g., Texas & N.O. R.R. Co. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548 (1930) (Railway Labor Act); Stafford v. Wallace, 258 U.S. 495 (1922) (Packers and Stockyards Act); Southern Ry. Co. v. United States, 222 U.S. 20 (1911) (Safety Appliance Act). Narrow interpretations of the taxing and spending powers in United States v. Butler, 297 U.S. 1 (1936) (striking provisions of the Agricultural Adjustment Act), and the Child Labor Tax Case, 259 U.S. 20 (1922) (striking the Child Labor Tax Law), solidified the image of an obstructionist Supreme Court, determined to impede legislative efforts to reverse the era's economic dysfunction and to ease the human suffering that it had wrought.

The century's first era of judicial activism proved a painful experience for the courts, as well as for the nation. Battered by court-

packing proposals and chastened by a wholesale change in personnel, the Court eventually abandoned the business of reviewing state and federal regulation of economic activity. See, e.g., Wickard v. Filburn, 317 U.S. 111, 129 (1942); West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937). Indeed, the reaction to the Court's early excesses was so strong that many supposed for a time that limits on the commerce power had become non-existent. See, e.g. , Gerald Gunther & Kathleen M. Sullivan, Constitutional Law 198 (13th ed. 1997) ("In the wake of Wickard . . . it was difficult indeed to articulate any limits on the reach of the commerce power."). And the Lochner specter of result-oriented activism still haunts the Court's debates today. See Lopez, 514 U.S. at 608 (Souter, J., dissenting) ("[I]t seems fair to ask whether the step taken by the Court today does anything but portend a return to the untenable jurisprudence from which the Court extricated itself almost 60 years ago.").

B.

The century's second era of judicial activism was more social than economic in nature. The post-war civil rights movement pursued a strategy of litigation to correct the abuses blacks suffered in every aspect of their civic experience. Seeking to emulate the movement's success, more and more citizens turned to the courts to vindicate a wide variety of individual liberties. Unlike the first era, which sought at least in part to protect the states against the encroachments of the federal legislature, the cases of this second era uniformly restricted the states' authority. The Court accomplished this in two ways. In some cases it incorporated the Bill of Rights against the states through the Fourteenth Amendment's Due Process Clause. See, e.g., Malloy v. Hogan, 378 U.S. 1 (1964). In other instances it formulated new rights from the Bill of Rights, see, e.g., Escobedo v. Illinois, 378 U.S. 478 (1964), and the Fourteenth Amendment, see , e.g., Roe v. Wade, 410 U.S. 113 (1973).

The verdict on this second activist era has been more mixed than the verdict on the first. Four of the most widely accepted decisions of the era imposed broad restrictions on the states. See Reynolds v. Sims, 377 U.S. 533 (1964) (requiring states to apportion their legislatures according to population); New York Times Co. v. Sullivan, 376 U.S. 254 (1964) (requiring states to recognize malice as an element of libel

135

actions); <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963) (requiring states to furnish legal representation in criminal cases); <u>Brown v. Board of Educ.</u>, 347 U.S. 483 (1954) (requiring states to end public school segregation). Unlike the most notable decisions of the first activist era, these four opinions have become judicial landmarks, and their position in the pantheon of our jurisprudence is secure.

In many contexts, however, the institutional stresses brought on by the era's most expansive and entangling decisions forced the Court to reverse course. Some decisions overextended the institutional capacity of the federal courts, installing judges as long-term supervisors of basic state functions. After approving district courts' broad equitable discretion to devise wide-ranging school desegregation plans, <u>see Swann v. Charlotte-Mecklenburg Bd. of Educ.</u>, 402 U.S. 1 (1971), the Court constrained district judges from extending those plans beyond the school district in which the constitutional violation occurred, <u>see Milliken v. Bradley</u>, 418 U.S. 717 (1974). And the rule that state prisoners could avail themselves of federal habeas corpus even if they failed to observe state procedures, <u>see Fay v. Noia</u>, 372 U.S. 391 (1963), gave way to the requirement that defendants show "cause and prejudice" for procedural default, <u>see Wainwright v. Sykes</u>, 433 U.S. 72 (1977). The Court likewise had to cabin its efforts to examine state administrative procedures case-by-case, <u>see Goldberg v. Kelly</u>, 397 U.S. 254 (1970), reducing such inquiry to only those cases involving "liberty" and "property" interests, <u>see Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564 (1972). In the midst of this era the Justices themselves engaged in the ad hoc review of state court obscenity rulings, <u>see</u>, <u>e.g.</u>, <u>Redrup v. New York</u>, 386 U.S. 767 (1967) (per curiam), until they finally cast off "the role of an unreviewable board of censorship for the 50 States" by making obscenity more a jury question, <u>Miller v. California</u>, 413 U.S. 15, 22 n.3 (1973). Other constitutional rulings were simply ridden too far, and the Court eventually had to rein them in. For example, the Court declined to apply the testimonial bar of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), to impeaching evidence, <u>see Harris v. New York</u>, 401 U.S. 222 (1971).

The Warren and early Burger Courts focused on finding new substantive rights in the Constitution and downplayed that document's structural mandates. Although many of its individual decisions were overdue and salutary, when the era is considered as a whole, the states

136

were relegated to a second-class constitutional status. As states themselves began to respect the civil rights of all their citizens, however, the justification for additional restrictions began to wear thin. And because "the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union," Gregory v. Ashcroft, 501 U.S. 452, 457 (1991) (quoting Texas v. White, 74 U.S. (7 Wall.) 700, 725 (1868)), this second era of activism presaged -- and indeed guaranteed -- a cyclical correction.

C.

This century's third and final era of judicial activism probably began with New York v. United States, 505 U.S. 144 (1992), in which the Supreme Court held that the "take title" provision of the Low-Level Radioactive Waste Policy Amendments Act of 1985 impermissibly coerced the states into passing legislation. Since that time, the Court has issued a spate of decisions striking federal enactments that exceeded Congress' authority at the expense of the states. See Printz v. United States, 117 S. Ct. 2365 (1997) (striking the interim background check provision of the Brady Handgun Violence Prevention Act); City of Boerne v. Flores, 117 S. Ct. 2157 (1997) (striking the Religious Freedom Restoration Act of 1993); Lopez, 514 U.S. 549 (striking the Gun Free School Zones Act of 1990); see also Seminole Tribe v. Florida, 517 U.S. 44 (1996) (invalidating Congress' attempt under the Indian Commerce Clause to abrogate the states' Eleventh Amendment immunity).

The common thread of contemporary activism is an interest in reviving the structural guarantees of dual sovereignty. For instance, Congress may not stretch the commerce power so far as to regulate noncommercial areas of traditional state concern-- activity that "has nothing to do with `commerce' or any sort of economic enterprise, however broadly one might define those terms." Lopez, 514 U.S. at 561. Nor may Congress "define its own powers by altering the Fourteenth Amendment's meaning." City of Boerne , 117 S. Ct. at 2168. The Court has preserved the states' immunity in federal court, defending their right not to be sued without consent. See Seminole Tribe, 517 U.S. 44. It has enforced the "etiquette of federalism," Lopez, 514 U.S. at 583 (Kennedy, J., concurring), barring Congress from "com-

137

mandee[ring] the legislative processes of the States," <u>New York</u>, 505 U.S. at 161 (internal quotation marks omitted), and forbidding the national government from "impress[ing] the state executive into its service" by "command[ing] the States' officers . . . to administer or enforce a federal regulatory program." <u>Printz</u>, 117 S. Ct. at 2371, 2384.

Taken as a whole, the decisions preserve Congress as an institution of broad but enumerated powers, and the states as entities having residual sovereign rights.

II.

As abbreviated as the preceding discussion is, it will suffice to pose the critical question. Will the current era of judicial scrutiny stand the tests of time and public acceptance any better than the prior eras have? The facial similarities between the present jurisprudence and the New Deal era underscore the dilemma. Yet upon closer scrutiny, the current wave of judicial decisions bears little relation to those which crested early in this century. If one remains attentive to the pitfalls of the past, the present jurisprudence holds the promise to be an enduring and constructive one, for its aims and means differ significantly from those of prior eras.

A.

As an initial matter, the outcomes of the current era have not consistently favored a particular constituency. In the first era of activism, courts were widely perceived as choosing sides with business interests in the political debate over the expansion of federal and state regulatory power and the abandonment of <u>laissez-faire</u>. During this time, all of the Supreme Court's cases limiting the scope of the enumerated powers led to results that were favorable to the commercial class. <u>See</u>, <u>e.g.</u>, <u>Carter</u>, 298 U.S. 238 (voiding pro-labor provision); <u>Hammer</u>, 247 U.S. 251 (voiding child labor provision). Moreover, the barricade of substantive due process thwarted social and economic advancements drafted not just by Congress, but by state governments as well. <u>See</u>, <u>e.g.</u>, <u>Morehead</u>, 298 U.S. 587 (rejecting state minimum wage law); <u>Adkins</u>, 261 U.S. 525 (rejecting federal minimum wage law); <u>Lochner</u>, 198 U.S. 45 (rejecting state maximum hours law). Given

138

this drumbeat of "pro-business" outcomes, critics were able to assemble a solid case that the court was promoting -- in a political fashion -- the interests of business at the expense of the interests of working men and women.

By contrast, the cases of the present era cannot be seen as single-mindedly promoting the interests of a particular constituency. Unlike the cases of the first era, the decisions of the third era display no pattern of favoritism. In fact, the results are unfavorable to a variety of interests. See New York, 505 U.S. 144 (striking down radioactive waste disposal law); Lopez, 514 U.S. 549 (striking down criminal law penalizing gun possession); Seminole Tribe, 517 U.S. 44 (barring suits against unconsenting states authorized by Indian Gaming Regulatory Act); Printz, 117 S. Ct. 2365 (striking down law requiring local law enforcement officials to administer federal regulatory scheme); City of Boerne, 117 S. Ct. 2157 (striking down act aiming to protect the free exercise of religion). As a matter of oxen, the gored are determined by infringements upon our federal system, not by judicial disdain for enacted policies.

Additionally, the cases of the current era arise out of disparate factual contexts, not simply out of repetitious clashes between business and labor interests. The first era's repeated parade of business-labor disputes solidified the perception that the Court was politically hostile to social welfare legislation. To be sure, the current cases present the customary array of amicus briefs advancing the positions of a variety of interest groups. But the identity and alignment of those groups varies, foreclosing the possibility that the judiciary will be seen as politically choosing sides in a single epic struggle. In the present period, the preservation of federalism values -- not the maintenance of laissez faire -- is the binding principle. Interestingly, even the states have occasionally aligned themselves on different sides of federalism issues, sometimes taking positions in derogation of their own sovereign power. See New York, 505 U.S. at 154 (noting that three states intervened as defendants in support of the take-title provision); Brief of 13 States, Amici Curiae, in Support of Respondent, Printz, 117 S. Ct. 2365 (1997) (No. 95-1478) (supporting enlistment of local officials to conduct background checks).

139

B.

The nature of textual interpretation in the third era also differs from the prior two. The courts of the first era gave an exceedingly narrow definition to the term "commerce," unduly restricting congressional power. By distinguishing commerce from manufacturing, production, and mining, see, e.g., Carter , 298 U.S. 238 (mining is not commerce); United States v. E.C. Knight Co., 156 U.S. 1 (1895) (manufacturing is not commerce), and by separating economic activities that directly affect interstate commerce from those that have only indirect effects, see, e.g., Schechter Poultry, 295 U.S. at 544-50 (wage and hour regulations lack direct relation to interstate commerce), the Supreme Court removed even the plainly economic activities of mines, manufacturing plants, railroads, and merchants from the sphere of regulable "commerce."

The current era of judicial scrutiny does not face this same fundamental textual problem. Courts are not motivated by a desire that a particular substantive meaning be given to a constitutional term such as commerce, but instead by the duty to find that some meaning must exist. The question now is not what the proper allocation of economic regulatory power ought to be, but whether the states will have any subjects of social welfare to call their own. The collapse of the first era's artificial distinctions dictates the third era's interpretive caution. The cases of the third era have not sought to characterize business and economic activity as something other than commerce. Modern courts instead have taken a minimalist approach, withholding only the narrowest of subjects from the ambit of the "commerce" power.

Identifying the connection between commerce and the traditional, noneconomic state concerns addressed by section 13981, however, would require the courts to "pile inference upon inference," in the end sanctioning a commerce power without any limitations. Lopez, 514 U.S. at 567. Although the appellants have presented able arguments in support of section 13981, the Commerce Clause must contain some limitations if its language is not to be completely excised from the Constitution. The choice we face is between minimal invalidation of congressional intrusion and complete abdication of our interpretive duty. To choose the latter would be to depart from the judicial role

140

of constitutional arbiter set forth nearly two centuries ago in <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137 (1803).

The search for meaning in textual provisions is common to all three judicial eras. And the real challenge to courts is to refrain from being textually selective. Yet, in reviewing the second and third eras, it is hard to understand how one can argue for giving capacious meanings to some constitutional provisions while reading others out of the document entirely. Here, appellants suggest that we give a reading that would rob all meaning from the phrase "Commerce .. . among the several States," giving Congress a blanket power simply "To regulate." It seems patently inconsistent to argue for a Due Process Clause that means a great deal and a Commerce Clause that means nothing. How one clause can be robust and the other anemic is a mystery when both clauses, after all, are part of our Constitution.

The Supreme Court affirmed in <u>Lopez</u> the notion that "commerce" must mean something short of everything. <u>See</u> 514 U.S. at 567 (noting that to uphold statute at issue "would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated"). This is not a radical principle. Rather than lashing out to greatly confine national power, the judiciary is proceeding, cautiously, to find a limiting principle at the margin. The <u>Lopez</u> limit on congressional power is not a strict one, but it is a limit.

C.

Finally, our role in this modern era is not as substantive adjudicators, but as structural referees. The due process decisions of the <u>Lochner</u> and Warren Court eras, as well as the individual rights rulings of the latter, attempted to remove the subject matter of those cases from political debate altogether. Those decisions prevented the people from seeking resolutions of their differences through their popularly elected representatives -- federal <u>and</u> state. By contrast, the present jurisprudence of federalism is purely allocative, standing for the simple proposition that the Constitution does not cast states as mere marionettes of the central government. This jurisprudence removes no substantive decision from the stage of political debate. Nor does this decision command those seeking to protect the rights of women to exit the arena. States remain free after <u>New York</u> to reach

141

regional solutions to their hazardous waste problems, after <u>Lopez</u> to criminalize the act of bringing a firearm within a school zone, after <u>Printz</u> voluntarily to cooperate with federal law enforcement efforts, and after today's decision to provide civil remedies to women who are battered or raped. No court blocks the path of legislative initiative in any of these substantive areas.

Instead of aggressively pursuing substantive preferences, this court validates a structural principle found throughout the Constitution. <u>See</u> <u>U.S. Const.</u> art. I, § 8 (enumerating congressional powers); <u>id.</u> art. I, § 10 (limiting powers of the states); <u>id.</u> art. IV, § 4 (guaranteeing states a republican form of government); <u>id.</u> art. V (incorporating states and Congress into the amendment process); <u>id.</u> art. VI (making federal law supreme); <u>id.</u> amend. X (reserving to states powers not delegated); <u>id.</u> amend. XI (making states immune to suit in federal court). Federalism is the shining gem cut by the Founders. It remains the chief contribution of America to democratic theory and the structural guarantor of liberty and diversity for the American people. <u>See</u> <u>Lopez</u>, 514 U.S. at 575-76 (Kennedy, J., concurring).

The role of the judiciary as a structural referee remains essential to the continued vitality of our federal system. <u>See id</u>. at 578 (Kennedy, J., concurring) ("[T]he federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far."). Courts have long adjusted the structural balance of power in our federal system "through judicial exposition of doctrines such as abstention, the rules for determining the primacy of state law, the doctrine of adequate and independent state grounds, the whole jurisprudence of pre-emption, and many of the rules governing our habeas jurisprudence." <u>Id</u>. (citations omitted). They have also commonly policed the structural lines inherent in the separation of powers. <u>See</u>, <u>e.g.</u>, <u>Clinton v. City of New York</u>, 118 S. Ct. 2091 (1998); <u>INS v. Chadha</u>, 462 U.S. 919 (1983); <u>United States v. Nixon</u>, 418 U.S. 683 (1974); <u>Marbury</u>, 5 U.S. (1 Cranch) 137. In so doing, courts have vindicated a simple, foundational principle: The federal government is one of limited powers not because it chooses to be, but because the Constitution makes that choice for it.

142

The judicial role in the structural questions of governance is a time-honored one. When Justice Black and Justice Harlan debated the incorporation of the Bill of Rights against the states through the Fourteenth Amendment, great structural principles were at stake. See, e.g., Malloy, 378 U.S. at 14-33 (Harlan, J., dissenting); Adamson v. California, 332 U.S. 46, 68-92 (1947) (Black, J., dissenting). Whether one agreed with Justice Black or Justice Harlan, no one doubted that the structural question of incorporation was a legitimate debate for the Court. Those who would call the modern era an illegitimate, activist one too easily forget this tradition. They would have it both ways -- approving wholly of incorporation and then chastising the courts for passing on the meaning of the enumerated powers. But it is important to remind ourselves of the principle underlying the incorporation debate: The judiciary rightly resolves structural disputes. Just as the relationship of the Bill of Rights to the Fourteenth Amendment was a legitimate structural question for the Court, so too is the debate over the relationship of Article I, Section 8 to the Tenth Amendment. It is just as important for the federal government to live within its enumerated powers as it is for state governments to respect the Bill of Rights. Insisting on both sets the state-federal balance right.

III.

The present controversy is a highly charged one. Some will doubtless be amazed that a federal court could find section 13981 unconstitutional when every American of good will abhors violence against women. Of course, incursions on dual sovereignty will always carry a measure of democratic sanction, representing as they do the enactments of the elected branches of government. Still, the structural dictates of dual sovereignty must not ebb and flow with the tides of popular support.

VAWA's civil suit provision falters for the most basic of reasons. Section 13981 scales the last redoubt of state government -- the regulation of domestic relations. By attaching civil penalties to criminal, but domestic, conduct, section 13981 "by its terms has nothing to do with `commerce.'" Lopez, 514 U.S. at 561. Appellant's defense of the provision rests on the same analogy rejected in Lopez -- that of attenuated causation to national productivity. See id. at 564 (rejecting

143

"costs of crime" and "national productivity" rationales because they would grant unlimited regulatory powers to Congress).

Section 13981 cannot be sustained under Section 5 of the Four-teenth Amendment for some of the same reasons that it cannot be sus-tained as an exercise of the commerce power. In both cases the displacement of state prerogatives in areas of traditional state concern would be profound. The displacement under the Fourteenth Amend-ment would come from the impermissible use of the enforcement and remedial powers of Section 5 to redefine Section 1 to include prohibi-tions on purely private actions. If Section 5 alone were read to allow Congress to regulate private (and often purely domestic) conduct, it would, just like an unlimited reading of the Commerce Clause, intrude on what has traditionally been the core of the state police power.* From whatever vantage point one views the case, the rent in the fabric of our federalism would be profound.

Our decision will assuredly be characterized as unjustifiable judi-cial activism. And just as assuredly, that characterization will miss the mark. It is true that our holding is "activist" in the sense that one pro-vision in a federal statute is declared unconstitutional (the remainder of the Violence Against Women Act remains in effect). What is

_____

*I believe that City of Boerne by itself effectively disposes of appel-lant's Section 5 arguments. The Court in that case was both clear and emphatic: "Congress does not enforce a constitutional right by changing what the right is. It has been given the power `to enforce,' not the power to determine what constitutes a constitutional violation." City of Boerne, 117 S. Ct. at 2164. Here, appellants are seeking the right to redefine the Fourteenth Amendment in contravention of not only the amendment's own language, but also the Supreme Court's recent ruling. See id. at 2164-66 (detailing the federalism rationale underlying the restriction of the Fourteenth Amendment to state action).

In relying in its Section 5 analysis extensively upon the Civil Rights Cases, 109 U.S. 3 (1883), and United States v. Harris, 106 U.S. 629 (1883), I do not understand the majority opinion either to adopt or endorse the discredited holdings in those cases. Rather, the majority relies on them for the same reason that the Supreme Court does, for the proposition that "their treatment of Congress'§ 5 power as corrective or preventive, not definitional, has not been questioned." City of Boerne, 117 S. Ct. at 2166.

144

equally true, however, is that today's decision has the distinguishing features of the third period of judicial scrutiny and not the discrediting features of the previous two. The substance of the issue before us is wholly disparate from Lopez and Printz and cannot be said to be part of any substantive judicial agenda. The holding here vindicates the structural values of government by reaffirming the concept of enumerated powers. And it vindicates the role of the judiciary in maintaining this structural balance. Finally, it vindicates the textual values of the Constitution by refusing to assign a meaning to "commerce" that is nowhere comprehended by the term.

My fine colleagues in dissent would not have it this way. The dissent simply rewrites the Constitution to its taste. It promotes a congressional power without limitation. Under this view, two pillars of our government will crumble: The courts would have almost no role in structural disputes and the states would play no more than a bit part in our federal system.

The restraints the dissent proposes to prevent this constitutional undoing are wholly ineffectual. First, the dissent argues that Congress can act under the Commerce Clause when it seeks to supplement, not supplant, state actions. Post at 209. But practically any exercise of congressional power can be artfully characterized as"supplementary" -- it will be the rare case where at least some states do not have some laws that attempt in some fashion to deal with the problem Congress seeks to redress. Second, if congressional enactments can conceivably be called civil rights statutes, then according to the dissent the judiciary must abdicate its role. Post at 209-211. Of course, most civil rights statutes should and will be sustained under the Commerce Clause. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964); Hoffman v. Hunt, 126 F.3d 575 (4th Cir. 1997). But statutes are not free from constitutional scrutiny solely because of their characterization as civil rights enactments. Third, the dissent asserts that in areas where states cannot "handle the problem," enumerated powers are converted into plenary ones. Post at 210. In practice, this will mean that when the state experimentation that our federal system envisages does not take the precise form that Congress prefers, Congress can impose a uniform rule.

Through these unexamined labels and glib formulas, none of which have any foundation in Supreme Court case law, the dissent would

145

sweep the role of the judiciary and the place of the states away. The dissent's response is that the states can fend for themselves in the political system. See Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 554 (1984). This, however, ignores the vast temptation on the part of Congress to attempt the solution of any and all of our problems, no matter how remote from commerce they may be. I agree that Congress has great latitude in legislating, but under the dissent's rationale, the states must meekly and subserviently swallow whatever Congress serves up. If, as the dissent suggests, judicial acts to safeguard Our Federalism are ipso facto violations of separation of powers, the role of the courts would not be what Marbury envisioned and the role of the states would not be what the Framers designed.

Maintaining the integrity of the enumerated powers does not mean that statutes will topple like falling dominos. Rather, the values of federalism must be tempered by the maxims of prudence and restraint. There have been signs, of course, that Lopez would presage an era of aggressive intrusion into the activities of coordinate branches. See, e.g., United States v. Olin Corp., 927 F. Supp. 1502, 1521-33 (S.D. Ala. 1996) (holding that as applied Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) exceeds Congress' commerce power), rev'd , 107 F.3d 1506 (11th Cir. 1997). Neither the Supreme Court nor the judiciary as a whole, however, has seen fit to take Lopez that far. This is as it should be. A wholesale invalidation of environmental, civil rights, and business regulation would signal a different and disturbing regime -- one other than that which we have now. If modern activism accelerates to a gallop, then this era will go the way of its discredited forebear.

In the end, neither swift retreat to cramped notions of commercial activity nor cessation of our judicial role will do. Only a role that is measured and cautious will ensure that a balanced allocation of powers in our federal system remains to protect our individual liberty. Today's holding is a measured one. To sustain this provision would signal that state governments are due no more than the sweet pieties of lip service and that no limits whatsoever exist on the exercise of congressional power.

I would affirm the judgment.

146

NIEMEYER, Circuit Judge, concurring:

I join the thorough opinion for the court, concluding that neither the Commerce Clause nor Section 5 of the Fourteenth Amendment provides Congress authority to enact the Violence Against Women Act of 1994, 42 U.S.C. § 13981 (this section hereafter referred to as "VAWA" or the "Act").**1** The broad, virtually limitless reach of VAWA into all violence motivated by gender, including domestic violence, whether implicating interstate commerce or not, far exceeds these constitutionally enumerated powers which were intended to be specific and limited grants of federal legislative authority. As the Tenth Amendment states, if a power is not delegated to the United States or prohibited to the States by the Constitution, it is reserved to the States or to the people. See U.S. Const. amend. X.

It may be seductive, albeit undisciplined, to conclude that the Commerce Clause has a virtually unlimited scope simply because the volume of interstate commerce has expanded to the point where today it is difficult to delineate between interstate and local commerce. That indulgence, however, would lead to the conclusion that the federal structure created by the Constitution no longer has applicability. Such a position, striking at the heart of our Constitutional order, would be alarming. Yet, it seems to be the position advanced by the government in this case. Because the government has refused even to recognize a line of demarcation between federal power authorized under the Commerce Clause and the States' retained powers, I write separately to address this issue.

Established Supreme Court precedent points to the existence of limits to the commerce power and defines these limits through two separate modes of analysis. Under one mode, the limits of the commerce power are defined by a federal regulation's nexus to interstate commerce. Under the other, the Court has observed that an overly broad exercise of the commerce power can be recognized when the exercise substantially infringes the general police power retained by the states under the Tenth Amendment. I will address each of these methods for defining limits to the commerce power, after first setting the basic factual backdrop.

_____

**1** I also agree with the remand of the Title IX claims.

147

I

While attending Virginia Polytechnic Institute ("Virginia Tech"), a state-owned university in Blacksburg, Virginia, Christy Brzonkala was sexually assaulted and raped by two football players who also were students at Virginia Tech. Some six months after the incident, Brzonkala filed a complaint against the football players under Virginia Tech's intramural disciplinary procedures. She did not pursue criminal charges because she had not preserved any physical evidence of the rapes. The record is not clear whether she has filed state law tort claims.

Brzonkala claims that persons employed by Virginia Tech, who were overly protective of the football program, frustrated university discipline of the players even though factual findings had been made in a university sponsored process to support Brzonkala's claim. If true, the alleged conduct by responsible university officials displays not only an unflattering lack of courage and judgment, but also a hardened insensitivity to Brzonkala's experience.

This case represents Brzonkala's effort to redress her injury in federal court under VAWA and under Title IX of the Education Amendments of 1972 to the Civil Rights Act of 1964, 20 U.S.C. § 1681 et seq. The defendants in this case have challenged the constitutionality of VAWA, while the United States has intervened to argue that VAWA is constitutional both under the Commerce Clause and under the Equal Protection Clause of the Fourteenth Amendment. I address only the Commerce Clause issue.

At oral argument, the government was pressed at some length to articulate its position on how to define the line between a national interest subject to regulation under the Commerce Clause and a local interest which is beyond the scope of Congress' legislative power. It continually refused to accept the challenge, leaving me with the clear impression that if the political pressure were sufficiently great, the government would feel justified in maintaining the position that Congress could constitutionally regulate local matters, such as divorces and, indeed, even child custody proceedings. Under the impact-on-the-economy test relied on by the government, Congress could rationalize a regulation of these important but traditionally local activities

148

simply by amassing the obviously available economic data showing their aggregate impact on the national economy. I believe that the government's approach, however, reveals a profound misunderstanding of Congress' authority and the limitations of the commerce power.

II

The Commerce Clause vests in Congress the power to"regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. This power has always been understood to be finite and therefore inadequate to regulate all commercial activity, including commercial activity which is purely local in character and effect. In The Federalist No. 45, James Madison wrote:

> The powers delegated by the proposed Constitution to the Federal Government, are few and defined. Those which are to remain in the State Governments are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce . . . . The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the State.

The Federalist, at 238 (George W. Carey & James McClellan eds., 1990); see also The Federalist No. 40, at 203 (George W. Carey & James McClellan eds., 1990) (James Madison) (Under the Constitution, the federal government's "powers are limited, and the States in all unenumerated cases, are left in the enjoyment of their sovereign and independent jurisdiction"); Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 179 (1996) (noting that rather than believing in unlimited federal legislative power, "most framers agreed that the scope of national lawmaking would remain modest").

In applying this understanding to the Commerce Clause, Chief Justice Marshall, in M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405 (1819), noted that the federal "government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only

149

those powers granted to it, . . . is now universally admitted." See also Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 195 (1824) ("The enumeration presupposes something not enumerated . . . . The completely internal commerce of a State, then, may be considered as reserved for the State itself").

The Supreme Court's modern Commerce Clause jurisprudence preserves inviolate this principle that the federal commerce power, while a significant grant of legislative power, is nonetheless finite, possessing identifiable and judicially enforceable boundaries:

> The authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce "among the several States" and the internal concerns of a State. That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system.

NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937). And the vitality of this principle was maintained in the Court's recent decision in United States v. Lopez, 514 U.S. 549 (1995), striking down the Gun-Free School Zones Act of 1990 (criminalizing the knowing possession of firearms in a school zone) on the grounds that the activity regulated was not economic; it had too tenuous a connection with commerce; and the statutory provision had no jurisdictional element that would ensure that the prosecuted conduct would have the requisite nexus to interstate commerce. Id. at 561. Central to its holding in Lopez, the Court explicitly recognized that there are outer limits to the reach of the Commerce Clause and that there are local and non-commercial activities which may not be reached by Congress under the Clause. See id. at 556-57.

The Commerce Clause is thus both an enumerated and a limited power authorizing the United States to regulate interstate commerce. But despite 200 years of Commerce Clause jurisprudence, we continue to face the difficult challenge of how to define the limits of the power, distinguishing that which is national from that which is local. In Jones & Laughlin Steel, the Court upheld the National Labor Relations Act of 1935 as a proper exercise of the commerce power, rea-

soning that although that act regulated some intrastate commercial activity, it did not exceed the Commerce Clause's grant of congressional power to regulate interstate commerce because that act only applied to labor practices "affecting [interstate] commerce." These, the Court said, were the "critical words" limiting the National Labor Relations Board's power to regulate labor practices. 301 U.S. at 31. Recognizing that Congress could not regulate local commerce or activity having little relation to interstate commerce, the Court observed that intrastate activities which "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" fall within the reach of Congressional power under the Commerce Clause. Id. at 37. "It is the effect upon commerce," the Court emphasized, "not the source of the injury, which is the criterion." Id. at 32 (citation omitted).

Similarly, in Wickard v. Filburn, 317 U.S. 111 (1942), a case upholding the exercise of the Commerce Clause power perhaps at its fullest reach, see Lopez, 514 U.S. at 560, the Court held that the Commerce Clause allowed Congress to regulate a farmer's production of wheat, even for home consumption, when the effect of such consumption by farmers in the aggregate would directly affect the price of wheat in the interstate market. See Wickard, 317 U.S. at 127. The Court noted that the Commerce Clause, even though conferring a wide-ranging power, nonetheless possesses constitutionally-prescribed limits, and "the reach of that power extends [only] to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power." Id. at 124 (emphasis added) (internal quotation marks omitted). It is noteworthy that wheat production was recognized as an economic activity that had a substantial impact on the price of wheat traded in interstate commerce. Thus, even though wheat production itself "may not be regarded as commerce," it might still be regulated under the Commerce Clause "if it exerts a substantial economic effect on interstate commerce." Id. at 125 (emphasis added).

Attempting to delineate the "vital" distinction between national and local, the Court in Jones & Laughlin Steel stated that the Commerce Clause enables Congress to regulate only intrastate acts which possess a "close and intimate relation to interstate commerce." Id. at 37

151

(emphasis added). And similarly in <u>Lopez</u>, the Court reiterated that the Commerce Clause may not be extended

> so as to embrace effects upon interstate commerce so <u>indirect and remote</u> that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.

<u>Lopez</u>, 514 U.S. at 557 (quoting <u>Jones & Laughlin Steel</u>, 301 U.S. at 37) (emphasis added). Thus, we may conclude that intrastate activities may be regulated under the Commerce Clause, but only if their relationship to interstate commerce is close and intimate and not "indirect and remote."

The requirement that a local activity which Congress seeks to regulate not have merely an "indirect" effect on interstate Commerce draws into question the quality of the nexus between the activity <u>sought</u> to be regulated and the interstate commerce <u>authorized</u> to be regulated. Drawing on the nature of the constitutional power to regulate interstate commerce, I therefore conclude that a local activity, in order to be covered by the Commerce Clause power, must have a <u>direct effect</u> on interstate commerce such that its regulation "targets" interstate commercial activity.

The requirement that a local activity which Congress seeks to regulate not be "remote" in effect on interstate commerce is distinct from the "direct effect" requirement and draws into question the proximateness of the activity's causal effect on interstate commerce. When examining remoteness, we can draw on well established tort principles of proximate cause, asking whether the local activity would stand next in its causation to the effect on interstate commerce and whether its impact is slight or incidental. <u>See generally Black's Law Dictionary</u> 1225-26 (6th ed. 1990). In order not to be remote, an effect must be proximate and intimately related to interstate commercial activity.

Thus, to determine whether an intrastate activity substantially affects interstate commerce and therefore is neither indirect nor remote, I would apply a test which requires that (1) the target of any

152

federal regulation of an intrastate activity must be interstate commerce, even though it may not be the purpose of the regulation,[2] and (2) the effect that the activity has on interstate commerce must be proximate and not incidental.

In addition to being so limited, the commerce power is also limited to regulating commerce. If not inherently clear, this was explicitly pointed out in Lopez.

When defining the "substantially affects" test, the Supreme Court stated, "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." Lopez, 514 U.S. at 560 (emphasis added). Applying an economic "subject-matter" requirement, the Court struck down the Gun-Free School Zones Act, noting that "by its terms [it] has nothing to do with `commerce' or any sort of economic enterprise however broadly one might define those terms." Id. at 561; see also id. at 567 ("The possession of a gun in a local school is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce"). Moreover, the Court concluded that the economic impact of the conduct regulated did not satisfy this subject-matter requirement. The Court recognized that the economic costs of violent crime, which would obviously be more likely when guns are present, might be "substantial." Thus, despite the fact that the Gun-Free School Zones Act was clearly rationally related to fighting violent crime and that violent crime might have a substantial negative effect on the national economy, the Supreme Court found that the act was not a permissible regulation of interstate commerce. The Court explicitly rejected the "costs of crime" argument as a basis for upholding a statute under the Commerce Clause. Id. at 564. The Court noted that to accept such reasoning would allow Congress to regulate all violent crime and all causes of violent crime. This, the Supreme Court found, the Constitution does not permit.

_____

**2** For example, Congress may enact legislation aimed at interstate commerce, even if its purpose is to promote social goals. The Freedom of Access to Clinic Entrances Act of 1994 might be such a law. See Hoffman v. Hunt, 126 F.3d 575, 582-88 (4th Cir. 1997) (upholding against a Commerce Clause challenge the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248).

Despite the Supreme Court's rejection of the "cost of crime" reasoning in Lopez, the government advanced a similar argument in this case, positing that because the costs of domestic violence were set out in Congressional "findings," they were sufficient to sustain a federal regulation on domestic violence involving women. In advancing this argument, the government misses the point of Lopez. Congressional findings on whether violence involving women has an adverse effect on the economy are just as irrelevant to the proper Commerce Clause analysis as were Executive Branch findings that gun violence had an adverse economic impact. Lopez held that this type of relationship between non-economic activity and the economy does not make the regulated activity subject to regulation under the Commerce Clause.

In sum, a statute depending for its validity on the Commerce Clause power must ultimately both be a regulation that reaches intrastate activity only to the extent necessary to regulate interstate commerce and be an economic regulation.

In considering whether VAWA is constitutional under these principles for applying the Commerce Clause, we begin by noting that violence against women is not commerce, nor is its regulation under VAWA aimed at the protection or promotion of interstate commerce. While it is clear that the congressional focus was trained on violence directed against women, it is just as clear that it was not trained on economic or commercial activity. Judge Luttig's opinion for the court in this case amply describes this congressional focus. See ante, at 20-24, 49-53. While Congress went to great lengths to justify its enactment based on the impact that violence against women has on the national economy, this kind of rationalization was explicitly rejected in Lopez. See 514 U.S. at 563-64. The Court observed there that if it were to accept the cost of crime or the impact of crime on national productivity as justifications, "Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody) for example." Id. at 564.

Such incidental rationalizations do not bring Congress within the specific constitutional grant of authority. The Commerce Clause authorizes only the regulation of interstate commerce. If, in regulating interstate commerce, Congress necessarily must regulate local activity

154

which has a substantial effect on the interstate commerce it seeks to regulate, then it may do so as long as the overall regulatory scheme is aimed at the protection or promotion of interstate commerce. See Lopez, 514 U.S. at 561. For example, in Wickard, the case identified as reflecting the broadest permissible reach of the Commerce Clause power, the Court upheld the Agricultural Adjustment Act of 1938, which regulated the amount of a farmer's harvest, even the portion that was intended for home consumption. The production of wheat was an important economic activity having a direct and substantial effect on the supply and therefore the price of wheat. In order to regulate the national wheat market, it was therefore necessary to regulate its important components.[3] The Court noted, "[i]t can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions" which fall within the legitimate domain of Congress under the Commerce Clause. Wickard, 317 U.S. at 128. But when, as in the case of VAWA, Congress directs its regulatory efforts at violence, assaults, and torts, or indeed domestic relations, it does not aim at economic activity. Instead, VAWA aims at a social ill which only incidently affects interstate commerce. In that sense, the regulated conduct's effect on commerce can only be characterized as "indirect."

The government argues that the prohibitions of VAWA promote jobs for women and therefore the economic activity of employment. This argument, however, is not supported by the language of the statute. See 42 U.S.C. § 13981. While data may support the finding that violence against women adversely affects the job market and causes an economic loss to the economy, the statute does not reflect an intent to address that economic concern; it does not refer to any job market or workplace, nor does it mention commerce except as a rationalization in its "purpose" section. See 42 U.S.C. § 13981(a). Moreover, VAWA does not restrict itself to violence that affects interstate commerce. Cf. Lopez, 514 U.S. at 561 (noting the importance of a "jurisdictional element which would insure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce").[4]

_____

[3] This is permissible because Congress has the power to "make all laws which shall be necessary and proper" for executing any of its enumerated powers. U.S. Const. art. I, § 8, cl. 18.

[4] Because VAWA contains no jurisdictional hook, this case does not present the issue of how far Congress can extend its power, if at all, to enact legislation through the use of jurisdictional hooks. Cf. Katzenbach v. McClung, 379 U.S. 294 (1964).

155

In providing additional remedies for violence against women, regardless of its connection with interstate commerce, Congress took aim at a social ill and not at commerce. Indeed, the data, which Congress claims prompted the enactment of VAWA, indicate Congress' concern with the increasing amount of violence against women, regardless of its economic impact. It is precisely such a broad social concern that falls outside the scope of Congress' Commerce Clause's power.

In short, I would hold that the activities regulated by VAWA are too remote from interstate commerce and that the regulation of commerce was not the target at which VAWA was aimed. For this reason, the enactment of VAWA cannot be upheld as a proper constitutional exercise of the Commerce Clause.

III

It is self-evident that if the scope of the commerce power is defined too broadly, our national government would no longer be one of enumerated -- and hence limited -- powers. This observation brings me to the second method for discerning the limits of the Commerce Clause's scope. If a federal regulation ostensibly justified by the Commerce Clause unduly infringes on the general police power, a power that was never conferred on the national government, it follows that such regulation exceeds the limited federal power. To support this syllogism and apply it in this case, it is therefore necessary to examine (1) whether it is true that the general police power was never intended to be conferred on the federal government and (2) whether VAWA unduly intrudes on the general police power retained by the States.

Over 200 years ago, issues regarding the scope of the new national government's powers dominated the debates surrounding the ratification of the Constitution. What had emerged from Philadelphia in 1787 was a legal text creating a government constructed upon principles of federalism. The Constitution accomplishes this result by limiting the power of the national government, and giving it only enumerated powers. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"). In constituting the new national government, no one believed that the

156

people conferred a general police power upon Congress. The Supreme Court most recently observed as much in <u>Lopez</u>, noting that the Constitution withholds "from Congress a plenary police power that would authorize enactment of every type of legislation." 514 U.S. at 566; <u>see also id.</u> at 584 (Thomas, J., concurring) (cautioning that the "substantial effects" test taken to its logical extreme would improperly give Congress "a `police power' over all aspects of American life"); <u>United States v. Dewitt</u>, 76 U.S. (9 Wall.) 41, 43-44 (1870). This proposition is not remarkable because the general police power of the States rests at the core of their sovereignty. Thus, to read the Commerce Clause so broadly as to infringe significantly on the States' general police power would undermine state sovereignty in violation of the federal structure created by the Constitution and confirmed by the Tenth Amendment. Consequently, I believe that the Commerce Clause may not be so broadly interpreted as to authorize wholesale regulation of the sphere traditionally regulated by the States through their general police power.

If the police power was retained by the states and the people, then we must address whether VAWA purports, in contravention of this Constitutional structure, to exercise the general police power.

Because the general police power is recognized to include the right of the States to promote the public health, safety, welfare, and morals of the State, <u>see Berman v. Parker</u>, 348 U.S. 26, 32 (1954), it is not disputed that redress for assault and rape traditionally falls within the States' police power. <u>See</u>, <u>e.g.</u>, <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 635 (1993) ("The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights") (internal quotation marks omitted); <u>United States v. Turkette</u>, 452 U.S. 576, 586 n.9 (1981) (noting that RICO does not interfere with the States' rights "to exercise their police powers to the fullest constitutional extent"); <u>see also Silkwood v. Kerr-McGee Corp.</u>, 464 U.S. 238, 248 (1984) (noting "the States' traditional authority to provide tort remedies to their citizens").

Moreover, the redress of sexual assaults and rape is a police power that the States, including Virginia, have traditionally exercised. Vir-

157

ginia law at the time that Brzonkala was attacked identified various crimes whose prosecution might cover the attacks on her. See, e.g., Va. Code Ann. § 18.2-61 (rape); Va. Code Ann.§ 18.2-67.3 (aggravated sexual battery); Va. Code Ann. § 18.2-67.1 (forcible sodomy); Va. Code Ann. § 18.2-67.5 (attempted rape, forcible sodomy, object sexual penetration, aggravated sexual battery, and sexual battery). The punishment for rape in Virginia is five years to life imprisonment, and aggravated sexual battery carries a maximum jail sentence of twenty years. Va. Code Ann. § 18.2-61(C), 18.2-67.3(B). Moreover, Brzonkala would have civil claims against her attackers under established tort principles. See, e.g. , Parsons v. Parker, 170 S.E. 1 (1933) (holding that Virginia law recognizes the civil action for rape). And Virginia's interest in exercising its police powers to prohibit and to remedy sexual assaults has been longstanding. Indeed, the common law of Virginia, as it existed before the United States Constitution, criminalized this conduct. See, e.g., For the Colony in Virginiea Britannia: Lawes Divine, Morall and Martiall, etc. 12 (David H. Flaherty ed., 1969) (1612) (punishing rape with the death penalty under "Dale's Code," Virginia's earliest code of law); Thomas Jefferson, Notes on the State of Virginia 143-44 (William Peden ed., 1954) (1787) (proposing to proportion punishments for crimes existing in Virginia during the period of the Articles of Confederation, which included rape).

Finally, as Virginia has asserted in its brief in this case, it enforces its sexual assault laws and in practice provides victims with "an array of remedies against the perpetrators to redress[these] wrong[s]." Statistical data confirm this assertion. See Virginia Criminal Sentencing Commission, Annual Report 19-20, (1997). While data are not available for the number of prosecutions as a percentage of the total number of sexual assaults that have taken place, the Virginia courts' compliance with sentencing guidelines for rape is over 90% and their compliance with sexual assault recommendations is over 70%. More revealing is the fact that the greater noncompliance in sexual assault cases can be attributed to the courts' treating sexual offenders more harshly than the guidelines recommend. See id.

Thus, while the general police power of the States, and of Virginia in particular, covers conduct amounting to sexual assault and rape, VAWA purports to redress that same conduct, limiting its scope only

158

to conduct motivated by gender, as both the language of the statute itself and Congress' explanation for it demonstrate. The statute creates a federal cause of action against a person committing a "crime of violence motivated by gender" and defines a crime of violence to be "an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another." 42 U.S.C. §§ 13981(c), (d)(2)(A). In creating this cause of action, Congress sought to redress all violence against women and did not limit its regulation to violence that has an economic impact, whether on interstate commerce or not. As Justice Kennedy observed in Lopez about the Gun-Free School Zones Act of 1990, "neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus." 514 U.S. at 580 (Kennedy, J., concurring). These same words describe VAWA. While domestic violence of the type regulated by VAWA undoubtedly impacts the economy, as does almost every human activity, the virtually unlimited scope of domestic violence covered by VAWA can be redressed only by exercise of the general police power by the states.

Violence against women is undoubtedly a national problem in that it is a problem that exists throughout every state in the nation. The government created by our Constitution, however, demands not that the problem be repeated in every state but that we determine whether that violence is a federal problem, that is, a problem that can be redressed with a federal power. The inquiry, therefore, turns to whether the Constitution enumerates a power with which our federal Congress can regulate violence against women generally. If not, then the Constitution, by its own terms, relegates regulation of the activity "to the States respectively, or to the people." U.S. Const. amend. X.

I recognize that the power to regulate commerce, if exercised by an enactment in fact aimed at regulating commerce, might incidentally overlap with the exercise of the general police power and that such an overlap would not per se render the enactment unconstitutional. But it is clear that Congress' undertaking to regulate violence against women through VAWA is not even aimed at the regulation of commerce. In its reports, Congress rationalized its statute only with the argument that the cost of violence against women generally

159

adversely affects the economy. See, e.g. , S. Rep. No. 101-545, at 33 (1990) (violence against women is estimated to cost society "at least $3 billion -- not million, but billion -- dollars a year"); S. Rep. No. 101-545, at 37 (1990) (noting that domestic violence has economic cost to the family and leads to homelessness and increased absences from work); S. Rep. No. 103-138, at 41 (1993) ("estimates suggest that we spend $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence"). But this cost-of-crime justification does not limit the statutory language to the regulation of commerce; rather it is a generalized rationalization that can be made equally with respect to all assaults, batteries, and indeed even murders. Each murder, for example, removes permanently from the economy a potentially productive citizen and fractures families causing further economic impact. Moreover, nowhere can we find any suggestion that women as a class have a more intimate connection with commerce than do men. The statute does not confine itself to the commerce-regulation power, and the regulation of commerce is not its target.

Because VAWA seeks to regulate activity so broadly that it exercises the States' general police power, I am further persuaded that the Act cannot be justified by the limited power of the Commerce Clause.

IV

In summary, the Commerce Clause authorizes Congress to regulate commerce among the States, i.e., the intercourse of economic activity among the States, and local activity insofar as it substantially affects interstate commerce. To satisfy this intrastate reach of the Commerce Clause, however, the effect of the intrastate activity on interstate commerce must be neither indirect nor remote; the federal regulation must be aimed at the regulation of interstate commerce, even though its purpose may be otherwise. Moreover, the scope of the Commerce Clause must be interpreted to preserve the federal structure of the Constitution and the States' general police power as an essential aspect of their sovereignty within that structure. Because VAWA regulates intrastate activity too broadly, detaching itself from any semblance of regulating interstate commerce, it is unconstitutional.

160

**Volume 5 of 5**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTY BRZONKALA,
Plaintiff-Appellant,

v.

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; ANTONIO J.
MORRISON; JAMES LANDALE CRAWFORD,
Defendants-Appellees,

and

CORNELL D. BROWN; WILLIAM E.
LANDSIDLE, in his capacity as
Comptroller of the Commonwealth,
Defendants.

LAW PROFESSORS; VIRGINIANS ALIGNED
       No. 96-1814(L)
AGAINST SEXUAL ASSAULT; THE ANTI-
DEFAMATION LEAGUE; CENTER FOR
WOMEN POLICY STUDIES; THE DC RAPE
CRISIS CENTER; EQUAL RIGHTS
ADVOCATES; THE GEORGETOWN
UNIVERSITY LAW CENTER SEX
DISCRIMINATION CLINIC; JEWISH WOMEN
INTERNATIONAL; THE NATIONAL
ALLIANCE OF SEXUAL ASSAULT
COALITIONS; THE NATIONAL COALITION
AGAINST DOMESTIC VIOLENCE; THE
NATIONAL COALITION AGAINST SEXUAL
ASSAULT; THE NATIONAL NETWORK TO
END DOMESTIC VIOLENCE; NATIONAL
ORGANIZATION FOR WOMEN;

NORTHWEST WOMEN'S LAW CENTER; THE
PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE, INCORPORATED;
VIRGINIA NATIONAL ORGANIZATION FOR
WOMEN; VIRGINIA NOW LEGAL
DEFENSE AND EDUCATION FUND,

INCORPORATED; WOMEN EMPLOYED;
WOMEN'S LAW PROJECT; WOMEN'S
LEGAL DEFENSE FUND; INDEPENDENT
WOMEN'S FORUM; WOMEN'S FREEDOM
NETWORK,
Amici Curiae.

_____

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

In response to a mountain of compelling evidence that violence animated by gender bias deprives many citizens of their civil rights, substantially affects the national economy and interstate commerce, and creates a profound problem that the states had been unable to remedy, Congress enacted the Violence Against Women Act of 1994. In passing this legislation, Congress took care to identify the constitutional source of its authority, expressly finding that the regulated activity -- gender-motivated violence -- has a "substantial adverse affect on interstate commerce." Furthermore, Congress specifically limited the reach of the statute challenged here, in order to ensure that it did not interfere with any state law or regulate in any area of traditional state concern.

Nevertheless, a majority of this court today holds that Congress had no power to enact this legislation. The majority can reach this conclusion only by disregarding controlling Supreme Court precedent, by refusing to give Congress's eminently rational findings proper deference, by creating troubling new rules of constitutional analysis, and by mischaracterizing the statute before us.

162

I recognize that people of good will -- including federal judges -- could believe that the statute challenged here does not constitute good public policy. But judges' policy choices provide no basis for finding a statute unconstitutional. See Vance v. Bradley , 440 U.S. 93, 97 (1979) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think the political branch has acted."). Thus, regardless of our personal policy choices, we must uphold a statute unless it violates the Constitution.

Proper judicial review of the massive congressional record inexorably leads to the conclusion that Congress had a rational basis for finding that gender-motivated violence substantially affects interstate commerce. Further, even when subjected to the most searching examination, it is clear that this carefully drawn statute neither interferes with state regulation nor legislates in an area of traditional state concern. Accordingly, I believe a court must conclude that Congress properly exercised its constitutional authority in enacting this statute. Therefore, I respectfully dissent.

I.

When considering the appeal of "an order granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6), [a court] must accept as true the facts alleged in the complaint." McNair v. Lend Lease Trucks, Inc., 95 F.3d 325, 327 (4th Cir. 1996). Christy Brzonkala, who entered Virginia Polytechnic Institute (Virginia Tech) as a freshman in the fall of 1994, alleges the following facts in her complaint.

On the evening of September 21, 1994, Brzonkala and another female student met two men who Brzonkala knew only by their first names and their status as members of the Virginia Tech football team. Within thirty minutes of first meeting Brzonkala, these two men, later identified as Antonio Morrison and James Crawford, raped her.

Brzonkala and her friend met Morrison and Crawford on the third floor of the dormitory where Brzonkala lived. All four students talked for approximately fifteen minutes in a student dormitory room. Brzonkala's friend and Crawford then left the room. Morrison imme-

163

diately asked Brzonkala if she would have sexual intercourse with him. She twice told Morrison "no," but Morrison was not deterred. As Brzonkala got up to leave the room, Morrison grabbed her and threw her, face-up, on a bed. He pushed her down by the shoulders and disrobed her. Morrison turned off the light, used his arms to pin down her elbows, and pressed his knees against her legs. Brzonkala attempted to push Morrison off, but to no avail. Without using a condom, Morrison forcibly raped her.

Before Brzonkala could recover, Crawford came into the room and exchanged places with Morrison. Crawford also raped Brzonkala by holding down her arms and using his knees to pin her legs open. He, too, used no condom. When Crawford was finished, Morrison raped her for a third time, again holding her down and again without a condom.

When Morrison had finished with Brzonkala, he warned her "You better not have any fucking diseases." In the months following the rape, Morrison announced publicly in the dormitory's dining room that he "like[d] to get girls drunk and fuck the shit out of them."

Following the assault, Brzonkala became depressed and avoided contact with most residents of her dormitory outside of her own room. She radically changed her appearance by cutting off her long hair. She ceased attending classes and eventually attempted suicide. She sought assistance from a Virginia Tech psychiatrist, who prescribed antidepressant medication. Neither the psychiatrist nor any other Virginia Tech employee made more than a cursory inquiry into the cause of Brzonkala's distress. She later sought and received a retroactive withdrawal from Virginia Tech for the 1994-95 academic year.

Approximately a month after Morrison and Crawford assaulted Brzonkala, she confided in her roommate that she had been raped, but could not bring herself to discuss the details. It was not until February 1995 that Brzonkala was able to identify Morrison and Crawford as the men who had raped her. Two months later, she filed a complaint against them under Virginia Tech's current sexual assault policy, which had been formally released for dissemination to students on July 1, 1994, but was not yet incorporated into the Student Handbook. After Brzonkala filed her complaint, she learned that another male

164

student athlete was overheard advising Crawford that he should have "killed the bitch."

Brzonkala did not pursue criminal charges against Morrison or Crawford, believing that criminal prosecution was impossible because she had not preserved any physical evidence of the rape. Virginia Tech did not report the rapes to the police, and did not urge Brzonkala to reconsider her decision not to do so. Sexual assault of a female student by a male student is the only violent felony that Virginia Tech authorities do not automatically report to the university or town police.

Virginia Tech held a hearing on Brzonkala's complaint against Morrison and Crawford. At the hearing, which was tape-recorded and lasted three hours, a number of persons, including Morrison and Crawford, testified. Morrison admitted that even though Brzonkala had twice told him "no," he had sexual intercourse with her in the dormitory on September 21. Crawford, who denied that he had sexual contact with Brzonkala (a denial corroborated by his suitemate, Cornell Brown), confirmed that Morrison had engaged in "sexual contact" with Brzonkala.

The Virginia Tech judicial committee found insufficient evidence to take action against Crawford, but found Morrison guilty of sexual assault. The committee imposed an immediate suspension on Morrison for two semesters (one school year). In May, 1995, Morrison appealed this decision, claiming that the college had denied him his due process rights and had imposed an unduly harsh and arbitrary sanction. Cathryn T. Goree, Virginia Tech's Dean of Students, notified Brzonkala in a letter dated May 22, 1995 that she had rejected Morrison's appeal and upheld his suspension for the Fall 1995 and Spring 1996 semesters. According to Virginia Tech's published rules, the decision of Dean Goree, as the appeals officer on this matter, was final.

In the first week of July 1995, however, Dean Goree and another Virginia Tech official, Donna Lisker, personally called on Brzonkala at her home in Fairfax, Virginia, a four-hour drive from Virginia Tech. These officials advised Brzonkala that Morrison's attorney had threatened to sue the school on due process grounds, and that Virginia

165

Tech thought there might be merit to Morrison's "ex post facto" challenge that he was charged under a sexual assault policy that was not yet spelled out in the Student Handbook. Dean Goree and Ms. Lisker told Brzonkala that Virginia Tech was unwilling to defend in court the school's decision to suspend Morrison for a year, and that a rehearing under the university's disciplinary policy as it existed prior to the adoption of the sexual assault policy was required. To induce Brzonkala to participate in a second hearing, Dean Goree and Ms. Lisker assured Brzonkala that Virginia Tech officials believed her story, and that the second hearing was a mere technicality to cure the school's error in bringing the first complaint under a version of the sexual assault policy not contained in the Student Handbook.

Brzonkala submitted to a second hearing, which was scheduled for late July. This hearing was <u>de novo</u> and lasted seven hours, more than twice as long as the first hearing. Brzonkala was required to engage her own legal counsel at her own expense. Moreover, the university belatedly informed her that student testimony given at the first hearing would not be admissible at the second hearing and that, if she wanted the second judicial committee to consider this testimony, she would have to submit sworn affidavits. Because she received insufficient notice, it was impossible for Brzonkala to obtain the necessary affidavits from her student witnesses. In contrast, the school provided Morrison with sufficient notice to give him ample time to procure the sworn affidavits of his student witnesses. Virginia Tech exacerbated this inequity by refusing both Brzonkala and her attorney access to the tape recordings of the first hearing, while granting Morrison and his attorney complete and early access to those tapes. Finally, Virginia Tech officials prevented Brzonkala from mentioning Crawford in her testimony because charges against him had been dismissed; as a result she had to present a truncated version of events.

Nevertheless, the university judicial committee found Morrison guilty of abusive conduct, and re-imposed the sanction that it had set after the first hearing: an immediate two-semester suspension.

Morrison again appealed; this appeal was successful. On August 21, 1995, in a letter attached to the complaint, Senior Vice-President and Provost Peggy Meszaros notified Morrison of her decision to set aside his sanction. The Provost explained that in her view "there was

sufficient evidence to support the decision that[he] violated the University's Abusive Conduct Policy and that no due process violation occurred in the handling of [his] case." She further informed Morrison, however, that his immediate suspension for one school year was "excessive when compared with other cases where there has been a finding of violation of the Abusive Conduct Policy." Provost Meszaros did not elaborate on the "other cases" to which she was referring. Instead of an immediate one-year suspension, the Provost imposed "deferred suspension until [Morrison's] graduation from Virginia Tech." In addition, Morrison was "required to attend a one-hour educational session with Rene Rios, E.O./AA Compliance Officer regarding acceptable standards under University Student Policy."

Virginia Tech did not notify Brzonkala of these changes in the outcome of her case. Instead, on August 22, 1995, Brzonkala learned from an article in The Washington Post that the university had lifted Morrison's suspension and that he would return to campus for the Fall 1995 semester. Morrison did in fact return to Virginia Tech in the Fall of 1995, on a full athletic scholarship.

Upon learning that the university had set aside Morrison's suspension and was permitting him to return in the Fall, Brzonkala canceled her own plans to return to Virginia Tech. She did this because she feared for her personal safety and because she believed that Virginia Tech had repudiated her claim that Morrison had raped her.

Brzonkala believes and so alleges that Head Football Coach Frank Beamer, as part of a coordinated university plan to allow Morrison to play football in 1995, participated directly and indirectly in the process by which the sanction against Morrison was overturned.

On December 27, 1995, Brzonkala filed suit against Morrison, Crawford, and Virginia Tech. On March 1, 1996, she amended her complaint. Her amended complaint alleges inter alia that Virginia Tech, in its handling of her rape claims and failure to punish the rapists in any meaningful manner, violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (1994). She also alleges that Morrison and Crawford brutally gang-raped her because of gender animus in violation of Subtitle C of the Violence Against

167

Women Act of 1994 (VAWA), 42 U.S.C. § 13981 (1994). The United States intervened to defend the constitutionality of VAWA.

The district court dismissed the Title IX claims against Virginia Tech for failure to state a claim upon which relief could be granted, and it dismissed Brzonkala's VAWA claims against Morrison and Crawford because it found VAWA to be beyond Congress's constitutional authority. I address first the Title IX claim and then the VAWA claim.

II.

Title IX of the Education Amendments of 1972 provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance .. . .

20 U.S.C. § 1681(a)(1994). Virginia Tech concedes that it is an "education program . . . receiving Federal financial assistance." Hence, the only question is whether Brzonkala has sufficiently alleged that she was "subjected to discrimination" by Virginia Tech "on the basis of sex." 20 U.S.C. § 1681(a).

The district court recognized that Brzonkala pled a Title IX claim on the basis of two distinct legal theories: a hostile environment theory, that Virginia Tech responded inadequately to a sexually hostile environment; and a disparate treatment theory, that Virginia Tech discriminated against Brzonkala because of her sex in its disciplinary proceedings. For the reasons set forth in the panel opinion in this case, Brzonkala v. Virginia Polytechnic Inst., 132 F.3d 949, 961-62 (4th Cir. 1997), I believe that Brzonkala has failed to allege a disparate treatment claim.

As for the hostile environment claim, determination of its validity must await the Supreme Court's decision in Davis v. Monroe County Bd. of Educ., 120 F.3d 1390 (11th Cir. 1997), cert. granted, 119 S. Ct.

168

29 (1998), which should provide substantial guidance as to whether Title IX establishes a cause of action to remedy a hostile environment of the sort Brzonkala alleges. The majority apparently agrees, but it remands the case so that the district court can hold the resolution of this issue in abeyance pending the Davis decision. Remand of this legal question, which will almost inevitably be appealed, only wastes time and scarce judicial resources. Rather than creating unnecessary extra work for the district court, we should, as we ordinarily do, hold our own opinion in abeyance until the Supreme Court rules. See, e.g., Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 181 (4th Cir. 1998); United States v. Hairston, 96 F.3d 102, 105 (4th Cir. 1996).

III.

With regard to the civil rights provision of the Violence Against Women Act of 1994 (VAWA), 42 U.S.C. § 13981 (1994), the district court held that Brzonkala's complaint stated a claim against Morrison and Crawford. The court concluded, however, that this portion of VAWA was unconstitutional because Congress lacked the authority to enact it. Like the majority, I agree with the district court that Brzonkala stated a claim. After careful review of the statute, however, I can only conclude that Congress acted within its broad authority in passing this legislation. I would therefore reverse the district court's ruling to the contrary and allow Brzonkala to pursue her claim.

A.

In September 1994, after four years of hearings, Congress enacted VAWA in order to address "the escalating problem of violence against women." S. Rep. No. 103-138, at 37 (1993). Subtitle C, the portion of the statute at issue in this case, establishes the right upon which a civil rights claim can be brought:

> All persons within the United States shall have the right to be free from crimes of violence motivated by gender . . . .

42 U.S.C. § 13981(b).

The statute goes on to set forth the elements necessary to plead and prove such a claim:

169

(c) Cause of action

A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

(d) Definitions

For purposes of this section--

(1) the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender; and

(2) the term "crime of violence" means--

(A) an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States; and

(B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken.

42 U.S.C. § 13981. Thus, to state a claim under § 13981(c) a plaintiff must allege that he or she has been the victim of a specific kind of

170

felony -- "a crime of violence motivated by gender." 42 U.S.C. § 13981(c).

Morrison and Crawford do not argue that Brzonkala's allegation of gang rape fails to satisfy § 13981(d)(2)'s definition of a "crime of violence." However, they do briefly assert that Brzonkala has failed to allege a "crime of violence <u>motivated by gender</u>." 42 U.S.C. § 13981(c) (emphasis added).

A "crime of violence motivated by gender" is defined as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1). Congress has indicated that "[p]roof of `gender motivation' under" Subtitle C of VAWA is to "proceed in the same ways proof of race or sex discrimination proceeds under other civil rights laws. Judges and juries will determine`motivation' from the `totality of the circumstances' surrounding the event." S. Rep. No. 103-138, at 52; <u>see also</u> S. Rep. No. 102-197, at 50 (1991).

The statute does not reach "[r]andom acts of violence unrelated to gender." 42 U.S.C. § 13981(e)(1). However, bias "can be proven by circumstantial as well as indirect evidence." S. Rep. No. 103-138, at 52. "Generally accepted guidelines for identifying hate crimes may also be useful" in determining whether a crime is gender-motivated, such as "language used by the perpetrator; the severity of the attack (including mutilation); the lack of provocation; previous history of similar incidents; absence of any other apparent motive (battery without robbery, for example); common sense." <u>Id.</u> at 52 n.61.

Brzonkala alleges that two virtual strangers, Morrison and Crawford, brutally raped her three times within minutes of first meeting her. Although Brzonkala does not assert that they mutilated her, the brutal and unprotected gang rape itself constitutes an attack of significant "severity." <u>Id.</u> Moreover, Brzonkala alleges that the rapes were completely without "provocation." <u>Id.</u> One of her assailants conceded during the college disciplinary hearing that Brzonkala twice told him "no" before he initially raped her. Further, there is an absence of any "apparent motive" for the rapes other than gender bias. <u>Id.</u> For example, no robbery or other theft accompanied the rapes.

171

Finally, Brzonkala alleges that when Morrison had finished raping her for the second time he told her, "You better not have any fucking diseases." She also alleges that Morrison later announced in the college dining room, "I like to get girls drunk and fuck the shit out of them." Verbal expression of bias by an attacker is certainly not mandatory to prove gender bias, but it is "helpful." S. Rep. No. 103-138, at 51. As the district court noted, Morrison's "statement reflects that he has a history of taking pleasure from having intercourse with women without their sober consent" and that "[t]his statement indicates disrespect for women in general and connects this gender disrespect to sexual intercourse." 935 F. Supp. at 785. In addition, since Brzonkala alleged that Morrison and Crawford engaged in a conspiracy to rape her, Morrison's comments are also relevant in assessing Crawford's liability. See Loughman v. Consol-Pennsylvania Coal Co., 6 F.3d 88, 103 (3rd Cir. 1993) (in a civil conspiracy "every conspirator is jointly and severally liable for all acts of co-conspirators taken in furtherance of the conspiracy"); United States v. Carpenter, 961 F.2d 824, 828 n.3 (9th Cir. 1992) (holding that "acts and statements in furtherance of the conspiracy may be attributed to" a co-conspirator and citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)); United States v. Chorman, 910 F.2d 102, 111 (4th Cir. 1990) (same).

In sum, Brzonkala has clearly alleged violations of the civil rights provision of VAWA. I find puzzling the majority's statement that these allegations "do not necessarily compel the conclusion that Morrison acted with animus toward women as a class, and might not even be sufficient, without more, to defeat a motion either for summary judgment or for a directed verdict." Ante, at 13. If the majority is simply indicating that Brzonkala may be unable to prove some or all of the allegations in her complaint, the statement is unremarkable. But if the majority is suggesting that, even if Brzonkala offers adequate evidence to support each and every one of these allegations, such evidence still might not be sufficient to prove a claim of gender-animated violence, the statement is incomprehensible. Brzonkala has alleged virtually all of the earmarks of a violent, felonious "hate crime": an unprovoked, severe attack, triggered by no motive other than gender-based animus, and accompanied by language clearly reflecting such animus. If she provides evidence proving these allegations, she is entitled to have a factfinder weigh that evidence.

172

B.

The remaining, and critical, issue is whether the district court correctly held that Congress exceeded its constitutional authority in enacting the civil rights provision of VAWA. Congress directly addressed this very question. On the basis of numerous specific findings and a host of evidence, Congress stated in the statute itself that it was invoking its authority "[p]ursuant to . . . section 8 of Article I of the Constitution" in order to protect the civil rights of "victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce by establishing a Federal civil rights cause of action for actions of violence motivated by gender." 42 U.S.C. § 13981(a).**1** Article I, Section 8, Clause 3 of the Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Our task is to determine whether Congress had a rational basis for reaching this conclusion.

_____

**1** Congress also expressly stated that Section 5 of the Fourteenth Amendment authorized enactment of this statute. See 42 U.S.C. § 13981(a). In view of my conclusion that the statute is a valid exercise of Congress's Commerce Clause power, I need not reach the question of whether the Fourteenth Amendment also authorized it. Despite the majority's statements to the contrary, however, nothing in the record demonstrates that Brzonkala or the Government "primarily" defended Subtitle C as a valid exercise of Congress's Fourteenth Amendment power in reaction to United States v. Lopez, 514 U.S. 549 (1995), or that they subsequently "retreated to defend" it"primarily as an exercise" of Commerce Clause power in reaction to City of Boerne v. Flores, 117 S. Ct. 2157 (1997). Ante, at 6. In their initial briefs before a panel of this court, the Government and Brzonkala argued both issues -- allotting substantial attention to both, but perhaps slightly more to the Fourteenth Amendment; for example, that issue was addressed first. In the supplemental briefs submitted to the en banc court after the panel had, without reaching the Fourteenth Amendment question, upheld the statute as a valid exercise of Congress's commerce power, the Government and Brzonkala again addressed both issues. This time, however, they devoted slightly more attention to the Commerce Clause argument, placing it first. Although the supplemental briefs were filed after Boerne issued, it seems to me that the parties' slight change in emphasis could well be simply a reaction to the perceived interest of our court.

1.

In making this assessment, we must keep certain principles in mind. First, the Supreme Court has directed that when a court is "asked to invalidate a statutory provision that has been approved by both Houses of Congress and signed by the President, particularly an Act of Congress that confronts a vexing national problem, it should do so only for the most compelling constitutional reasons." Mistretta v. United States, 488 U.S. 361, 384 (1989). This is "particularly" true where, as here, the legislative "judgments are based in part on empirical determinations." Board of Educ. v. Mergens, 496 U.S. 226, 251 (1990).

Second, a court faced with a challenge to an exercise of the commerce power owes even greater deference to Congress than a court asked to determine whether a federal statute violates an express prohibition of the Constitution. As Justice Kennedy explained in United States v. Lopez, "[t]he substantial element of political judgment in Commerce Clause matters leaves our institutional capacity to intervene more in doubt than when we decide cases, for instance, under the Bill of Rights even though clear and bright lines are often absent in the latter class of disputes." 514 U.S. 549, 579 (1995) (Kennedy, J., concurring); see also id. at 568 ("The history of the judicial struggle to interpret the Commerce Clause . . . counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power."). In accordance with these principles, the Supreme Court has long held, and recently reiterated in Lopez, that the proper inquiry for a court when considering a challenge to Congress's Commerce Clause power is "whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." 514 U.S. at 557.

In Lopez, the Supreme Court concluded that the Gun-Free School Zones Act of 1990 (GFSZA), 18 U.S.C. § 922(q)(1994), fell outside Congress's commerce power. Id. at 567. Several characteristics of the GFSZA led the Court to this conclusion. As the facts of the case demonstrated, and as the Court noted, id. at 561 n.3, the GFSZA effectively supplanted state criminal regulation with federal regulation; the defendant had initially been charged by state police with violation of a state criminal law punishing the possession of a firearm at a school,

174

but those charges were dropped after federal agents charged him with violation of the GFSZA, id. at 551. Moreover, although the Government defended the GFSZA as a proper exercise of the commerce power, the statute by its own terms had "nothing to do with `commerce,'" contained no jurisdictional element ensuring a connection to interstate commerce in each case, and was supported by no congressional findings demonstrating that gun possession near schools had a substantial effect on interstate commerce. Id. at 561-62. The Supreme Court noted that, in these circumstances, it "would have to pile inference upon inference" to find a rational basis for concluding that the activity regulated by the GFSZA "substantially affect[s] any sort of interstate commerce." Id. at 567. This the Court declined to do, and it therefore declared that Congress had exceeded its Commerce Clause power in enacting the GFSZA. Id.

In contrast to the congressional silence about its basis for passing the GFSZA, Congress created a voluminous record demonstrating its reasons for enacting VAWA. Accordingly, a court in this case can begin where the Lopez Court could not, by"evaluat[ing] the legislative judgment that the activity in question substantially affected interstate commerce." Id. at 563; see also City of Boerne v. Flores, 117 S. Ct. 2157, 2169-70 (1997) (noting the importance of Congressional findings in determining the "appropriateness of[Congress's] remedial measures"). In taking the legislative record supporting Subtitle C into account, I recognize that discerning a rational basis "is ultimately a judicial rather than a legislative question," Lopez, 514 U.S. at 557 n.2 (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 273 (1964) (Black, J., concurring)), and that "simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." Id. (quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n , 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring)). But when Congress has made a specific finding that the regulated activity adequately affects interstate commerce, a "court must defer" to that finding if Congress had "any rational basis for such a finding." Hodel, 452 U.S. at 276.

The Supreme Court has consistently recognized the importance of deference to Congressional findings in Commerce Clause cases and has never struck down a statute that was supported by a finding that the regulated activity had the necessary effect on commerce. See

175

Lawrence H. Tribe, <u>American Constitutional Law</u>, 310-11 (2d. ed. 1988) (noting that the Supreme Court "has without fail given effect to" congressional findings). When the rationale for congressional action appears in the legislative record, the proper inquiry in assessing commerce power challenges involves examination of that record and determination of whether it demonstrates that Congress had a rational basis for finding that the regulated activity substantially affects interstate commerce. <u>See</u>, e.g., <u>Hodel</u>, 452 U.S. at 275-83; <u>Hodel v. Indiana</u>, 452 U.S. 314, 326 (1981); <u>Perez v. United States</u>, 402 U.S. 146, 155-56 (1971); <u>Katzenbach v. McClung</u>, 379 U.S. 294, 299-301 (1964); <u>Heart of Atlanta Motel</u>, 379 U.S. at 252-254. <u>See also United States v. Leshuk</u>, 65 F.3d 1105, 1111-12 (4th Cir. 1995) (rejecting a <u>Lopez</u> challenge to the Comprehensive Drug Abuse Prevention and Control Act by relying heavily upon Congress's "detailed findings" concerning the interstate commerce effects of the regulated activity). Accordingly, I turn to that inquiry.

2.

The congressional findings and testimony that support the enactment of VAWA under the Commerce Clause are detailed and extensive.[2] Space limitations prevent setting them all out here. But even abbreviated excerpts from the vast legislative record demonstrate that Congress carefully and repeatedly documented the substantial effect that gender-based violence has on interstate commerce and the national economy. For example, Congress found that:

> - "Gender-based crimes and the fear of gender-based

_____

[2] Most of Congress's findings do not appear in the statute itself, but in applying rational basis review courts also consider findings of congressional committees. <u>See Lopez</u>, 514 U.S. at 562; <u>see also Preseault v. ICC</u>, 494 U.S. 1, 17 (1990) (citing House Report in discussion of congressional findings regarding effect on interstate commerce of federal "rails-to-trails" statute); <u>Hodel</u>, 452 U.S. at 277-80 (relying on committee reports to uphold Congress's power under the Commerce Clause to enact the Surface Mining and Reclamation Control Act); <u>Hoffman v. Hunt</u>, 126 F.3d 575, 587 (4th Cir. 1997) (relying on a House Report to uphold Freedom of Access to Clinic Entrances Act (FACE) as a legitimate exercise of Commerce Clause power).

176

crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy." S. Rep. No. 103-138, at 54.

- "Gender-based violence bars its most likely targets -- women -- from full participation in the national economy." Id.

- "[P]roblem[s] of domestic violence . . . because of their interstate nature, transcend the abilities of State law enforcement agencies." Id. at 62.

Indeed, in the Conference Committee Report on VAWA, Congress made detailed and express findings, which were originally part of the text of the statute itself and were removed only to avoid cluttering the United States Code. See Violence Against Women: Law and Litigation § 5:40 and § 5:42 (David Frazee et al. eds., 1997). The conference report included the ultimate finding that

> crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce. . ., by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

H.R. Conf. Rep. No. 103-711, at 385 (1994), reprinted in 1994 U.S.C.C.A.N. 1839, 1853 (emphasis added).

Congress additionally explained that "the cost" of gender-motivated violence "is staggering." S. Rep. No. 101-545, at 33 (1990). One example of such gender-motivated violence is domestic violence, which alone is estimated to cost employers "$3 to $5 billion annually due to absenteeism in the workplace." Women and Violence: Hearing Before the Committee on the Judiciary, 101st Cong. 58 (1990) (statement of Helen K. Neuborne) (emphasis added). Furthermore, "esti-

177

mates suggest that we spend $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence." S. Rep. No. 103-138, at 41. Congress noted "[i]t is not a simple matter of adding up the medical costs, or law enforcement costs, but of adding up all of those expenses plus the costs of lost careers, decreased productivity, foregone educational opportunities, and long-term health problems." S. Rep. No. 101-545, at 33.

These monetary figures were accompanied by other evidence establishing that gender-motivated violence has a substantial impact on interstate commerce:

> Over 1 million women in the United States seek medical assistance each year for injuries sustained by their husbands or other partners. As many as 20 percent of hospital emergency room cases are related to wife battering.
>
> But the costs do not end there: woman abuse"has a devastating social and economic effect on the family and the community." . . . It takes its toll in homelessness: one study reports that as many as 50 percent of homeless women and children are fleeing domestic violence. It takes its toll in employee absenteeism and sick time for women who either cannot leave their homes or are afraid to show the physical effects of the violence.

Id. at 37 (footnote omitted).

Congress further found that the fear of violence"takes a substantial toll on the lives of all women, in lost work, social, and even leisure opportunities." S. Rep. No. 102-197, at 38 (1991) (emphasis added). Thus, the legislature expressly recognized, as the Senate explained, that

> women often refuse higher paying night jobs in service/retail industries because of the fear of attack. Those fears are justified: the No. 1 reason why women die on the job is homicide and the highest concentration of those women is in service/retail industries. . . . 42 percent of

178

deaths on the job of women are homicides; only 12 percent of the deaths of men on the job are homicides.

S. Rep. No., 103-138, at 54 n.70 (citations omitted).

Congress also explicitly found that the states refused or were unable to deal effectively with the problems created by gender- based violence. The Conference Report concluded that "bias and discrimination in the [state] criminal justice system[s] often deprives victims of crimes of violence motivated by gender of equal protection of the law." H.R. Conf. Rep. No. 103-711, at 385. Numerous reports from the state supreme courts demonstrated to the Senate "that crimes disproportionately affecting women are often treated less seriously than comparable crimes against men," and the Senate concluded that "these reports provide overwhelming evidence that gender bias permeates the [states'] court system." S. Rep. No. 102-197, at 43-44. Congress further indicated that a uniform national approach to these problems was needed by noting that, while federal statutes currently provide "a civil rights remedy" for gender-based violence in the workplace, no such remedy existed for gender-based violence "committed on the street or in the home." H.R. Conf. Rep. No. 103-711, at 385.

The majority does not assert that these findings lack documentation or power.3 Instead, it nitpicks them. See ante, at 45-49. For example, the majority suggests that because hearings were held by "three different Congresses" and some of the congressional findings were general, they do not deserve deference. Id. at 45-46. But in Hodel, the Supreme Court relied on numerous general findings from five different Congresses to uphold the challenged statute. 452 U.S. at 278-80 & n.19. Indeed, the Hodel Court specifically commended Congress

---

3 These specific findings are not mere "incidental rationalizations." See ante, at 154 (Niemeyer, J., concurring). Rather, Congress has demonstrated that gender-motivated violence is an "activity having a direct and substantial effect on the supply and therefore the price" of health care, consumer goods, and the like in the same way that a farmer's consumption of his home-grown wheat was held in Wickard v. Filburn, 317 U.S. 111, 128 (1942), to have the requisite effect on interstate commerce because of its impact on the supply and price of the national wheat market. But see ante, at 154-155 (Niemeyer, J., concurring).

179

for holding "extended hearings during which vast amounts of testi-mony and documentary evidence" were received, demonstrating "six years of the most thorough legislative consideration." Id. at 278-79. Thus, the Supreme Court has praised precisely the kind of full and extended congressional consideration that the majority criticizes.

The majority also suggests that because the Senate found in 1993, a year prior to the passage of VAWA and two years prior to issuance of the Lopez decision, that gender-based violence "affects" (rather than "substantially affects") interstate commerce and that VAWA therefore met the "modest threshold required by the Commerce Clause," ante, at 50, none of Congress's findings merits deference. Given that the Supreme Court has repeatedly deferred to a congressio-nal record containing evidence that an activity affected interstate commerce without any specific findings as to the degree of this effect, see, e.g., McClung, 379 U.S. at 299; Heart of Atlanta Motel, 379 U.S. at 246, and that in Lopez the Court reiterated that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," Lopez, 514 U.S. at 562, this contention is a makeweight at best.4  In fact, a panel of this court, which included two members of today's majority, recently relied on congressional committee reports to uphold a federal statute in the face of a post-Lopez Commerce Clause challenge even though those reports -- and the statute itself -- found merely that the regulated activity affected (not substantially affected) interstate commerce. See Hoffman v. Hunt, 126 F.3d 575, 587 (4th Cir. 1997)(citing H.R. Conf. Rep. No. 103-488 at 7-8 (1994), reprinted in 1994 U.S.C.C.A.N. 724,

_____

4 Similarly, the majority's contention as to the statute's purposes is meritless. The majority asserts that one of Subtitle C's "express statutory purpose[s]" -- "to promote public safety, health, and activities affecting interstate commerce" -- exhibits Congress's"misapprehension of the scope of the power to regulate interstate commerce." Ante, at 51. But in Hodel, the Supreme Court held that Congress could properly exercise its Commerce Clause power to require restoration of mined "prime farm-land," which had only an "infinitesimal" effect on interstate commerce, 452 U.S. at 322-24, because Congress could reasonably act to protect "agriculture, the environment, or public health and safety, injury to any of which interests would have deleterious effects on interstate commerce," id. at 329 (emphasis added).

180

724-25); Freedom of Access to Clinic Entrances Act of 1994, Pub. L. No. 103-259, § 2, 108 Stat. 694 (1994); see also Terry v. Reno, 101 F.3d 1412, 1416 (D.C. Cir. 1996), cert. denied , 117 S. Ct. 2431 (1997).

Moreover, the majority's critique of the findings here ignores one of those findings' most significant characteristics. A year after the Senate Report that the majority faults, Congress enacted VAWA upon receipt from the Conference Committee of findings (which were originally included in the statute itself) that gender-based violence has a "substantial adverse effect on interstate commerce." H.R. Conf. Rep. No. 103-711, at 385 (emphasis added). That Congress made these express findings prior to the issuance of Lopez, when the importance of congressional findings that regulated activity has a "substantial" effect on interstate commerce had not yet been explicated, plainly demonstrates just how strong Congress found the link between gender-based violence and interstate commerce to be.

The majority further claims that findings and evidence of the effects of gender-based violence on the national economy are irrelevant because they do not "describe the effects of gender-motivated violence on interstate commerce." Ante, at 50. The Commerce Clause, however, pertains to more than just interstate commerce; it gives Congress a plenary power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This broad provision of authority encompasses the power to regulate problems affecting the national economy as a whole. The Commerce Clause does not render "the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy. Rather it is an affirmative power commensurate with national needs." North American Co. v. SEC, 327 U.S. 686, 705 (1946). Thus, the mere fact that a statute addresses a problem affecting the national economy in general, rather than interstate commerce in particular, does not deprive Congress of the authority to enact it under the Commerce Clause.

The majority eventually concedes that VAWA's "legislative record" demonstrates "that violence against women is a sobering problem . . . that . . . ultimately does take a toll on the national economy" and "supports an inference that some portion of this violence,

181

and the toll it exacts, is attributable to gender animus." <u>Ante</u>, at 52. Nonetheless, the majority holds that Congress exceeded its Commerce Clause authority in enacting VAWA. I cannot agree.

Proper application of the mandated rational basis standard of judicial review simply does not permit the result reached by the majority. That standard requires us to answer a single question: did Congress have a rational basis for finding, as it expressly did, that serious violence motivated by gender animus has "a substantial adverse affect on interstate commerce by deterring potential victims from traveling interstate, from engaging in employment in interstate commerce, and from transacting with business, and in places involved, in interstate commerce . . ., by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." H. R. Conf. Rep. No. 103-711, at 385. Congress so found only after four years of hearings and consideration of massive amounts of testimony, statistics, and other evidence. Analysis of this legislative record unquestionably demonstrates that each one of Congress's findings as to the substantial, deleterious impact of gender-based violence on interstate commerce is grounded in abundant evidence. In fact, it is hard to envision more careful legislative consideration, a more complete legislative record, or more amply supported legislative findings. In light of the voluminous, persuasive record and the extensive deliberation supporting Subtitle C, my independent evaluation of Congress's "legislative judgment," <u>Lopez</u>, 514 U.S. at 563, compels me to conclude that Congress had a rational basis for finding that gender-based violence substantially affects interstate commerce.[5]

_____

[5] The majority contends that in reaching this conclusion I have failed to engage in any "independent analysis of whether gender-motivated violence substantially affects interstate commerce." <u>Ante</u>, 66. First, I note that this criticism epitomizes the majority's flawed approach to the question before us -- judges are <u>not</u> to determine in the first instance whether a regulated activity substantially affects interstate commerce. Rather, they are, as the <u>Lopez</u> Court directed, "to evaluate the <u>legislative judgment</u> that the activity in question substantially affected interstate commerce." <u>Lopez</u>, 514 U.S. at 563 (emphasis added).

Second, the majority's criticism that I have failed to make any "independent analysis" would only be valid if "independent analysis" required

182

Supreme Court precedent well supports this conclusion. Certainly legislators could rationally find that the impact of gender-motivated violence on interstate commerce was at least as substantial as the impact of growing wheat for home consumption, see Wickard v. Filburn, 317 U.S. 111, 125 (1942) ("even if .. . activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"), or racial discrimination, see McClung, 379 U.S. at 304 (Congress had a "rational basis" for believing that racial discrimination by local (non-chain) restaurants located in a single state affected interstate commerce), or local loansharking, see Perez, 402 U.S. at 156 (Congress rationally concluded that local loansharking affects interstate commerce because it supports "organized crime," which "exacts millions from the pockets of people"). As the Supreme Court explained in Heart of Atlanta Motel, "if it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." 379 U.S. at 258 (internal citation omitted).

Given Congress's clear finding that gender-based violence has a substantial effect on interstate commerce, the compelling evidence in the legislative record supporting that finding, and the fact that the challenged statute in no way interferes with state action on matters of

_____

one to disagree with Congress. The majority offers no support for such a notion, and there is none. In fact, Supreme Court precedent demonstrates that if a court, after evaluating a statute and its legislative record, finds that it agrees with Congress's legislative judgment that a regulated activity substantially affects interstate commerce, the opinion of the court need only identify the relevant portions of the legislative record and state the court's conclusion that the legislative judgment made by Congress had a rational basis. See, e.g., Hodel, 452 U.S. at 277-80 (describing legislative record and then stating, "[i]n light of the evidence available to Congress and the detailed consideration that the legislation received, we cannot say that Congress did not have a rational basis for concluding that surface coal mining has substantial effects on interstate commerce"); Heart of Atlanta, 379 U.S. at 252-53 (citing evidence in legislative record, in the absence of any findings, and then stating "the voluminous testimony presents overwhelming evidence that discrimination by hotels and motels impedes interstate travel"). I have done precisely that here.

183

traditional state concern, it seems to me that a court can only uphold Subtitle C. Significantly, every court to consider the question, except the majority and the court below, has reached the same conclusion. See Liu v. Striuli, ___ F. Supp.2d. ___, 1999 WL 24961 (D.R.I. 1999); Ziegler v. Ziegler, 28 F. Supp.2d. 601 (E.D. Wash. 1998); Crisonino v. New York City Housing Auth., 985 F. Supp. 385 (S.D.N.Y. 1997); Anisimov v. Lake, 982 F. Supp. 531 (N.D. Ill. 1997); Seaton v. Seaton, 971 F. Supp. 1188 (E.D. Tenn. 1997); Doe v. Hartz, 970 F. Supp. 1375 (N.D. Iowa 1997), rev'd on other grounds, 134 F.3d 1339 (8th Cir. 1998); Doe v. Doe, 929 F. Supp. 608 (D. Conn. 1996); Timm v. DeLong, No. 8:98CV43 (D. Neb. June 22, 1998); Mattison v. Glick Corp. of America, Inc., Civ. A. No. 97-CV-2736, 1998 WL 32597 (E.D. Pa. Jan. 27, 1998).[6]

C.

The length and the prolixity of the majority opinion fail to mask the deep flaws in its rationale for invalidating Subtitle C. The majority creates an unprecedented new rule of law and relies upon fundamentally unsound notions of both the judicial function and the demands of federalism.

1.

Perhaps the most obvious of the majority's errors is its creation of a new rule that confines Congress's power under the Commerce Clause to either the direct regulation of economic activities or the enactment of statutes containing jurisdictional elements. This new rule depends upon a distorted view of Lopez and a cavalier disregard for the Supreme Court's other Commerce Clause precedents. Moreover, the majority's contention that this new rule justifies its holding demonstrates a serious misunderstanding of the statute before us.

_____

[6] Other courts have, without discussion of the constitutional question, held that a plaintiff has stated a valid cause of action under Subtitle C and so refused to grant defendants' motions to dismiss. See, e.g., Kuhn v. Kuhn, No. 98 C 2395, 1998 WL 673629 (N.D. Ill. Sept. 16, 1998); see also Wesley v. Don Stein Buick, Inc., 985 F. Supp. 1288, 1300-01 (D. Kan. 1997) (permitting plaintiff to amend her complaint to state a claim under Subtitle C without reaching the constitutional question).

184

Under the governing caselaw, including Lopez, Congress clearly had the authority to enact Subtitle C under the Commerce Clause.

The majority cites Lopez as the source for its rule that Commerce Clause legislation is unconstitutional unless it regulates economic activities or contains a jurisdictional element. Lopez, the majority contends, "expressly held that because the Gun-Free School Zones Act `neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce,'" ante, at 16 (quoting Lopez, 514 U.S. at 551) (emphasis added), "it exceed[ed] the authority of Congress `to regulate . . . Commerce among the several States,'" id. (quoting U.S. Const. art. I, § 8, cl. 3). See also ante, at 20-25.

Notwithstanding the frequency and vehemence with which the majority makes this assertion, it constitutes a fundamental mischaracterization of the Supreme Court's decision. To be sure, Lopez held that the GFSZA did not regulate a "commercial activity" or "contain [ ] a requirement [i.e., a jurisdictional element] that the possession be connected in any way to interstate commerce." Lopez, 514 U.S. at 551. But the Lopez Court never held that the challenged statute exceeded Congress's authority because it did not fit into one of these categories. If the Lopez Court had struck down the GFSZA for these reasons alone, its opinion would have ended after discussion of these two issues at 514 U.S. at 562. Instead, the Court continued -- for an additional six pages -- to evaluate whether one could rationally conclude that possession of a gun in a school zone substantially affected interstate commerce. Lopez, 514 U.S. at 562-68. The Court only invalidated the GFSZA after pointing out the lack of congressional findings establishing a substantial effect on interstate commerce, after noting that the statute displaced state policy choices in an area of traditional state concern, and after considering and rejecting the Government's arguments.

A new rule restricting Congress's power under the Commerce Clause to regulating economic activity or enacting statutes containing jurisdictional elements undeniably conflicts with the pre-existing Commerce Clause jurisprudence that the Lopez Court approved. The Lopez Court quoted Wickard v. Filburn's famous teaching that "even if appellee's activity be local and though it may not be regarded as

185

commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." 317 U.S. at 125 (emphasis added), quoted in Lopez , 514 U.S. at 556. That statement simply cannot be reconciled with the majority's new rule.

Similarly, in NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937), which was also approved in Lopez, the Supreme Court explained that

> [t]he fundamental principle is that the power to regulate commerce is the power to enact "all appropriate legislation" for "its protection and advancement." . . . That power is plenary and may be exerted to protect interstate commerce "no matter what the source of the dangers which threaten it."

Id. at 36-37 (emphasis added) (citations omitted); see also Heart of Atlanta Motel, 379 U.S. at 258 ("The power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce." (emphasis added)). It is this power -- the power to protect, advance, and promote commerce -- that Congress invoked in passing Subtitle C. See also Goetz v. Glickman , 149 F.3d 1131, 1137 (10th Cir. 1998) (rejecting argument that "Congress' commerce power is limited to restricting or prohibiting an activity," concluding "`[i]t is now indisputable that the power to regulate interstate commerce includes the power to promote interstate commerce'") (quoting United States v. Frame, 885 F.2d 1119, 1126 (3d Cir. 1989)).

In arguing that Subtitle C is unconstitutional because it does not directly regulate economic activity, the majority slights these principles and ignores the expressly-stated purpose of the statute: "to promote . . . activities affecting interstate commerce by establishing a Federal civil rights cause of action for victims of crimes of violence motivated by gender." 42 U.S.C. § 13981(a) (emphasis added). The legislative record identifies these "activities" as including interstate travel, access to health care services, employment in general, the employment of victims of gender-based violence in particular, and -- more particularly still -- the employment of such individuals in cer-

186

tain sectors of the economy. In Subtitle C, Congress legislated against gender-based violence under the Commerce Clause as a means of "protection and advancement" of these and other economic activities. See Jones & Laughlin, 301 U.S. at 36-37.

The fact that in enacting Subtitle C Congress was also legislating against a moral wrong renders the enactment "no less valid" under the Commerce Clause. See Heart of Atlanta Motel, 379 U.S. at 257. That a statute was not explicitly meant "to increase the gross national product by removing a barrier to free trade, but rather to protect personal safety and property rights, is irrelevant [because] Congress can regulate interstate commerce for any lawful motive." United States v. Soderna, 82 F.3d 1370, 1374 (7th Cir. 1996) (Posner, C.J.); see also United States v. Weslin, 156 F.3d 292, 296 (2d Cir. 1998) ("it does not matter whether Congress's motive in enacting the statute was commercial, noncommercial, or mixed. For Congress may regulate interstate commerce for any purpose not affirmatively forbidden by the Constitution").

In sum, established precedent renders the majority's contention that gender-based violence itself is not an economic activity simply beside the point. In an effort to escape this precedent, the majority suggests that Lopez heralds a new era of Commerce Clause jurisprudence in which courts will flyspeck congressional judgments, striking them down if they do not regulate a sufficiently economic activity or do not contain a jurisdictional element. That is certainly not what the Lopez Court said. As an inferior court, we must follow what the Supreme Court says, not what we believe, or hope, its opinions foreordain.

The Lopez Court said that the GFSZA "plow[ed] thoroughly new ground and represent[ed] a sharp break with the long-standing pattern of federal firearms legislation," 514 U.S. at 563 (internal quotation marks omitted), indicating that it was enunciating what two members of the five person majority expressly stated was a"limited holding," id. at 568 (Kennedy, J., concurring). Of course, the Lopez Court did refuse to make an "additional expansion" of Congress's commerce power to uphold the GFSZA, and it clarified that a regulated activity must "substantially" affect interstate commerce. But as the majority itself apparently acknowledges, ante, at 61, the Lopez Court did not overrule a single Commerce Clause precedent. Nor, as detailed

187

within, see infra, at 193-194, did it abandon the "rational basis" test. Id. at 557-68; see also United States v. Hartsell, 127 F.3d 343, 348 n.1 (4th Cir. 1997) (Lopez is not "a radical sea change which invalidates the decades of Commerce Clause analysis"); United States v. Wright, 117 F.3d 1265, 1269 (11th Cir. 1997) ("Lopez did not alter our approach to determining whether a particular statute falls within the scope of Congress's Commerce Clause authority"), vacated in part on other grounds, 133 F.3d 1412 (11th Cir. 1998); United States v. Wilson, 73 F.3d 675, 685 (7th Cir. 1995)(the Lopez Court "reaffirmed, rather than overturned, the previous half century of Commerce Clause precedent").

Rather, in describing the history of the Court's Commerce Clause jurisprudence, Lopez forthrightly embraced the modern expansive view of Congress's power under the Commerce Clause, and eschewed the more restrictive view of "commerce" that relied on formalistic distinctions. Id. at 555. Justice Kennedy's concurrence specifically warned us not to seek "mathematical or rigid formulas" for deciding the constitutionality of statutes under the Commerce Clause. 514 U.S. at 573 (Kennedy, J., concurring) (citing Wickard , 317 U.S. at 123 n.24). The concurrence also cautioned against a strict requirement that the regulated activity itself be connected with commerce, noting that the history of the Supreme Court's Commerce Clause jurisprudence demonstrates the "imprecision of content-based boundaries used without more to define the limits of the Commerce Clause." Id. at 574 (Kennedy, J., concurring). Yet the majority's new rule mandates the use of precisely such rigid requirements and "content-based boundar-[ies]."

The majority's attempt to distinguish the case at hand from Hoffman, 126 F.3d 575, in which this court recently held the Freedom of Access to Clinic Entrances Act (FACE) to be within Congress's Commerce Clause authority, tellingly demonstrates the problems with such formalistic rules. FACE contains no jurisdictional element and, as we pointed out, "the activity regulated" was "not itself economic or commercial." Id. at 587. Rather the regulated conduct, like the activity regulated by Subtitle C, was identified as the "use of force" or the "threat of force" that sufficiently affects interstate commerce. Id. Thus, FACE patently does not satisfy the majority's new rule, which restricts Congress's Commerce Clause authority to enactment

188

of statutes with jurisdictional elements or regulations of economic activity.

Implicitly recognizing this, the majority slips in an exception to its rule for regulation of non-economic activity that has a "meaningful connection" with "specific" economic activities. Ante, at 21. It claims that, unlike protests at abortion clinics, gender-based violence lacks such a connection. Id. But Congress expressly found that gender-based violence does affect specific economic activities, e.g., the participation of its victims in the labor market and the provision of health care services, and that the connection of gender-based violence to these activities is "meaningful" both in particular instances and in the aggregate.

The majority's rule thus forces it to contend that these economic activities are insufficiently "specific" and that the effect of gender-based violence upon such activities is insufficiently "direct." Id. at 21, 27. Such specificity and directness requirements find no support in the governing "substantially affects" test, however. Indeed, the majority's requirement that the activity be "specific" conflicts with that test; it suggests that once an activity affecting commerce becomes widespread enough to be "general," its effects somehow become insufficiently "substantial" to justify an exercise of the Commerce Clause power. Moreover, as noted in Lopez, the Supreme Court "departed from the distinction between `direct' and `indirect' effects on interstate commerce" in 1937 in Jones & Laughlin , 301 U.S. 1, and has never returned to such distinctions because they"artificially [ ] constrain[ ] the authority of Congress to regulate interstate commerce." Lopez, 514 U.S. at 555-56. The majority opinion amply proves the wisdom of the Lopez Court's rejection of such rigid and technical tests for determining constitutionality under the Commerce Clause; as the majority's difficulty with its own formula shows, such tests lead only to a proliferation of dubious distinctions.

The majority's new rule also conflicts with the Supreme Court's specific holding, subsequent to Lopez, that an activity need not be commercial in character in order to come within the scope of the Commerce Clause. Just two terms ago, in Camps New-found/Owatonna, Inc. v. Town of Harrison, 117 S. Ct. 1590 (1997), the Court held that a state law adversely affecting a nonprofit camp

189

violated the dormant Commerce Clause. At the outset of its analysis the Camps Court noted that the "reasoning" of cases involving "Congress' affirmative Commerce Clause powers" also applied in the context of the dormant Commerce Clause. Id. at 1597. The Court then rejected arguments made by those defending the statute "that the dormant Commerce Clause is inapplicable [ ] because the campers are not `articles of commerce' or more generally that interstate commerce is not at issue here." Id. The critical inquiry was not whether campers constituted "articles of commerce" or whether attending camp constituted an economic activity; rather, the challenged statute implicated the Commerce Clause because the services provided by the camp "clearly ha[d] a substantial effect on interstate commerce." Id.

Not only is the majority's new rule without precedent, the premises underlying that rule are seriously misconceived. The majority contends that gender-based violence is "a type of crime relatively unlikely to have any economic character at all." Ante, at 21. See also id. at 22. This argument only makes sense if one utterly ignores the effects of gender-based violence and instead focuses entirely on the motives of its perpetrators. There is, however, no reason to define the character of a crime by reference only to the actor's motive. Such reasoning leads to incongruous results. For example, arson is clearly a property crime, but on the majority's rationale it would not be considered as such in cases where the perpetrator had no interest in destroying anything, but only wanted to see the flames.

Moreover, the majority's implicit claim that gender-based harm to persons is insufficiently economic to be regulable under the commerce power involves a disturbing anomaly, as recent events demonstrate. A few months ago in Baltimore, an apparent victim of gender-based violence was found locked in the trunk of a car, which had been set on fire. The majority's approach would appear to give Congress the authority, under the Commerce Clause, to provide a remedy for the damage done to the car, but not for the victim's medical expenses, lost wages, or other damages.**7**

_____

**7** The distinction between harm to property and harm to persons is not merely a hypothetical one here; rather it is directly relevant to the scope of the majority's holding, because Subtitle C applies to property damage

In sum, the majority has created a new and troubling rule out of whole cloth. Lopez cannot be fairly read to restrict congressional authority under the Commerce Clause to regulation of economic activities and enactment of statutes containing a jurisdictional element. Indeed, Supreme Court precedent, including Lopez, rejects the use of such rigid, formalistic rules. The core teaching of Lopez remains true to the Court's prior and subsequent precedent: Congress must ensure that legislation enacted pursuant to its Commerce Clause authority reaches only activities that "substantially affect interstate commerce," and the courts must ensure that Congress has performed this constitutional obligation in a rational manner.

2.

The majority's second fundamental mistake results from its absolute refusal to recognize our restricted role as judges. Due to this error, the majority fails to apply the correct standard of judicial review and to give proper deference to the legislative judgment challenged here.

The Constitution creates a government of separated powers, in which legislative authority is allocated to Congress. Courts can, of course, refuse to give effect to an otherwise properly enacted law if they find it inconsistent with the Constitution. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-78 (1803). But to prevent this mighty judicial power from engulfing and ultimately eliminating the

_____

as well. It is difficult to see how the majority's rationale about economic activities could apply to this aspect of the statute. Could one honestly say that a statute, which provides a remedy for property damage caused by gender-based violence, regulates an activity that is insufficiently economic to come within the commerce power? One could only do so by falling back on unfounded categorical assertions that violence, or at least gender-based violence, is not an economic activity. One certainly could not say that a statute providing a remedy for gender-based property damage regulates "a type of crime relatively unlikely to have any economic character at all." Ante, at 21. This aspect of Subtitle C would thus seem to be unaffected by the court's opinion today. Yet the majority purports to invalidate Subtitle C in its entirety.

191

legislative powers reserved to Congress, the Supreme Court has established that acts of Congress are entitled to a strong presumption of constitutionality. See Flemming v. Nestor, 363 U.S. 603, 617 (1960).

Chief Justice Rehnquist, the author of the principal opinion in Lopez, has elaborated upon this rule of judicial restraint, noting that because "[j]udging the constitutionality of an Act of Congress is properly considered the gravest and most delicate duty that this Court is called upon to perform," constitutional review of a statute begins with "deference" to the "duly enacted and carefully considered decision of a coequal and representative branch of our Government." Walters v. National Ass'n of Radiation Survivors, 473 U.S. 305, 319 (1985) (internal quotation marks omitted). The Chief Justice has further explained that such deference is only appropriate because a court "must have due regard to the fact that [it] is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government." Rostker v. Goldberg, 453 U.S. 57, 64 (1981) (internal quotation marks omitted) (emphasis added). Justice Kennedy, concurring in Lopez, similarly noted that "the sworn obligation to preserve and protect the Constitution in maintaining the federal balance" belongs "in the first and primary instance" to the legislative and executive branches, not the judiciary. Lopez , 514 U.S. at 577 (Kennedy, J., concurring) (emphasis added).

As the opening words of its opinion demonstrate, the majority steadfastly refuses to recognize the constraints placed upon the judiciary by the separation of powers. In purporting to act on behalf of "We the People" in striking Subtitle C -- an act of the people's duly elected legislature -- the majority seeks to augment its limited judicial authority with a representative authority that it does not in fact possess. Indeed, the majority's resort to this kind of rhetoric constitutes an implicit acknowledgment that an unelected, unaccountable federal court could not, on its own power, properly invalidate Subtitle C.

Although the majority attempts to echo the Lopez Court by invoking "foundational" principles to justify its holding, the Lopez Court expressly recognized that maintenance of the proper balance of power requires respect for more than one such principle:"Just as the separa-

192

tion and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." Lopez, 514 U.S. at 552 (quoting Gregory v. Ashcroft, 501 U.S. 452, 458 (1991)). Thus, while the Supreme Court in Lopez recognized that both separation of powers and federalism are foundational or first principles, the majority utterly ignores the former in an effort to elevate the latter. Compare ante, at 5-6, with Lopez, 514 U.S. at 552.

The majority manifests its lack of respect for the separation of powers by refusing to apply the rational basis standard of review, even though it assertedly recognizes that this standard controls here. See ante, at 67.**8** Indeed, the majority complains about the "incessant invocations" of this standard by Brzonkala and the Government. Ante, at 66. It seems natural, however, to refer frequently to the governing standard of judicial review in a case, like this one, in which application of that standard is critical. Moreover, the parties do no more than quote and follow the Supreme Court, which has consistently (not to say incessantly) invoked precisely this standard. See, e.g., Preseault, 494 U.S. at 17 (deference to congressional findings of sufficient effect on interstate commerce is required if there is " any rational basis for such a finding") (emphasis added); Hodel, 452 U.S. at 277 (when "Congress has determined that an activity affects interstate commerce, the courts need only inquire whether the finding is rational") (emphasis added); McClung, 379 U.S. at 303-04 (after a court determines that Congress had "a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce" the court's "investigation is at an end") (emphasis added).

Although the Lopez Court did clarify that activity must "substantially" affect interstate commerce in order for Congress to regulate it under the Commerce Clause, the Court did not in any way retreat from the well-established rational basis standard of judicial review. To the contrary, the Lopez Court explained that since Jones &

_____

**8** The majority also maintains that I do not apply the rational basis standard and that it does. See ante, at 67-68. I am content to let the reader judge.

193

Laughlin, 301 U.S. 1 -- which both recognized a "greatly expanded" view of Congress's power under the Commerce Clause and warned that this power is "subject to outer limits"-- the Supreme Court "has heeded this warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." Lopez, 514 U.S. at 556-57 (emphasis added) (citing Hodel, Perez, McClung, and Heart of Atlanta Motel).

In refusing to apply the rational basis standard, the majority stands alone. Every one of our sister circuits to consider a post-Lopez Commerce Clause challenge, as well as this court itself in an earlier case, has respected and applied the rational basis standard to uphold a wide range of federal statutes. See United States v. Franklyn, 157 F.3d 90, 93 (2d Cir.) cert. denied, 119 S. Ct. 563 (1998) (upholding 18 U.S.C. § 922(o), which criminalizes the possession or transfer of handguns); United States v. Cardoza, 129 F.3d 6, 11-13 (1st Cir. 1997) (upholding Youth Handgun Safety Act); Hoffman v. Hunt , 126 F.3d 575, 584-88 (4th Cir. 1997) (upholding Freedom of Access to Clinic Entrances Act (FACE)); United States v. Knutson, 113 F.3d 27 (5th Cir. 1997) (upholding 18 U.S.C. § 922(o) criminalizing the possession or transfer of machine guns); United States v. Parker , 108 F.3d 28, 29-31 (3d Cir.) (reversing district court and upholding Child Support Recovery Act), cert. denied, 118 S. Ct. 111 (1997); United States v. Olin Corp., 107 F.3d 1506, 1509-11 (11th Cir. 1997) (upholding CERCLA); United States v. Bramble, 103 F.3d 1475, 1482 (9th Cir. 1996) (upholding Eagle Protection Act); Terry v. Reno , 101 F.3d 1412, 1415-18 (D.C. Cir. 1996) (upholding FACE), cert. denied, 117 S. Ct. 2431 (1997); Proyect v. United States, 101 F.3d 11, 12-14 (2d Cir. 1996) (upholding Comprehensive Drug Abuse Prevention and Control Act); United States v. McHenry, 97 F.3d 125, 128-29 (6th Cir. 1996) (upholding the Anti Car Theft Act), cert. denied, 117 S. Ct. 992 (1997; United States v. Hampshire, 95 F.3d 999, 1001-04 (10th Cir. 1996) (upholding Child Support Recovery Act), cert. denied, 117 S. Ct. 753 (1997); United States v. Kenney , 91 F.3d 884, 889-91 (7th Cir. 1996) (upholding 18 U.S.C. § 922(o)); United States v. Dinwiddie, 76 F.3d 913, 920 (8th Cir.) (upholding FACE), cert. denied, 117 S. Ct. 613 (1996).

Because it refuses to apply the rational basis standard, the majority fails to give appropriate deference to the abundant and well-supported

194

congressional findings demonstrating that gender- motivated violence has the requisite effect on interstate commerce. The majority itself acknowledges that "a healthy degree of judicial deference to reasonable legislative judgments of fact" is appropriate, but then asserts that the parties' invocation of rational basis review contemplates a "deference indistinguishable from judicial abdication," and refuses to defer in any way to the compelling findings here. Ante, at 66. Even if the parties have oversold the necessary deference, and that is not clear to me, a court must nonetheless defer to rational congressional findings. This is required because we are, as the Chief Justice explained, "not exercising a primary judgment," Rostker, 453 U.S. at 64, but rather reviewing the "carefully considered decision of a coequal and representative branch of our Government," Walters , 473 U.S. at 319. Deference to these legislative judgments, not disregard of them, constitutes the "paradigm of judicial restraint." FCC v. Beach Communications, Inc., 508 U.S. 307, 314 (1993). Compare ante, at 122-137 (Wilkinson, C.J., concurring).

Congressional findings are significant, not for some formalistic or procedural reason, cf. ante, at 40-49, but because they clearly state Congress's contemporaneous judgment as to the need, scope, and basis for the law that it is enacting. The statute itself articulates the existence of a congressional judgment of constitutionality, while findings articulate the content of that judgment. We defer to the former out of respect for the primary legislative power and sworn responsibility of Congress under the constitution, Rostker, 453 U.S. at 64, and we grant an additional measure of deference to the latter in recognition of Congress's status as a coequal, deliberative body whose determinations are presumed to be rational, Walters , 473 U.S. at 319. Where Congress has supported a statute with an explicitly articulated rationale asserting its constitutionality, therefore, invalidation of the statute constitutes not just the correction of a possibly inadvertent congressional overestimate of its competence, but rather a direct repudiation of Congress's full authority.

In Lopez, of course, the Court had no congressional findings to which to defer. But nothing in Lopez suggests that when Congress has considered a matter and made a rational finding of constitutionality -- let alone an explicit finding based on a massive congressional record, as in this case -- a court should not defer to that finding. On

195

the contrary, the Lopez Court noted that consideration of congressional findings is "of course" part of the proper judicial inquiry. Lopez, 514 U.S. at 562. In support of that statement, the Lopez Court cited Preseault, 494 U.S. at 17, in which the Court expressly explained that "we must defer to a congressional finding that a regulated activity affects interstate commerce if there is any rational basis for such a finding." (internal quotation marks omitted).

Nonetheless, the majority suggests that the complete absence of congressional findings did not in any way impact the Lopez Court's decision to invalidate the GFSZA. See ante, at 41-49. The majority is almost forced to take this position because, if congressional findings are, as I believe, important, then the stunning lack of any findings supporting the GFSZA presents a formidable problem for the majority's position. In contrast to Subtitle C, in which Congress compiled an enormous factual record and left nothing to guesswork, in the GFSZA Congress left everything -- the necessity for the legislation, the rationale supporting it, the connection between gun possession near schools and interstate commerce, even the source of Congress's power -- to conjecture.

The GFSZA was enacted as part of the Crime Control Act of 1990, Pub. L. No. 101-647, § 1702, 104 Stat. 4844. The House Report on the Crime Control Act states its purpose in the most general terms, as provision of "a legislative response to various aspects of the problem of crime in the United States." H.R. Rep. No. 101-681(I), at 69 (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6473. This report does not even mention the GFSZA, let alone explain how possession of a gun within 1000 feet of a school affects interstate commerce. Congress held a single subcommittee hearing on GFSZA; witnesses testified as to "tragic instances of gun violence in our schools," but no one mentioned "the effect of such violence upon interstate commerce" -- not even a floor statement attempted to explain the constitutional basis for the statute. United States v. Lopez , 2 F.3d 1342, 1359 (5th Cir. 1993), aff'd, 514 U.S. 549 (1995).

The lack of congressional findings served as the justification for the Fifth Circuit's refusal to uphold the GFSZA. Id. Although the Supreme Court did not affirm the Fifth Circuit on this basis, the Court did find the lack of legislative findings significant. First, the Court

196

remarked on the Government's "conce[ssion] that `[n]either the statute nor its legislative history contain[s] express congressional findings.'" Lopez, 514 U.S. at 562 (quoting Brief for United States at 5-6). Then the Court noted that although such findings "normally [are] not required," they do assist a court. Id. Such findings, the Court explained, "enable [a court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no substantial effect was visible to the naked eye." Id. at 563.

Nevertheless, the majority maintains that the Lopez Court's "lucid recitation" of the "arguments" made by the Government and dissent in that case eliminated any need for congressional findings. Ante, at 42. Alternatively, the majority claims that if the Lopez Court's decision "turned on" the lack of congressional findings, it could and would have consulted findings that Congress made after the statute had been challenged. Id.

These contentions present multiple problems. If the Supreme Court truly regarded the lack of congressional findings in the GFSZA to be of no import, why did the Court comment on the assistance such legislative findings provide the judiciary? See Lopez, 514 U.S. at 562. Why did the Court note the lack of findings in the GFSZA? Id. Why did the Court point out that the Government did "not rely upon [ ] subsequent [congressional] findings as a substitute for the absence of findings in the first instance"? Id. at 563 n.4 (emphasis added). And why did the Court also hold that it would not import "previous findings to justify" the GFSZA? Id. at 563.

As indicated above, supra, at 195, congressional findings submitted upon passage of legislation simply are not the same as the arguments of lawyers, even government lawyers, after a law has been challenged in the courts. For example, in United States v. Bass, 404 U.S. 336 (1971), the government lawyers argued that in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 1202(a), 82 Stat. 197, 236 (1968), Congress validly exercised its Commerce Clause authority to criminalize possession of a firearm by a felon. Neither the statutory language nor any Congressional findings so stated. For this reason, the Supreme Court refused to "adopt this broad reading" of the statute and instead construed it to require a con-

197

nection with interstate commerce. Id. at 339. However, the Court expressly reserved the question of whether the result would be different if Congress had made appropriate findings, noting that "[i]n light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally punish the `mere possession' of firearms." Id. n.4 (emphasis added).

In sum, the Supreme Court has directed that, in deciding whether a statute was properly enacted under the Commerce Clause, a court must apply a rational basis standard of judicial review, deferring -- not abdicating but deferring -- to rationally based congressional findings that the regulated activity substantially affects interstate commerce. This means that when Congress makes findings, a court carefully examines them, but only to determine if they have a rational basis. The sole ground for rejecting legislative findings is, therefore, that they lack any rational basis.**9**

In order to strike down Subtitle C, the majority must ignore our restricted role in assessing a challenge to Congress's Commerce Clause power, refuse to follow the prescribed rational basis standard of judicial review, and deny the deference due to Congress's clear and amply supported findings.

_____

**9** Post-Lopez, our sister circuits have often reiterated that "court[s] must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." Terry, 101 F.3d at 1416; accord Proyect, 101 F.3d at 12-13; United States v. McKinney, 98 F.3d 974, 979 (7th Cir. 1996); Hampshire, 95 F.3d at 1004; United States v. Kim, 94 F.3d 1247, 1250 (9th Cir. 1996); United States v. Bishop, 66 F.3d 569, 576-77 (3d Cir. 1995); Cheffer v. Reno, 55 F.3d 1517, 1520-21 (11th Cir. 1995); see also Knutson, 113 F.3d at 29-31 (upholding 18 U.S.C. § 922(o) solely on the basis of "congressional findings" and noting that Lopez "made clear that federal Commerce Clause legislation continues to merit a high degree of judicial deference"); United States v. Monteleone, 77 F.3d 1086, 1091-92 (8th Cir. 1996) (upholding 18 U.S.C. § 922(d) on the basis of "explicit Congressional findings"). Moreover, in Leshuk, 65 F.3d at 112, this court upheld the Comprehensive Drug Abuse Prevention and Control Act principally on the basis of Congress's detailed findings.

198

3.

Finally, the majority errs by profoundly misunderstanding the nature and extent of the proper limits imposed by federalism concerns on Congress's commerce power. Whether considered as part of the substantially affects tests, see Lopez, 514 U.S. 549, or as a separate inquiry, see New York v. United States, 505 U.S. 144 (1992), federalism concerns do not justify invalidation of Subtitle C. The Founders provided Congress with a broad and far-ranging power to regulate interstate commerce, but they restrained that power by locating it within an explicit constitutional system that depends upon two spheres of government -- state and federal -- to represent the interests of, and be accountable to, the people. The majority disregards this careful scheme of structural limitations and seeks to place additional and unprecedented constraints on Congress. Subtitle C, which legislates in an area of traditional congressional expertise, and does not interfere with or usurp any state authority, fits comfortably within the proper federalism-based limits on Congress's Commerce Clause power.

The Constitution allocates to Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. 1,§ 8, cl. 3. The Founders intended this power to be extensive in order to remedy the "defect of power in the existing Confederacy to regulate the commerce between its several members." The Federalist No. 42, at 267 (James Madison) (Clinton Rossiter ed., 1961). From the outset, the Supreme Court recognized the extent of this power, holding it "complete in itself," and to "be exercised to its utmost extent." Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196 (1824). This statement of Chief Justice Marshall in Ogden is "understood now as an early and authoritative recognition that the Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise." Lopez, 514 U.S. at 568 (Kennedy, J., concurring). At the same time, however, the Founders established judicially-enforceable limits on Congress's commerce authority.

The most important of these, and the one at issue here, is the limit arising from the structure of the government established by the Constitution -- a federal government composed of sovereign states. In

199

<u>Ogden</u> itself, Chief Justice Marshall recognized that the central structural concern in Commerce Clause cases is the capacity of different government entities to represent the interests of the people:

> If, as has always been understood, the sovereignty of congress, though limited to specific objects, is plenary as to those objects, the power over commerce . . . is vested in congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. The wisdom and the discretion of congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from abuse. They are the restraints on which the people must often rely solely, in all representative governments.

<u>Gibbons</u>, 22 U.S. at 197. Far from disavowing this principle, the Supreme Court in modern times has expressly embraced it:

> [T]he fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect "States as States" is one of process rather than one of result. Any substantive restraint on the exercise of the Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a "sacred province of state autonomy."

<u>Garcia v. San Antonio Metro. Transit Auth.</u>, 469 U.S. 528, 554 (1985).**10**

_____

**10** The majority scolds me for citing and quoting <u>Garcia v. San Antonio Metro. Transit</u>, 469 U.S. 528 (1985), because then-Justice Rehnquist and Justice O'Connor, in their dissents in that case, predicted that it would one day be overruled so that the Court could resume its "constitutional responsibility to oversee the Federal Government's compliance with its duty to respect the legitimate interests of the States." <u>Ante</u>, at 74 (quoting <u>Garcia</u>, 469 U.S. at 589 (O'Connor, J., dissenting)) (internal quotation marks omitted). <u>Garcia</u>, however, remains the law of the land, and treat-

200

Chief Justice Marshall and the Garcia Court thus explained that, because our government is a representative one, limits on a power as broad and important as that conferred by the Commerce Clause normally must come from the Congress, which is constitutionally designed to respond most sensitively to the will of the people, rather than from the unelected federal judiciary.

But neither in the nineteenth nor in the twentieth century has the Supreme Court counseled absolute judicial acquiescence to Congress's Commerce Clause legislation. Although, as Justice Marshall's language in Ogden implies, 22 U.S. at 197, Congress's capacity to represent "the people" is inherently superior to that of the courts, it is not inherently superior to that of state legislatures. The rationale for judicial deference to Commerce Clause legislation does not, therefore, apply as strongly to cases involving conflicts between federal and state authority as it does to cases in which a court has only its own view of what appropriately falls within the commerce power upon which to rely.

For this reason, courts reviewing Commerce Clause legislation

_____

ing it as such hardly constitutes "quaint innocence." Ante at 72. Furthermore, the emphasis placed on political accountability in cases like New York and Printz v. United States, 521 U.S. 98 (1997), conclusively demonstrates that the political process concerns articulated in Garcia have in fact proved to be more accommodating of an effective judicial role in protecting federalism than they initially appeared to be. Far from being "in blissful denial of the Court's most recent precedents on Our Federalism," ante, at 72, therefore, faithful adherence to those precedents requires courts to choose an approach deriving from considerations of representative authority and political process over a categorical approach of the sort that the majority adopts today. Finally, and most importantly, the majority's criticism of my use of Garcia rests on a fundamental misrepresentation of my position. Whatever the legal or totemic significance of Garcia, I nowhere maintain, and this dissent cannot fairly be read even to suggest, that "Congress alone is constitutionally responsible for the protection of the sovereign States." Ante , at 72. Rather, I repeatedly and expressly recognize that the courts, and not just Congress, have a definite obligation to ensure that our federal structure remains intact. See supra, at 199-200, and infra, at 201-204, 206-208, 212.

may appropriately take the relative representative abilities of the states and the federal government into account. Matters in which states may have the representational advantage include those in which community standards necessarily shape official regulation and those in which the development of a variety of approaches is preferable to a uniform national scheme. See, e.g., Gregory, 501 U.S. at 458 (noting that our federal structure makes government more "sensitive to the needs of a heterogeneous society" and "allows for [ ] innovation and experimentation in government"). Of course, dormant Commerce Clause doctrine teaches that a uniform national scheme must always be preferred with respect to regulations of certain kinds, and Lopez similarly suggests that when Congress regulates with respect to "commercial concerns that are central to the Commerce Clause," inevitably it is regulating activity that has a substantial effect on interstate commerce. Lopez, 514 U.S. at 583 (Kennedy, J., concurring).**11**

Another, more fundamental aspect of the judicially-enforceable limitation on the commerce power is a court's duty to ensure the proper functioning of the constitutional mechanisms that preserve the representative authority of the states within the national political process. See Garcia, 469 U.S. at 554. The Supreme Court's decision in

_____

**11** Thus, not only is federal regulation of this kind constitutional under the affirmative Commerce Clause, but also state regulation of this sort, if it benefits in-state interests and burdens out-of-state interests, is prohibited by the dormant Commerce Clause. A court reviewing such federal regulation need not weigh the representative capacity of a state legislature against that of Congress because, as the dormant Commerce Clause teaches, the value of state representative authority could not, in those circumstances, outweigh the value of national uniformity. A court, therefore, need only consider whether the states are better suited than Congress to regulate a certain subject if the states would be permitted to discriminate in favor of their own residents in regulating that subject. It is solely in this context -- that of identifying the class of cases in which a court can consider the possible representative superiority of the states -- that the question of whether the regulated activity is sufficiently commercial or "economic" becomes relevant. Contrary to the majority's assertions, there is no rule that Congress is prohibited from ever using the commerce power to regulate certain subjects-- for example, activities that the majority categorizes as "non-economic" -- just because they are not at the core of the Commerce Clause.

202

New York, 505 U.S. 144, represents an application of this principle. In that case, the Court struck down legislation designed to coerce states into regulating the disposal of radioactive waste in a particular fashion. The Court found the legislation unconstitutional in order to compensate for a possible failing in the national political process. By offering both state and federal officials a way to address the problem of toxic waste disposal without taking full responsibility for the unpopular task of selecting particular disposal sites, the challenged statute "raise[d] the possibility that powerful incentives might lead both federal and state officials to view departures from the federal structure to be in their personal interests." Id. at 182. Moreover, by obscuring accountability for the selection of disposal sites, the statute dampened the incentives that would otherwise operate to encourage these officials to protect state interests.

The New York Court recognized that the effectiveness of both state and federal governments as representative bodies suffers when citizens are confused about which sphere of government is responsible for the regulation of an activity. Id. at 168. The problem of political accountability will be most acute when, as with the statute at issue in New York, the federal government has effectively commandeered state authority:

> [W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation.

Id. at 169. The representative effectiveness of state and federal governments would also be impaired if "the Federal Government [were] to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities," because in this situation "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." Lopez, 514 U.S. at 577 (Kennedy, J., concurring).

203

Lopez, like New York, seeks to preserve the efficacy of both the states and the federal government as representative bodies. Seen in the broader context of the Supreme Court's decisions addressing federalism and the commerce power, Lopez stands for the proposition that Commerce Clause legislation may be unconstitutional if it directly supersedes official state action in an area of traditional state concern. In these circumstances, political accountability is definitively disrupted, the value of local expertise is lost, and the benefits of the development of a variety of approaches to a problem are forfeited.**12**

Despite its zeal to protect the rights of the states in the federal system, the majority utterly fails to recognize and respect these genuine

_____

**12** As Justice Kennedy suggested in Lopez, 514 U.S. at 577, history may often be relevant in determining whether a statute will impermissibly blur the lines of political accountability; the likelihood that citizens will become confused regarding which sphere of government is responsible for regulation of an activity will depend in part on which sphere has traditionally controlled it. History can also be a guide to the identification of areas in which states may be superior to Congress as representative entities. However, courts should not, indeed cannot, rule an act of Congress unconstitutional just because it regulates a matter historically governed by the states. Congress undeniably has the power to legislate in areas traditionally controlled by the states. See Gregory, 501 U.S. at 460. Moreover, as the Supreme Court has observed in the context of state immunity, history cannot reasonably be made dispositive on questions of federalism:

> The most obvious defect of a historical approach to state immunity is that it prevents a court from accommodating changes in the historical functions of States . . . . At the same time, the only apparent virtue of a rigorous historical standard, namely, its promise of a reasonably objective measure for state immunity, is illusory. Reliance on history as an organizing principle results in line-drawing of the most arbitrary sort; the genesis of state governmental functions stretches over a historical continuum from before the Revolution to the present, and courts would have to decide by fiat precisely how longstanding a pattern of state involvement had to be for federal regulatory authority to be defeated.

Garcia, 469 U.S. at 543-44. The same principles apply here.

federalism-based limitations. Instead it imposes its own unprece-
dented, formalistic limits on Congress's commerce power. In addition
to its rule about economic activities and jurisdictional elements, the
majority holds that Commerce Clause legislation is unconstitutional
unless the rationale connecting the regulated activity to commerce
contains a "principled" limitation. Lopez requires imposition of such
a limitation, the majority argues, because without it Congress's com-
merce power would become an unbridled police power. This argu-
ment fails on several grounds.

First, contrary to the majority's suggestion, neither Lopez nor any
other Supreme Court case mandates such a holding. Certainly the
Lopez Court found the lack of such limitations in the rationale sup-
porting the GFSZA to be one of the factors militating against its con-
stitutionality. 514 U.S. at 564-67. But the Court never held that this
characteristic was, in itself, sufficient to justify invalidation.

Second, the majority's requirement that Congress's Commerce
Clause legislation must be supported by a rationale with limits -- one
that renders some class of significant activity beyond Congress's
reach -- would permit courts to shirk their duty to make reasoned
decisions. If a court were allowed to strike down a statute based
solely on the principle that something must fall outside the scope of
Congress's rationale for enacting the statute, then a court would be
free of the responsibility to provide substantive reasons as to why or
how that particular statute exceeds Congress's authority. The
Supreme Court has expressly criticized its own prior use of an
approach that permitted this kind of decisionmaking:

> Although the need to reconcile state and federal interests
> obviously demanded that state immunity have some limiting
> principle, the Court did not try to justify the particular result
> it reached; it simply concluded that "a line[must] be drawn"
> and proceeded to draw that line. . . . This inability to give
> principled content . . . no less significantly than its unworka-
> bility, led the Court to abandon the distinction . . . .

Garcia, 469 U.S. at 543 (citations omitted). The majority's approach
would permit cases to be decided based on this same empty principle

205

that "a line must be drawn"; courts would not, under this approach, even be required to articulate where the line lies, or why it is there.

Moreover, we certainly may not, and Lopez does not hold that we can, strike down legislation that does not significantly interfere with state authority solely because Congress could someday enact more invasive legislation on the same reasoning as that advanced to support the statute in question. A court reviewing the constitutionality of legislation should base its decision primarily on the operation of a statute at hand, not on its belief in the unconstitutionality of another, hypothetical statute or series of statutes. Cf. Rescue Army v. Municipal Court of Los Angeles, 331 U.S. 549, 569 (1947) ("constitutional issues affecting legislation will not be determined . . . in advance of the necessity of deciding them" or "in broader terms than are required by the precise facts to which the ruling is to be applied"); Alabama State Fed'n of Labor v. McAdory, 325 U.S. 450, 461 (1945) (noting Supreme Court's long practice of refusing to decide "abstract, hypothetical, or contingent questions, or to decide any constitutional question in advance of the necessity for its decision, or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, or to decide any constitutional question except with reference to the particular facts to which it is to be applied" (citations omitted)). Courts must of course consider the implications that the statute before them may have for the federal structure established by the Constitution. But as explained earlier, and as cases such as Lopez and New York indicate, courts should only strike down legislation to protect federalism if there is some reason to believe that the representative authority of the states has been or will be unconstitutionally impaired.

Furthermore, the availability of the judicially-enforceable limitations on the commerce power, which I have described above, fatally undermines the basic premise of the majority's approach. It simply is not the case that, without its new "principled limitations" requirement, Congress would have carte blanche to regulate any activity and thereby to obliterate the division of power between the national government and the states. Well established federalism-based limits on the commerce power exist to preserve the union of independent states.

Federalism concerns already empower courts to invalidate Congressional legislation that severely interferes with the national politi-

206

cal process, such as legislation that seriously impairs accountability by commandeering state regulatory authority for federal purposes. See Printz v. United States, 521 U.S. 98 (1997); New York, 505 U.S. 144. Federalism concerns also authorize courts to strike certain legislation even if it interferes with the political process less severely. See Lopez, 514 U.S. at 583 (Kennedy, J., concurring). For example, statutes that directly supersede official state action in an area of traditional state concern are constitutionally suspect. See Lopez, 514 U.S. at 561 n.3, 564; id. at 580-83 (Kennedy, J., concurring). This is so because such statutes significantly interfere with political accountability, and because regulation in an area of traditional state concern raises the question of whether the states may be better representatives of the people than the federal government, with respect to the regulated activity. When a federal statute directly supersedes official state action in an area of traditional state concern, then (and only then) may a court properly consider whether the rationale supporting the statute contains an inherent limiting principle. Cf. id. at 564-66. In such circumstances, the danger that the approval of the statute would give Congress the power (in theory) to eliminate the distinction between federal and state government has more substance. Even statutes that lack such a limiting principle, however, should not be struck down categorically in order to satisfy "abstract notions" of theory or propositional logic, as the majority is so eager to do; rather, such statutes should be evaluated through the exercise of the kind of "practical judgment" that the Supreme Court has expressly advised courts to use in Commerce Clause cases, see, e.g., Polish Nat'l Alliance v. NLRB, 322 U.S. 643, 650 (1944), and that the Lopez Court itself employed, see, e.g., 514 U.S. at 567 (noting, with respect to the principles that guide Commerce Clause adjudication, that "[t]hese are not precise formulations, and in the nature of things they cannot be").

When these principles are applied to Subtitle C, the question of its constitutionality is not a close one; Subtitle C fits easily within these federalism-based limitations on Congress's power.

First, Subtitle C does not directly -- or indirectly -- obscure the lines of political accountability or supersede any state action. It obviously does not interfere with official state action in the way that the GFSZA did. The Lopez Court noted that "[u]nder our federal system, the `States possess primary authority for defining and enforcing the

207

criminal law.' . . . When Congress criminalizes conduct already denounced as criminal by the States, it effects a `change in the sensitive relation between federal and state criminal jurisdiction.'" Lopez, 514 U.S. at 561 n.3 (quoting Brecht v. Abraham , 507 U.S. 619, 635 (1993), and United States v. Enmons, 410 U.S. 396, 411-12 (1973)). The GFSZA disrupted the federal-state balance by giving federal officials the power to override a state prosecutor's decision not to pursue a case, as well as the power to interfere with a state prosecution by initiating a virtually identical federal action. Subtitle C, in contrast, is not a criminal statute, displaces no state criminal law, and permits no such interference with official state action.**13**

Nor, contrary to the majority's contentions, does Subtitle C directly supersede or impermissibly infringe on the states' authority to regulate family law matters. Domestic matters may be addressed in some cases brought under Subtitle C, but no state or official regulation is superseded as a result. Instead, Congress expressly limited the reach of Subtitle C in deference to traditional areas of state expertise on family law matters. See 42 U.S.C. § 13981(e)(4) (statute confers no "jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree.").

Moreover, nothing in Subtitle C otherwise supersedes or interferes with official state regulation. Victims of gender-based violence remain free to press state criminal charges and pursue state tort remedies, and states remain free to treat such claims as they will. In fact, far from displacing state law, Congress carefully designed Subtitle C to harmonize with state law and to protect areas of state concern. Subtitle C not only expressly deprives federal courts of any jurisdiction over state law domestic relations claims, 42 U.S.C.§ 13981(e)(4); it also specifically references state criminal laws in defining a "crime of

_____

**13** Because Subtitle C is not a criminal statute, reliance on and analogy to the cost of crime rationale that was rejected in Lopez is misplaced. See ante, at 28-31; 153-154 (Niemeyer, J., concurring). Congress did not attempt to justify its enactment of Subtitle C with vague references to the high cost of crime. Rather, Congress's enactment of Subtitle C was firmly rooted in rational findings, based on abundant evidence, that violence caused by gender animus substantially affects interstate commerce.

violence," 42 U.S.C. § 13981(d)(2) ("crime of violence" defined as "an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18." (emphasis added)).

Subtitle C thus acts to supplement, rather than supplant, state law. The states may still "experiment[ ] to devise various solutions" to the problems of gender-based violence. Lopez, 514 U.S. at 581 (Kennedy, J., concurring). Subtitle C simply provides victims of such violence with an independent, federal civil rights remedy as an alternative means of recovering the damages they incur.

Furthermore, Subtitle C does not regulate in an area traditionally controlled by the states, like criminal justice, as the GFSZA did. Rather, Subtitle C governs an area -- civil rights-- that has been a critically important federal responsibility since shortly after the Civil War. Consequently, no problems of political accountability lurk in the implementation of Subtitle C.

Indeed, federal action is particularly appropriate when, as here, there is persuasive evidence that the states have not adequately protected the rights of a class of citizens. In passing Subtitle C, Congress made extensive and convincing findings that state law had failed to successfully address gender-motivated violence. Congress concluded that:

> Other State remedies have proven inadequate to protect women against violent crimes motivated by gender animus. Women often face barriers of law, of practice, and of prejudice not suffered by other victims of discrimination. Traditional State law sources of protection have proved to be difficult avenues of redress for some of the most serious crimes against women. Study after study has concluded that crimes disproportionately affecting women are often treated less seriously than crimes affecting men. Collectively, these reports provide overwhelming evidence that gender bias permeates the court system and that women are most often its victims.

209

S. Rep. No. 103-138, at 49 (footnotes omitted). **14**

Congress further noted that "[e]ach and every one of the existing civil rights laws covers an area in which some aspects are also covered by State laws. What State laws do not provide, and cannot provide by their very nature, is a national antidiscrimination standard." S. Rep. No. 102-197, at 49. In Subtitle C, Congress acted in a paradigmatic area of federal expertise and passed a civil rights law in response to "existing bias and discrimination in the criminal justice system." H.R. Conf. Rep. No. 103-711, at 385.

Not only did extensive objective evidence support Congress's conclusion that the states could not effectively deal with the pervasive problem of gender-based violence, but state officials themselves confirmed the inability of the states to handle the problem. Indeed, nothing more clearly illustrates the basic difference between Subtitle C

_____

**14** The studies referred to in the above quotation were largely state-sponsored, including the following: Administrative Office of the California Courts Judicial Counsel, Achieving Equal Justice for Women and Men in the Courts (1990); Colorado Supreme Court Task Force on Gender Bias in the Courts, Gender & Justice in the Colorado Courts (1990); Connecticut Task Force on Gender Justice and the Courts (1991); Florida Supreme Court Gender Bias Study Commission, Report (1990); Supreme Court of Georgia, Gender and Justice in the Courts (1991); Illinois Task Force, Gender Bias in the Courts (1990); Maryland Special Joint Committee, Gender Bias in the Courts (1989); Massachusetts Supreme Judicial Court, Gender Bias Study of the Court System in Massachusetts (1989); Michigan Supreme Court Task Force on Gender Issues in the Courts, Final Report (1989); Minnesota Supreme Court Task Force for Gender Fairness in the Courts, Final Report (1989); Nevada Supreme Court Gender Bias Task Force, Justice For Women (1989); New Jersey Supreme Court Task Force, Women in the Courts (1984); New York Task Force on Women in the Courts, Report (1986); Rhode Island Supreme Court Committee on Women in the Courts (1987); Utah Task Force on Gender and Justice, Report to the Utah Judicial Council (1990); Vermont Supreme Court and Vermont Bar Association, Gender and Justice: Report of the Vermont Task Force on Gender Bias in the Legal System (1991); Washington State Task Force, Gender and Justice in the Courts (1989); Wisconsin Equal Justice Task Force, Final Report (1991). See S. Rep. No. 103-138, at 49 n.52.

and the GFSZA than the fact that Subtitle C responded to the states' self-described needs, while the GFSZA added a redundant layer of federal regulation in an area where most states had already acted.

Before Congress ever enacted the GFSZA, 40 states had already effectively addressed possession of guns near schools and, in fact, had enacted criminal statutes outlawing the very behavior made a federal crime in the GFSZA, Lopez, 514 U.S. at 581 (Kennedy, J., concurring); indeed, Lopez himself was originally arrested by state authorities and charged with a state crime. In sharp contrast, prior to the enactment of VAWA, 41 Attorneys General from 38 states (including Virginia), the District of Columbia, and two territories, urged Congress to enact the legislation, explaining that the states had been unable to solve the problems arising from gender-animated violence. See Crimes of Violence Motivated by Gender: Hearing Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 103d Cong. 34-36 (1993) (Letter from Attorneys General). The highest law enforcement officer in each of these jurisdictions told Congress: "Our experience as attorneys general strengthens our belief that the problem of violence against women is a national one, requiring federal attention, federal leadership, and federal funds." Id.; see also Women and Violence: Hearing before the Senate Comm. on Judiciary, 101st Cong. 137-56 (1990) (noting pervasive nature of this problem in both rural and urban areas).

When there has been, as there was here, a "demonstrated state failure" to deal with a problem, Congress would even be justified, as the Chief Justice has recently noted, in federalizing state crimes. See Chief Justice William H. Rehnquist, 1998 Year-End Report on the Federal Judiciary (January 1999).**15**  Thus, Congress was certainly jus-

_____

**15** The majority quotes the Chief Justice's criticism, in 1991, of the civil rights provision of VAWA as it had been proposed at that time. Ante at 36. That criticism pertained to an earlier, very different version of the statute, and it has not been reiterated since Subtitle C was enacted in its current form. The majority also notes that last year the Chief Justice included VAWA in a list of statutes whose enactment he regarded as bad policy. Id., at 36-37 n.12. The Chief Justice's most recent Year-End Report, however, suggests that this discomfort with VAWA primarily pertains not to VAWA's civil rights provision, but rather to its criminal

211

tified in concluding that gender-based violence qualified as a problem for which national civil rights legislation was preferable to a variety of failed state approaches.

The majority disregards this evidence in favor of its own conception of the states' needs, and ignores the structural limitations inherent in our federal system in favor of its own categorical and unprecedented limits on Congress's power. It must do so in order to find that federalism concerns require the invalidation of Subtitle C. In fact, no federalism concerns require this result: Subtitle C does not supersede or intrude on any state powers, nor does it regulate in any area of traditional state concern. Rather, Subtitle C governs civil rights, a traditional subject of federal regulation, and provides a necessary national remedy for a severe problem that the states have, by their own admission, been unable to address effectively.

D.

The proper judicial role in commerce power cases certainly does not permit courts to surrender responsibility for safeguarding federalism to Congress. Nor does it require courts to simply stand and watch while Congress federalizes whole areas of law traditionally regulated by the states. It does, however, strictly confine a court's ability to strike down an act of Congress based on judgments of a kind that an unrepresentative body is ill-equipped to make.

History and precedent demonstrate that courts are not adept in formulating rules that limit the commerce power by guaranteeing a sphere of governmental authority to the states. In order to create and enforce such rules, judges inevitably rely, as my colleagues in the majority do, upon their own conception of "what is truly national and what is truly local." Lopez, 514 U.S. at 567-68.

_____

provisions, which constitute part of the trend "to federalize crimes." Chief Justice William H. Rehnquist, 1998 Year-End Report on the Federal Judiciary (January 1999). Moreover, as noted in text above, the Chief Justice has expressly recognized that "demonstrated state failure" -- a consideration that Congress plainly relied upon in enacting Subtitle C -- makes even the federalization of state crimes acceptable. Id.

This approach directly contradicts the principles that identify a court's proper role. More than fifty years ago, the Supreme Court explained that the determination of whether an activity sufficiently affects interstate commerce

> is a matter of practical judgment, not to be determined by abstract notions. The exercise of this practical judgment the Constitution entrusts primarily and very largely to the Congress, subject to the latter's control by the electorate. Great power was thus given to the Congress: the power of legislation and thereby the power of passing judgment upon the needs of a complex society. Strictly confined though far-reaching power was given to this Court: that of determining whether the Congress has exceeded limits allowable in reason for the judgment which it has exercised.

Polish Nat'l Alliance, 322 U.S. at 650. The majority, of course, rejects a "strictly confined" judicial role. Instead, it would have courts substitute their own "abstract notions" about the proper allocation of power between the federal and state governments for the "practical judgment" that emerges from the political and legislative processes. This approach not only inflates judicial authority, it also demeans the constitutional structure, derogates congressional integrity and decisionmaking, and underestimates state power.

Even more disturbingly, the majority's ruling undermines the fundamental principle of the government under which the federal courts were created: that the people, through the mechanisms and within the limits described in the Constitution, have the ultimate authority to determine how they are to be governed. The majority today does not act to protect the rights of people underrepresented by the mechanisms of government. Rather, the majority seeks, in the name of "the People," to defend the states. Both the states and the people, however, are represented in the federal legislative process. Moreover, they are represented through mechanisms that, both practically and constitutionally, are far better designed than is the judiciary to protect their interests in preventing an improper distribution of power between the national government and the states.

My colleagues in the majority iterate and reiterate that the enumeration of powers in the Constitution reserves authority to the states,

213

that ours is a system of dual sovereignty, and that the states must operate as independent governmental bodies for that system to continue to exist. No one doubts the validity of any of these principles. The critical question, however, is who decides how they are to be upheld.

The Constitution itself provides a clear and specific answer to that question. It gives the fundamental power of government -- the power of legislation -- to Congress. Congress is not some central dictatorial assembly with interests independent of and antithetical to those of the states. Rather, Congress is composed entirely of members elected from each state to represent the interests of the people of that state, and is specifically designed to preserve state authority and protect state interests. Congressional legislation accordingly is not, as the majority suggests, a command from an autonomous central power to totally subjugated states. Congressional legislation is instead the product of the constitutionally coordinated authorities of the states, the localities, and the people. Courts thus have slender authority to invalidate the result of Congress's legislative process in order to protect the states or localities, unless there is some reason to suspect that the legislative process has been or will be unreliable.

The majority believes that we, the judiciary, know best when it comes to deciding which level of government can enact certain legislation; in essence, the majority's ruling today seeks to defend the states and the people against themselves in order to enforce its own understanding of what the federal government can properly do, and what must be left to the states. When federal courts undertake responsibility of this kind without specific constitutional support, the threat to our system of government is grave indeed.

Judges Murnaghan, Ervin, and Michael have authorized me to indicate that they join in this dissent.

214